# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| CAMERON INTERNATIONAL CORPORATION, | § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. 6:20-cv-00124 |
| v. | § § | |
| BUTCH'S RATHOLE & ANCHOR SERVICE, INC., | § § § | **JURY TRIAL REQUESTED** |
| Defendant. | § § § | |

## PLAINTIFF CAMERON INTERNATIONAL CORP.'S
## <u>OPENING CLAIM CONSTRUCTION BRIEF</u>

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  Introduction ............................................................................................................ 1

II.  Background and Asserted Patents .......................................................................... 2

    A.  Fracturing Manifolds ..................................................................................... 3

    B.  Fracturing Trees ............................................................................................ 4

    C.  Fluid Conduits ............................................................................................... 5

        1.  Prior-art frac iron—multiple fluid pathways ................................... 6

        2.  Cameron's single fluid conduit—one and only one fluid pathway ........... 8

            a.  '132 Patent ......................................................................... 9

            b.  '645 Patent ......................................................................... 9

III.  Legal Standards .................................................................................................... 14

    A.  Claim Construction ...................................................................................... 14

    B.  Indefiniteness .............................................................................................. 15

IV.  Claim Terms ......................................................................................................... 16

    A.  '132 Patent: "positioned at" ........................................................................ 17

    B.  '645 Patent: "pipe joints" ............................................................................ 18

V.  Conclusion ........................................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
  725 F.3d 1315 (Fed. Cir. 2013)...................................................................15

*Azure Networks, LLC v. CSR PLC*,
  771 F.3d 1336 (Fed. Cir. 2014)...................................................................14

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012)....................................................................15

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)....................................................................................15

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)...................................................................14

*Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017)...................................................................15

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)...................................................................15

*True Chem. Sols., LLC v. Performance Chem. Co.*,
  No. MO-18-CV-00078-ADA (W.D. Tex. Sept. 25, 2019)..............................14, 15

*Whirlpool Corp. v. Ozcan*,
  No. 2:15-CV-2103-JRG, 2016 WL 7474517 (E.D. Tex. Dec. 29, 2016).........15, 16

**Statutes**

35 U.S.C. § 112(b) .........................................................................................15

## EXHIBIT LIST

| Ex. | Description |
|-----|-------------|
| A | Declaration of Dr. Gary R. Wooley |
| B | U.S. Pat. Publ. No. 2012/0181015 A1 ("Kajaria") |
| C | *Frac Manifold*, SCHLUMBERGER OILFIELD GLOSSARY |
| D | GLOSSARY OF OILFIELD PRODUCTION TERMINOLOGY (1st ed. 1988) |
| E | U.S. Patent Publication No. 2010/0300672 ("Childress") |
| F | WAN RENPU, ADVANCED WELL COMPLETION ENGINEERING (3d ed. 2011) |
| G | *Christmas Tree*, SCHLUMBERGER OILFIELD GLOSSARY |
| H | MICHAEL ECONOMIDES AND KENNETH G. NOLTE, RESERVOIR STIMULATION (3d ed. 2000) |
| I | A DICTIONARY FOR THE OIL AND GAS INDUSTRY (1st ed. 2005) |
| J | *Frac Tree*, SCHLUMBERGER OILFIELD GLOSSARY |
| K | *Frac Head*, SCHLUMBERGER OILFIELD GLOSSARY |
| L | *Joint*, SCHLUMBERGER OILFIELD GLOSSARY |
| M | *Trunk Line*, SCHLUMBERGER OILFIELD GLOSSARY |
| N | Office Action, U.S. Patent Appl. No. 16/206,160 (Jan. 3, 2019) |
| O | Response to Office Action, U.S. Patent Appl. No. 16/206,160 (Feb. 21, 2019) |

# I.  INTRODUCTION

Butch's proposed ten terms for construction. It contends that nine are indefinite, including simple-to-understand terms like "a single fluid conduit." Butch's also argues that typical patent claim terms, like "attached to" and "positioned at," are indefinite. But all of these terms have plain and ordinary meanings, and their meanings are otherwise clear from the intrinsic record. None of the identified terms are indefinite, and a person of ordinary skill in the art (a "POSITA")—who would have significant relevant industry experience and education—would understand them with reasonable certainty.

For the remaining term, Butch's proposes that "pipe joints" means "structures for joining pipes." This contradicts the common industry usage, and the plain language of the claims, which describe the "pipe joints" as being "coupled to" connection blocks, and which describe the connection blocks themselves as joining pipes. The claims, the specification, and the entire oilfield industry use "pipe joints" to mean lengths of pipe. The Court should adopt the ordinary and customary understanding in the industry as applied the same way in the patent claims.

As to "positioned at," Cameron proposes that the Court should construe this term to mean "attached to or adjacent to." This will clarify for the jury that the connection block that is "positioned at" the fracturing tree to provide fracturing fluid to the well can be either "attached to" the fracturing tree (e.g., included as part of the stack of valves and conduits composing the fracturing tree), or "adjacent to" the fracturing tree.

As explained in detail below, the Court should find all of the proposed terms not indefinite; apply the straightforward industry-based and patent supported proposed constructions for "pipe joints" and "positioned at"; and give all of the remaining terms their plain and ordinary meanings.

1

## II.   BACKGROUND AND ASSERTED PATENTS

Hydraulic fracturing is a method of stimulating the production of oil and gas from a reservoir that involves pumping fluids downhole at high pressures and flow rates to fracture the oil and gas containing formations. Ex. A, ¶¶ 27–32. Hydraulic fracturing requires a substantial deployment of equipment to the wellsite, including frac tanks, blenders, pump trucks, and proppant storage units. *Id.* A depiction of a typical prior-art fracturing operation is below. Ex. A, ¶¶ 30–32 (annotating Ex. B, Fig. 1C).



FIG. 1C
(Prior Art)

As this figure shows, fracturing a single well 12A (red) requires deploying and connecting many pieces of fracturing equipment, such as high-pressure pumps 9A– 9E (green) mounted on pump trucks 5A–5E (purple) for providing fracturing fluid to well 12A. *Id.*

The depiction of the connections between these components, including fluid conduits 10A– 10E (blue) between the outlets of the high-pressure pumps and the single well 12A, is "vastly simplified," as the complexity of the interconnections "is significant and expensive." *Id.* (quoting Ex. B, [0011]). Given this complexity, moving the equipment to fracture the next well (*e.g.*, 12B (outlined red)) introduces significant downtime between fracturing operations, increasing costs and delaying production. *Id.*

This dispute concerns three components of modern fracturing—fracturing manifolds, fracturing trees, and the fluid conduits that connection them—that together reduce the costs and delays of moving fracturing operations from one well to the next in prior-art fracturing systems.

2

## A.     Fracturing Manifolds

A fracturing manifold is a series of pipes, connections, and valves that direct fracturing fluid from the fracturing fluid supply toward the individual wells. *Id.* ¶ 33; Ex. C (defining "frac manifold" as "[a] system of frac valves that directs treatment fluid from the missile to multiple frac trees"); Ex. D (defining "manifold" as "[a]n accessory system of valves and piping to a main piping system (or other conductors) that serves to divide a flow into several parts, to combine several flows into one, or to reroute a flow to any one of several possible destinations").

The illustration below shows how fracturing manifolds can simplify fracturing multiple



Fig. 1

wells by allowing operators to make connections 52 (yellow highlighted number) (analogous to the simplified connections 10A–10E depicted above) to each well 48 (red highlighted number) in advance. Ex. A ¶¶ 34–36; Ex. E, [0019], [0021] (noting valves 38 (green highlighted number) control flow into the high pressure lines 52 so that "a single valve 38 is capable of controlling the entire pumping and isolation functions for one well 14").

The operator can then redirect the fracturing fluid to a particular well by opening a corresponding valve 38. Ex. A ¶¶ 34–36; Ex. E, [0019], [0021]. But as explained below, connections 52 between a prior-art fracturing manifold's

3

outlet and its respective well are complex and expensive, and the high pressures inherent to hydraulic fracturing may require upgraded equipment at the wellhead. Ex. A, ¶¶ 45–50.

## B.     Fracturing Trees

One such piece of upgraded wellhead equipment is a fracturing tree. Fracturing trees are a specific type of Christmas tree installed specifically for the fracturing process. Ex. A, ¶¶ 49–50; Ex. J (defining "frac tree" as "[a] Christmas tree installed specifically for the fracturing process."). A Christmas tree is "[a]n assembly of valves, spools, pressure gauges, and chokes fitting to the wellhead of a completed well to control production." Ex. G; Ex. A, ¶¶ 42–44; Ex. F, CMRN000961 ("A 'Christmas tree' is an assembly consisting of valves and fittings and is used for controlling oil- and gas-well fluid and providing outlets and inlets for produced fluid and washing fluid, and so on."). An operator installs the Christmas tree on top of a wellhead assembly (a system of valves and adapters at the wellbore's surface termination). Ex. A, ¶¶ 42–43; Ex. F, CMRN000960.

The figure at right depicts a typical Christmas tree. Ex. A, ¶¶ 44–45; Ex. G (enlarged). Although there are various types of Christmas trees designed for specific uses (Ex. F, CMRN000961), the components of typical Christmas trees have production pressure ratings. Ex. A, ¶¶ 44–50; Ex. I



(defining "Christmas Tree" as "used when reservoir pressure is sufficient to cause reservoir fluids to flow to the surface"); Ex. D (defining "Christmas Tree" as a device "to control well

production"). As this suggests, using typical Christmas trees for much higher pressure operations like fracturing may lead to costly and dangerous failures. Ex. A, ¶¶ 44–50.

One way operators can avoid these costly and dangerous failures is by using isolation equipment when a typical Christmas tree is in place during a fracturing operation. Ex. A, ¶ 47. Tree savers, for instance, are isolation equipment that can protect the Christmas tree and the wellhead from the high fracturing pressures and abrasive fracturing materials. Ex. H, CMRN000521; Ex. A, ¶ 47. The tree saver mounts on the existing Christmas tree, and a mandrel extends through the valves on the tree and into the tubing to prevent the fluid or pressure from directly reaching the tree. Ex. H, CMRN000521; Ex. A, ¶ 47. After fracturing is complete, the operator removes the tree saver, and the Christmas tree and wellhead valves can operate normally to control the flow of production fluid. Ex. H, CMRN000521; Ex. A, ¶ 47.

Alternatively, an operator can replace the Christmas tree with a fracturing tree. Ex. A, ¶¶ 48–50; Ex. J (defining "frac tree" as "[a] Christmas tree installed specifically for the fracturing process."). Although frac trees may look similar to typical Christmas trees, and share many components, "[f]rac trees generally have larger bores and higher pressure ratings than production trees to accommodate the high flow rates and pressures necessary for hydraulic fracturing." Ex. J; Ex. A, ¶¶ 48–50. To provide for these higher pressure ratings and flow rates, fracturing trees comprise heavier-duty materials and valves than typical Christmas trees. Ex, A, ¶ 49. These upgrades make fracturing trees more expensive, heavier, and bulkier. *Id.*

C. **Fluid Conduits**

Connecting the fracturing tree to the fracturing manifold can be complex. *Id.*, ¶¶ 37–41. As explained above, the fracturing tree is large and heavy, and is in a fixed position above the wellbore. *Id.* The fracturing manifold, likewise comprising heavy-duty pipes and valves that can withstand the pressures and abrasive materials inherent to fracturing, is also large and heavy. *Id.*

5

And it is in a fixed position to best accommodate bringing fluid to multiple wells from the various mixers and pumps. *Id.* Because of this, the outlets of fracturing manifolds and the inlets of fracturing trees generally do not align, vertically or horizontally. *Id.* Connecting fracturing manifolds to fracturing trees thus usually requires installing fluid conduits that can change direction between the respective outlets and inlets. *Id.*

### 1. Prior-art frac iron—multiple fluid pathways



The prior art solved this problem of making the vertical and horizontal changes necessary to connect the fracturing manifold to the fracturing tree (while also providing sufficient flow rate and pressure) by using multiple pieces of smaller-diameter fluid conduits called "frac iron," or "treating iron." *Id.*, ¶ 37; Ex. H, CMRN000521–000523. As the annotated figure at left shows, crosses or tees at the outlet of prior-art fracturing manifolds may provide outlets for connecting multiple pieces of frac iron (connections 52). Ex. E, Fig. 1 (annotated and excerpted), [0019]; Ex. A, ¶ 37.

To provide inlets for multiple pieces of frac iron, a fracturing tree includes a flow cross, commonly called a "frac head." Ex. A, ¶ 51; Ex. K (defining "frac head" as "[a] flow cross installed on top of a frac tree where treating iron is connected and treatment fluid enters the frac




tree") (noting "goat head" as an alternative form of the term); Ex. J ("A frac tree typically consists of upper and lower master valves, flow cross, wing valves, goat head, and swab valve."). As the green arrows in the above annotated images of typical frac heads show, frac heads include multiple inlets for connecting frac iron to the fracturing tree. Ex. A, ¶ 51.

The below figure shows how the frac iron lines running between the flow cross at the fracturing manifold and the frac head at the fracturing tree provide multiple fluid pathways between the fracturing manifold and the fracturing tree. Ex. E, Fig. 1 (annotated); Ex. A, ¶¶ 33–36. With the valves 38 (outlined red) closed, and the valve 38 (outlined green) open, the fracturing fluid will flow (blue arrows) through the outlet cross 40 at the fracturing manifold, through high pressure lines 52 (the frac iron), and into inlet connections 54 on the frac head at frac tree 48. Ex. E, [0019], [0021]; Ex. A, ¶¶ 33–36, 51. As this figure reflects, each high pressure line 52 thus represents a separate fluid pathway between the fracturing manifold and frac tree 48. Ex. A, ¶¶ 33–35.



To facilitate the horizontal and vertical adjustments necessary to align frac iron along the ground from the fracturing manifold and up to the frac head inlets (generally at or near the top of the fracturing tree), multiple segments of frac iron connect using hammer unions. Ex. A, ¶¶ 39–41. A typical make-up requires dozens of these hammer unions, which, as the name implies, workers must install using repeated sledgehammer strikes, as in the image at right. *Id.* Aside from complicating frac iron connections, hammer unions have



7

other disadvantages. *Id.* Each of the dozens of hammer unions between a frac manifold's outlet and the corresponding inlet at a fracturing tree represents a potential point of failure because of the high pressures. *Id.* These connections are often the source of simultaneous leaks. *Id.*



Even properly installed frac iron increases the risk of worksite injuries and leaks. *Id.* Crisscrossing frac iron creates a hazardous "spaghetti plate" at the wellsite. *Id.* This requires the use of tie-downs to decrease vibrations in, and movement of, the frac iron. *Id.* And using multiple, smaller-diameter fluid conduits during high-pressure fracturing operations increases the likelihood of leaks, while also creating bottlenecks in the flow path. *Id.* For these reasons, and those obvious from the picture above, workers have coined the derisive term "fractapus" to describe the jumble of frac iron running to the frac head atop a fracturing tree in a traditional fracturing operation. *Id.*

### 2. Cameron's single fluid conduit—one and only one fluid pathway

Some inventions in U.S. Patent Nos. 9,915,132 (ECF No. 1-1) (the "'132 Patent") and 10,385,645 (ECF No. 1-2) (the "'645 Patent") (collectively, the "Asserted Patents") seek to solve

the problems explained above by, among other things, simplifying the connections to fracturing trees by enabling the use of a single, larger-diameter fluid conduit instead of multiple pieces of prior art iron, providing one and only one fluid pathway between the fracturing manifold and each fracturing tree.

### a.    '132 Patent

The '132 Patent teaches methods and systems to "accommodate spacing and elevation differences" when connecting fracturing trees. *See, e.g.*, '132 Patent at Abstract; Ex. A, ¶ 53. In some embodiments, the '132 Patent discloses a single fluid conduit to the fracturing tree comprising connection blocks 42 connecting lengths of conduit (*e.g.*, pipe sections) together to accommodate for these differences in space and elevation. *See* '132 Patent at 5:62–6:3.

Asserted Claims 9 and 12 describe such embodiments. Claim 9 requires "a single fluid conduit coupled to the well fracturing tree," where "the single fluid conduit includes . . . a first connection block positioned at the well fracturing tree" and "a second connection block," with "one or more pipe sections coupled between the first connection block and the second connection block." *Id.* Although some dependent claims (*e.g.*, Claim 11) require adding adjustment joints, the embodiment in Claim 9 is broader, and provides for vertical and horizontal adjustments of the fluid conduit by using individual lengths of pipe through the connection blocks. *Id.*; Ex. A, ¶ 54. While Claim 9 requires only a single well fracturing tree, Claim 12 (which depends from Claim 9) describes an embodiment comprising another well fracturing tree—which a POSITA would understand to connect to the system just as the independent claim describes. Ex. A, ¶¶ 53–55.

### b.    '645 Patent

The '645 Patent similarly teaches, among other things, systems and methods for providing a single fluid pathway between a fracturing manifold and a fracturing tree instead of prior-art frac iron. *See, e.g.*, '645 Patent at 9:25–28 ("Like some other embodiments described above, the

fracturing system depicted in Fig. 11 uses only a single fluid conduit 26 per fracturing tree 20 rather than using multiple, smaller fluid conduits."); Ex. A, ¶¶ 56–64.

### i. Connection blocks and pipe joints

Annotated Figure 11 below reflects one such embodiment. *Id.*; '645 Patent at 8:49–57, 9:9–38. The fluid conduit in this embodiment comprises several pipes 170 (yellow highlighted numbering) that connect to each other through connection blocks 172 (green highlighted numbering). '645 Patent at 8:49–57. Claim 1 requires a fracturing manifold, a plurality of fracturing trees (*e.g.*, element 20 (red)), and a plurality of fluid conduits (*e.g.*, the blue-shaded element in Figure 11). *See id.* at Claim 1.



FIG. 11

The plurality of fluid conduits couples the fracturing manifold to the fracturing trees. *Id.* Any individual fluid conduit to a fracturing tree can comprise one or more rigid fluid components connected in series (as with the six pipes 170 in Figure 11). *Id.* But Claim 1 requires that there is ultimately "one and only one rigid fluid pathway from the fracturing manifold to the fracturing tree," like the shaded blue fluid conduit from Figure 11. *See id.* In other words, Claim 1 excludes solutions like multiple pieces of prior-art frac iron that would provide multiple fluid pathways between the fracturing manifold and the fracturing tree. Ex. A, ¶¶ 57–63.[1]

---

[1] This is also clear from the prosecution history. The Examiner at first rejected Claim 1 for double-patenting over U.S. Patent No. 9,932,800. Ex. N at CMRN000288–000289. The Examiner

Claim 1 further requires that the rigid fluid pathway include pipe joints (*e.g.*, pipes 170 in the Figure 11 embodiment)[2] and connection blocks. '645 Patent at Claim 1. Although some dependent claims (*e.g.*, Claims 5–6) require adjustment joints, Claim 1 does not. *Id.* Claim 1 is broader. It also includes the embodiments where the pipe joints and connection blocks can "be rotated to desired positions before assembling these components together (*e.g.*, via studded connections)" to achieve the desired horizontal and vertical adjustments to connect the outlet of the fracturing manifold to the inlet of the fracturing tree. *Id.* at 8:37–43.



Claim 1 also requires a specific arrangement of the pipes and connection blocks, an example of which the annotated Figure 11 at right highlights.[3] Ex. A, ¶¶ 60–61. For instance, Claim 1 requires "a first pipe [green arrow] that is attached to a first connection block [yellow arrow] via a first flanged connection [purple

---

understood the '800 Patent to require that "the fracturing trees are coupled to the fracturing manifold by only one rigid fluid conduit." *Id.* at CMRN000291. After a telephonic interview, the applicant amended Claim 1 in further accordance with the prior-issued '800 Patent to add the "one and only one rigid fluid pathway" limitation to clarify this point. *See* Ex. O at CMRN000322, 000329. The applicant differentiated Claim 1 from the relevant claims in the '800 Patent by amending to require the specific arrangement of pipes and connection blocks in series that appear in the issued claim. *Id.* at CMRN000329. The applicant and Examiner thus understood Claim 1 to exclude embodiments, like those using prior-art frac iron, where there are multiple fluid pathways between the fracturing manifold and the fracturing tree.

[2] As Cameron will explain in more detail below, the ordinary and customary meaning of "pipe joint" in the art is "a length of pipe." *See, e.g.*, Ex. D (defining "joint" as "[a] length of pipe"); Ex. L (defining "joint" as "[a] length of pipe"); Ex. A, ¶¶ 23, 70–75 (confirming these definitions).

[3] Because there are more than two pipe joints and connection blocks in the Figure 11 embodiment, there are other ways to read Claim 1 onto this configuration.

arrow].” '645 Patent at Claim 1. It further requires "a second pipe [orange arrow] that is in fluid communication with the first pipe and is attached to a second connection block [silver arrow] via a second flanged connection [pink arrow]." *Id.*

### ii.    Trunk lines and outlet branches

Some embodiments of the '645 Patent require a shared trunk line and outlet branches.[4] The shared trunk line generally refers to the portion of the fracturing manifold where pressurized fluid enters, and from which fluid flows to the fracturing manifold's various outlet branches. *See, e.g.*, '645 Patent at Abstract ("[t]he fracturing manifold can include a trunk line that provides fracturing fluid to multiple outlet branches"), 1:66–2:4 ("In some instances, a fracturing manifold includes a trunk line for providing fracturing fluid to multiple outlet branches of the manifold."); Ex. A, ¶¶ 62–63; Ex. I (defining "trunkline" as "a main line"); Ex. M (defining "trunk line" as "[f]langed piping that connects the missile to each leg on a frac manifold").[5]

With that in mind, the outlet branches are extensions from the shared trunk line that, in some embodiments, can bring the manifold's outlet and valves closer to the well. *See, e.g.*, '645 Patent at Abstract ("[outlet branches] can include valves for controlling flow of fracturing fluid to wells downstream of the valves"), 1:66–2:4 ("the multiple outlet branches can include valves for controlling flow of fracturing fluid toward wells from the trunk line"); Ex. A, ¶¶ 62–63.

For example, annotated Figure 10 (below) from the '645 Patent reflects one such configuration. *Id.* In this configuration, the visible portion of fracturing manifold 22's shared trunk

---

[4] Some claims use the term "trunk line," while others use the term "shared trunk conduit." Both terms describe the same element. *See* Ex. A, ¶ 62.

[5] The term "missile" refers to the component where the pumps pressurize the fracturing fluid and that then provides the pressurized fracturing fluid to the fracturing manifold. *See* Ex. A, ¶ 62.

line (green) includes conduit 42 and connection blocks 48 and 50. *See* '645 Patent at 1:66–2:4, 8:26–48. The outlet branches (purple) are the manifold's extensions from the shared trunk line, which in this embodiment comprise a pair of valves 46 and 44, respectively. *See id.*, Claim 3 (requiring valves in the outlet branches), Claim 4 (requiring "a first outlet branch having two valves connected in series" and "a second outlet branch having two valves connected in series").



FIG. 10

In this embodiment, fluid connection 26 (blue) between the fracturing manifold and the fracturing tree (red) begins at the outlet of the respective valves 46 and 44. *See* '645 Patent at 1:66–2:4, 8:26–48. In other embodiments, the outlet branches might not have valves, and the manifold valves might be in different locations. *See id.* at Claim 2 (requiring outlet branches but not requiring they contain valves). The green shared trunk line can extend and include additional outlet branches to service additional wells.

\* \* \* \* \*

In sum, the Asserted Patents teach (among other things) systems and methods that use a single, rigid, larger-diameter fluid conduit in place of multiple lines of smaller-diameter frac iron. Ex. A, ¶¶ 56–65. Many advantages of this change—like simplifying the setup and eliminating

potential points of failure by providing a single fluid pathway between the fracturing manifold and the fracturing tree—are evident from comparing Cameron's commercial embodiment, MONOLINE™ (below, left), with a prior-art fracturing job using frac iron (below, right). *Id.*

 

### III. LEGAL STANDARDS

#### A. Claim Construction

Courts must generally give claim terms their plain and ordinary meanings. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds) (internal quotations omitted). The plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips*, 415 F.3d at 1313.

"Although extrinsic evidence can also be useful, it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *True Chem. Sols., LLC v. Performance Chem. Co.*, No. MO-18-CV-00078-ADA, at 3 (W.D. Tex. Sept. 25, 2019) (quoting *Phillips*, 415 F.3d at 1317). "Technical dictionaries may be helpful, but they may also provide definitions that are too broad or not indicative of how the term is used in the patent." *Id.* "Expert testimony also may be helpful," but it should be supported and well-reasoned. *Id.*

14

There are ultimately "'only two exceptions to [the] general rule' that claim terms are construed according to their plain and ordinary meaning." *Id.* (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). These two exceptions arise "when the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution." *Id.* "To act as his/her own lexicographer, the patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *Id.* at 3–4 (quoting *Thorner*, 669 F.3d at 1365). Disavowing claim scope requires "a clear disavowal." *Thorner*, 669 F.3d at 1366. So when "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable," and those statements cannot provide a clear disavowal of claim scope. *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## B. Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter of the invention. 35 U.S.C. § 112(b). This does not demand absolute precision—claims are indefinite only if "read in light of the specification delineating the patent, and the prosecution history, [they] fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). As it challenges a patent's validity, a challenger must show the failure of any claim for indefiniteness by clear and convincing evidence. *Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

In the end, "indefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). And conclusory assertions of indefiniteness cannot meet the clear and convincing burden. *See, e.g.*, *Whirlpool Corp. v. Ozcan*, No. 2:15-CV-2103-JRG, 2016 WL 7474517, at *3 (E.D. Tex. Dec. 29, 2016) (finding defendant "failed to meet the high burden necessary to establish that the relevant claims

are indefinite" where "[i]nstead of submitting evidence, such as an expert declaration, to demonstrate the understanding of a person of ordinary skill in the art, [defendant] relie[d] entirely on attorney argument based on the patent's intrinsic evidence") (Gilstrap, J.).

## IV.    CLAIM TERMS

Butch's contends that every claim term but one (pipe joints) is indefinite. These terms, however, have plain and ordinary meanings that a POSITA would easily understand within the context of the claims with reasonable certainty. The discussion above about the technology disclosed in the patents shows this because it explains (and in many cases illustrates) within the context of the claims, and based on the skill and knowledge of a POSITA, many terms that Butch's contends are indefinite. *See, e.g.*, § II(c)(2), *supra* (discussing and/or illustrating "a single fluid conduit," "fracturing trees," "one and only one rigid fluid pathway," "one rigid fluid conduit," "outlet branches," "pipes," "connection blocks," and "studded connections").

That the claims are not indefinite is also apparent from the declaration of Dr. Gary R. Wooley. As his declaration explains, Dr. Wooley has the requisite education, training, and experience of one of ordinary skill in the art. *See* Ex. A at ¶¶ 1–11, 24–26. After reviewing the claims, the specification, and the prosecution history, Dr. Wooley is unequivocal that a POSITA would understand these terms with reasonable certainty. *See id.* at ¶¶ 23, 66–67.

As to Butch's positions, it has not explained why simple terms like "fluid conduit" do not have a plain and ordinary meaning and are not capable of construction with reasonable clarity. But Butch's has informed Cameron that it will not rely on any expert to support its indefiniteness arguments. Courts facing this situation—where one party argues indefiniteness with no expert testimony support, and the other has evidence and expert testimony to support a term's meaning— have rejected indefiniteness. *See Whirlpool Corp.*, 2016 WL 7474517, at *3 (finding defendant "failed to meet the high burden necessary to establish that the relevant claims are indefinite" where

"[i]nstead of submitting evidence, such as an expert declaration, to demonstrate the understanding of a person of ordinary skill in the art, [the defendant] relie[d] entirely on attorney argument based on the patent's intrinsic evidence" because "[t]he Court finds such argument unpersuasive"). That said, because the bases for Butch's indefiniteness contentions are unclear, Cameron will respond to Butch's specific arguments after Butch's reveals them in its opening brief.

For now, Cameron will focus on the only terms for which either party has proposed a construction: "positioned at" from the '132 Patent, and "pipe joints" from the '645 Patent. The Court should adopt Cameron's proposed constructions for both for the reasons explained below.

## A. '132 Patent: "positioned at"

| Claim 9 | |
|---|---|
| Cameron's Proposed Construction | Butch's Proposed Construction |
| "attached to or adjacent to" | Indefinite |

Claim 9 requires "a first connection block *positioned at* the well fracturing tree." '132 Patent at Claim 9 (emphasis added). This claim also requires that "fracturing fluid can be routed . . . to the well fracturing tree through the first connection block." A POSITA would understand this to mean that the second connection block is attached to the fracturing tree (*e.g.*, as part of the stack of valves comprising the fracturing tree), or adjacent to the fracturing tree, to facilitate the flow of fracturing fluid into the wellbore. *See* Ex. A, ¶¶ 68–69.

This understanding fits with dependent Claim 10, which requires the connection block to be "attached to a valve of the well fracturing tree." Butch's is wrong that this term is indefinite. As explained above, based on the claim language and the intrinsic record, a POSITA would understand with reasonable certainty how the first connection block is positioned at the well. *See* Ex. A, ¶¶ 68–69. The Court should therefore find this term not indefinite, and construe it to mean "attached to or adjacent to."

## B.     '645 Patent: "pipe joints"

| Claim 1 | |
| --- | --- |
| Cameron's Proposed Construction | Butch's Proposed Construction |
| "lengths of pipe" | "structures for joining pipes" |

Claim 1 requires "a plurality of pipe joints and connection blocks coupled to one another," and describes "the plurality of pipe joints and connection blocks" as including "a first pipe that is attached for a first connection block" and "a second pipe that is . . . attached to a second connection block." As this shows, the "plurality of pipe joints" (which are described as "coupled to" the connection blocks) include the first and second pipes later described as "attached to" the first and second connection blocks, respectively. *See* Ex. A, ¶¶ 70–75.

The specification supports this understanding of Claim 1 for the reasons that Section II(c)(2)(b)(i), *supra*, illustrates. For instance, Figures 10 and 11 show embodiments where fluid conduit 26 comprises lengths of pipe connected to connection blocks in the manner described in Claim 1. The specification further refers to element 170 alternately in the same paragraph as "pipe joints 170" and "pipes 170." *See* '645 Patent at 8:29–43. As shown in the annotated Figures above, such as Figures 10 and 11, element 170 is a length of pipe, not a structure for joining pipes. In short, the intrinsic record supports Cameron's position that "pipe joints" refers to "lengths of pipe," and nothing in the intrinsic record suggests that "pipe joints" are distinct from "pipes," or that "pipe joints" means "structures for joining pipes," as Butch's proposes. *See* Ex. A, ¶¶ 71–73.

In any event, Butch's proposal is particularly inappropriate given the language of Claim 1, as it would require coupling "structures for joining pipes" with connection blocks—which are, as Claim 1 requires, themselves structures for joining pipes. *Id.*, ¶ 71; '645 Patent at 9:34–38 ("Additionally, although the pipes 170 are shown connected orthogonally to one another via the connection blocks 172 in the present embodiment, other embodiments could include pipes 170

connected to one another at different angles."), Claim 1 ("a first pipe that is attached to a first connection block . . . a second pipe that is . . . attached to a second connection block"), Claim 7 ("the second pipe is also attached to the first connection block"), Claim 8 ("the first pipe and the second pipe are connected orthogonally to one another via the first connection block"), Claims 10–11, Claim 14, Claim 17, Claim 20, Figs. 3, 10–11.

And the intrinsic record's use of "pipe joints" to mean "lengths of pipe" adheres to the ordinary and customary use in the industry. *See* Ex. L (defining "joint" as "[a] length of pipe"); Ex. D (defining "joint" as "[a] length of pipe"); Ex. A, ¶ 74 (concurring with these definitions). Unlike Butch's proposal, which conflates the pipe joints and connection blocks, Cameron's proposal also clarifies the claim language for the jury. *See, e.g.*, '645 Patent at Claim 1 ("a plurality of [lengths of pipe] and connection blocks coupled to one another . . . including: a first pipe that is attached to a first connection block . . . and a second pipe that is . . . attached to a second connection block"). The Court should thus construe "pipe joints" consistent with the intrinsic record, and its ordinary and customary meaning in the industry, to mean "lengths of pipe."

## V.    CONCLUSION

As the above discussion shows, a POSITA would understand all the identified terms with reasonable certainty. The Court should therefore find all the claims not indefinite; adopt Cameron's proposed constructions for "positioned at" and "pipe joints"; and give the remaining terms their plain and ordinary meanings.

DATED: July 15, 2020

Respectfully submitted,

By: */s/ John R. Keville*
John R. Keville
Texas Bar No. 00794085
jkeville@winston.com
Merritt D. Westcott (*Pro Hac Vice*)
Texas Bar No. 24027091
mwestcott@winston.com
William M. Logan
Texas Bar No. 24106214
wlogan@winston.com
Evan D. Lewis (*Pro Hac Vice*)
Texas Bar No. 24116670
edlewis@winston.com
WINSTON & STRAWN LLP
800 Capitol Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 651-2600
Facsimile: (713) 651-2700

ATTORNEYS FOR PLAINTIFF,
CAMERON INTERNATIONAL
CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of July, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> David G. Henry, Sr.
> DHenry@GrayReed.com
> Eric S. Tautfest
> etautfest@GrayReed.com
> Jared Hoggan
> jhoggan@GrayReed.com
> GRAY REED & MCGRAW LLP
> 900 Washington Avenue, Suite 800
> Waco, Texas 76701
>
>
> M. Jill Bindler
> jbindler@GrayReed.com
> David T. DeZern
> ddezern@GrayReed.com
> David M. Lisch
> dlisch@GrayReed.com
> GRAY REED & MCGRAW LLP
> 1601 Elm Street, Suite 4600
> Dallas, Texas 75201
>
> ATTORNEYS FOR DEFENDANT BUTCH'S
> RATHOLE & ANCHOR SERVICE, INC.

 /s/ John R. Keville
 John R. Keville

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| CAMERON INTERNATIONAL CORPORATION, | § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. 6:20-cv-00124 |
| v. | § § | |
| BUTCH'S RATHOLE & ANCHOR SERVICE, INC., | § § § | **JURY TRIAL REQUESTED** |
| Defendant. | § § § | |

**PLAINTIFF CAMERON INTERNATIONAL CORP.'S**
**<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page**

I. Introduction ................................................................................................... 1

II. Claim Construction Principles ....................................................................... 2

III. Disputed Claim Terms .................................................................................. 3

    A. '132 Patent ............................................................................................ 3

        1. "a single fluid conduit" / "a single fluid conduit coupled to the well fracturing tree" ................................................................................ 3

        2. "positioned at" ............................................................................... 6

        3. "comprising an additional well fracturing tree" ............................ 7

    B. '645 Patent ............................................................................................ 8

        1. "one and only one rigid fluid pathway" ........................................ 8

        2. "at least one rigid fluid conduit" / "the at least one rigid fluid conduit" .......... 11

        3. "pipe joints" ................................................................................ 13

        4. "outlet branch(es)" ...................................................................... 16

        5. "the second connection block"; "the second pipe"; "the third studded connection" ............................................................... 17

        6. "the second pipe"; "the first pipe"; "the third pipe" ..................... 18

IV. Conclusion .................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008)................................................................................12

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
    616 F.3d 1249, 1255 (Fed. Cir. 2010)......................................................................15

*Bradford Co. v. Conteyor N. Am., Inc.*,
    603 F.3d 1262 (Fed. Cir. 2010)..................................................................................5

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH*,
    224 F.3d 1308 (Fed. Cir. 2000)................................................................................14

*Capital Sec. Sys., Inc. v. NCR Corp.*,
    725 F. App'x 952 (Fed. Cir. 2018) ...........................................................................11

*Carnegie Steel Co. v. Cambria Iron Co.*,
    185 U.S. 403 (1902)....................................................................................................2

*Enzo Biochem, Inc. v. Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010)..............................................................................6, 7

*Fisher-Price, Inc. v. Graco Children's Products, Inc.*,
    154 F. App'x 903 (Fed. Cir. 2005) .............................................................................5

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008)................................................................................14

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)................................................................................................2, 7

*Nevro Corp. v. Boston Scientific Corporation*,
    955 F.3d 35 (Fed. Cir. 2020)................................................................................2, 10

*Quest Diagnostics Investments LLC v. Lab. Corp. of Am. Holdings*,
    No. CV-18-1436 (MN), 2020 WL 210799 (D. Del. Jan. 14, 2020) ......................4, 7

*Schoenhaus v. Genesco, Inc.*,
    440 F.3d 1354 (Fed. Cir. 2006)................................................................................15

*Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017)..................................................................................2

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..................................................................................4

*True Chem. Sols., LLC v. Performance Chem. Co.*,
   No. MO-18-CV-00078-ADA (W.D. Tex. Sept. 25, 2019) .......................................................2

*Whirlpool Corp. v. Ozcan*,
   No. 2:15-CV-2103-JRG, 2016 WL 7474517 (E.D. Tex. Dec. 29, 2016) ..................................2

**Statutes**

35 U.S.C. § 271(a) ...............................................................................................................................6

# I.     INTRODUCTION

Butch's contends that nine of the ten terms it proposed for construction are indefinite. But claims are indefinite only if, viewed in light of the specification and prosecution history, they do not inform those skilled in the art about the scope of the invention with reasonable certainty. Butch's provides no evidence that one skilled in the art would not be able to determine the scope of the claimed invention but relies solely on attorney argument.

Contrary to Butch's assertions, Cameron's patents provide extensive intrinsic evidence about the meanings of the terms Butch's alleges are indefinite. The extrinsic evidence Cameron sets forth below, and in its opening claim construction brief, also support those meanings. Cameron's expert, Dr. Gary R. Wooley,[1] describes the state of the art and the claim terms, applies the claim terms to some embodiments disclosed in the specifications, and explains the claim terms in the context of the prior art. Dr. Wooley concludes that one skilled in the art would understand the challenged terms with reasonable certainty, and supports his conclusions with references to the intrinsic and extrinsic evidence, including industry textbooks and dictionaries. Finally, as to the solitary claim term for which Butch's proposes a construction ("pipe joints"), Butch's provides no intrinsic or extrinsic evidence for its construction.

Butch's has failed to show that Cameron's claim terms are indefinite by clear and convincing evidence, or that its proposed construction of "pipe joints" is proper. The Court should adopt Cameron's proposed constructions because they accord with the intrinsic and extrinsic evidence, including the opinion of an expert in the field of the patented inventions.

---

[1] Dr. Wooley is a person of ordinary skill in the art (a "POSITA") for the subject matter in the Asserted Patents. ECF No. 27-1, ¶¶ 24–26.

## II.     CLAIM CONSTRUCTION PRINCIPLES

As Butch's noted, this Court has summarized the claim construction standard well in other cases. *See, e.g.*, *True Chem. Sols., LLC v. Performance Chem. Co.*, No. MO-18-CV-00078-ADA, at 3 (W.D. Tex. Sept. 25, 2019). As to indefiniteness, Butch's must prove the claim terms indefinite by clear and convincing evidence. *Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). Claims are indefinite only if, when "read in light of the specification delineating the patent, and the prosecution history, [they] fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898, 901 (2014).

But definiteness does not demand "absolute precision." *Id*. A claim is not indefinite just because it is susceptible to differing interpretations, as this would render nearly every claim term indefinite whenever a party could manufacture a plausible alternative construction. *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020). Instead, the patent may provide reasonable certainty about a claimed inventions' scope by giving detailed guidance and examples of claimed systems and devices. *Nevro Corp.,* 955 F.3d at 39.

Moreover, "patents are 'not addressed to lawyers, or even to the public generally,' but to those skilled in the relevant art." *Nautilus*, 572 U.S. at 901 (quoting *Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 437 (1902)). Because the indefiniteness inquiry turns on the understanding of a POSITA, courts have declined to find indefiniteness when, as here, a defendant provides only attorney argument about the intrinsic evidence. *See, e.g.*, *Whirlpool Corp. v. Ozcan*, No. 2:15-CV-2103-JRG, 2016 WL 7474517, at *3 (E.D. Tex. Dec. 29, 2016) (finding claims definite where "[i]nstead of submitting evidence, such as an expert declaration, to demonstrate the understanding of a person of ordinary skill in the art, [defendant] relies entirely on attorney argument based on the patent's intrinsic evidence"). Here, Butch's provides just argument but no evidence, and

certainly not clear and convincing evidence that a POSITA would not understand the scope of the relevant claims with reasonable certainty.

### III.    DISPUTED CLAIM TERMS

#### A.    '132 Patent

The '132 patent generally describes various arrangements for fracturing systems. *See, e.g.*, ECF No. 1-1 at Abstract; ECF No. 27-1, ¶ 53. As Dr. Wooley explains, some embodiments of the '132 patent specification disclose using a single fluid conduit to the fracturing tree, where that single fluid conduit comprises connection blocks between lengths of pipe (*e.g.*, pipe sections). ECF No. 27-1 ¶¶ 53–55; ECF No. 1-1 at 5:62–6:3.

Butch's argues that the claimed subject matter is "remarkably simple" and uses "only well-known industry components," but also argues that the disputed claim terms are not understandable. ECF No. 28 at 2. As Cameron explains below, however, a POSITA would understand these simple terms with reasonable certainty.

**1. "a single fluid conduit" / "a single fluid conduit coupled to the well fracturing tree"**

| Claim 9 | |
|---|---|
| **Cameron's Proposed Construction** | **Butch's Proposed Construction** |
| **"a single fluid conduit"** <br> Plain and ordinary meaning | **"a single fluid conduit"** <br> Indefinite |
| **"a single fluid conduit coupled to the well fracturing tree"** <br> Plain and ordinary meaning: "a single fluid conduit coupled to a specific type of Christmas tree installed specifically for the fracturing process" | **"a single fluid conduit coupled to the well fracturing tree"** <br> Indefinite <br> ("fracturing tree": plain and ordinary meaning) |

Claim 9 describes a "well fracturing tree" and "a single fluid conduit coupled to the well fracturing tree." ECF No. 1-1. Butch's argues incorrectly that "[t]here is no source of cognizable

guidance for providing reasonable notice as to what point an operator has (or has not) a 'single' fluid conduit." ECF No. 28 at 3.

First, the words are not complicated. Butch's does not argue that they are, nor that the patentee gave the words any special meanings. This should resolve the issue. *See, e.g.*, *Quest Diagnostics Invests. LLC v. Lab. Corp. of Am. Holdings*, No. CV-18-1436 (MN), 2020 WL 210799, at *5 (D. Del. Jan. 14, 2020) (finding "common words with common meaning" not indefinite); *cf. Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (noting courts are to apply plain and ordinary meaning absent a clear definition from the patentee or a clear disavowal of claim scope).

Second, Butch's argument does not consider the understanding and knowledge of a POSITA. "Fluid conduit" and "fracturing tree"[2] are well-known industry terms. ECF No. 27-1 ¶¶ 53–55, 67. A POSITA would have been familiar with coupling fluid conduits to fracturing trees from the extensive use of these components in the prior art. ECF No. 27-1 ¶¶ 53–55, 67. A POSITA also would have understood that in the prior art, ***multiple*** fluid conduits were coupled to a fracturing tree (ECF No. 27-1 ¶¶ 30–32, 37–41, 51),[3] providing clarity that this particular claim language refers to using a single fluid conduit instead of those multiple fluid conduits. *See id.*

---

[2] Butch's concedes the Court should give "fracturing tree" its plain and ordinary meaning. ECF No. 28 at 2. Cameron agrees, with the understanding that the plain and ordinary meaning refers to "a specific type of Christmas tree installed specifically for the fracturing process." *See* ECF No. 27-1 ¶ 49.

[3] For instance, Dr. Wooley describes that before modern fracturing manifolds a POSITA would have coupled multiple fluid conduits to a fracturing tree from several high-pressure pumps. *Id.* ¶¶ 30–32 (describing ECF No. 27-2). Dr. Wooley also confirms that a POSITA would have been familiar with coupling multiple fluid conduits (frac iron) to a fracturing tree from a fracturing manifold. *Id.* ¶¶ 37–41. And a POSITA would have understood that typical fracturing trees include "frac heads" that provide inlets for coupling multiple fluid conduits. *Id.* ¶ 51.

¶¶ 52–53. This is also plainly evident by the following claim language: "such that, during a fracturing operation, fracturing fluid is delivered to the well fracturing tree through only the single fluid conduit." ECF No. 1-1 at claim 9. Butch's feigned confusion is inconsistent with the plain words in the claim.

The same is true of Butch's strained argument that the above claim language is ambiguous about whether a single fluid conduit comprising multiple components is still a "single fluid conduit." ECF No. 28 at 5. In other words, Butch's purports it is confused whether a fluid conduit is still "single" if it is made of, for example, multiple pipes and connection blocks arranged in series. *Id*. Claim 9 addresses this, stating, "the single fluid conduit includes: a first connection block positioned at the well fracturing tree; a second connection block; and one or more pipe sections coupled between the first and second connection block and the second connection block." It is thus quite clear that multiple components attached in series may compose the "single fluid conduit" and that this "single fluid conduit" couples to[4] the fracturing tree so that fracturing fluid flows to the tree only through this "single fluid conduit." ECF No. 27-1 ¶¶ 53–55.

Finally, Butch's argues that the claim is indefinite because the inventor could have written that "fracturing fluid *is* routed from the second connection block to the first connection block through the one or more pipe sections" rather than "fracturing fluid *can be* routed from the second connection block to the first connection block through the one or more pipe sections." ECF No. 28 at 6 (emphasis added). It is unclear how this relates to definiteness. But Cameron's choice

---

[4] Butch's also argues incorrectly that a POSITA would not understand the meaning of "coupled to." ECF No. 28 at 7–8. This connection language is, and has always been, commonplace in patent claims, and a POSITA would well understand its scope in this context. *Cf. Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1270–71 (Fed. Cir. 2010) (construing "coupled to"); *Fisher-Price, Inc. v. Graco Children's Prods., Inc.*, 154 F. App'x 903, 909 (Fed. Cir. 2005) (finding limitation requiring one element "coupled to" another not indefinite).

of "can" rather than "is" clarifies that a system infringes Claim 9 if it is *capable* of routing fluid in the claimed manner because actual use is unnecessary for infringement. *See* 35 U.S.C. § 271(a).

The claim terms "fluid conduit" and "fracturing tree" are common names for "well-known industry components" that "perform[] conventional functions." ECF No. 28 at 2. A POSITA would understand with reasonable certainty what it means to couple these two components in Claim 9. *Id.* ¶¶ 23, 54. Butch's has therefore failed to show that the above claim terms are indefinite.

### 2. "positioned at"

| Claim 9 | |
|---|---|
| Cameron's Proposed Construction | Butch's Proposed Construction |
| "attached to or adjacent to" | Indefinite |

Claim 9 requires "a first connection block ***positioned at*** the well fracturing tree." ECF No. 1-1 (emphasis added). This claim also requires that "fracturing fluid can be routed . . . to the well fracturing tree through the first connection block." A POSITA would understand this to mean that the "first connection block" is attached to the fracturing tree (*e.g.*, as part of the stack of valves comprising the fracturing tree), or is adjacent to the fracturing tree to facilitate the flow of fracturing fluid into the wellbore. *See* ECF No. 27-1, ¶¶ 68–69. This fits with the language of dependent claim 10, which further narrows the claim scope to require that the "first connection block" is "attached to a valve of the well fracturing tree."

Rather than seek meaning, Butch's demands "boundaries of the relative spatial relationship between the first connection block and the tree" or the "distance from the tree the connection block can be arranged while still being positioned at the tree." ECF No. 28 at 8. But this is not what definiteness requires.[5] Definiteness does not demand "absolute precision" because it "must take

---

[5] Butch's also cites *Enzo Biochem, Inc. v. Applera Corp.* for the proposition that patents must provide a standard to measure terms of degree. ECF No. 28 at 9 (citing 599 F.3d 1325, 1332 (Fed.

into account the inherent limitations of language" and allow for "some modicum of uncertainty." *See Nautilus*, 572 U.S. at 901. A POSITA can determine with reasonable certainty whether a connection block is "positioned at" (or "attached to or adjacent to") a fracturing tree. ECF No. 27-1 ¶ 69. Further, "positioned at" is a common phrase that any juror can understand and apply to resolve a factual dispute. *See, e.g.*, *Quest Diagnostics Invs.*, 2020 WL 210799, at *5 (finding "common words with common meaning" not indefinite). Claim construction (or definiteness) need not eliminate all potential factual disputes centered on terms with common meanings. *See id.*

Butch's has offered no evidence that a POSITA would not understand what it means for a first connection block to be "positioned at" a well fracturing tree, and it has thus failed to show that the phrase "positioned at" is indefinite. The Court should adopt Cameron's construction that "positioned at" in claim 9 means "attached to or adjacent to."

### 3. "comprising an additional well fracturing tree"

| Claim 12 | |
|---|---|
| Cameron's Proposed Construction | Butch's Proposed Construction |
| Plain and ordinary meaning: "adding another specific type of Christmas tree installed specifically for the fracturing process." | Indefinite |

The term "fracturing tree" has an ordinary and customary meaning in the art: it is a "specific type of Christmas tree installed specifically for the fracturing process." ECF No. 27 ¶ 49. As a POSITA would understand, dependent claim 12 simply requires adding another fracturing tree consistent with the type of fracturing system described in independent claim 9. ECF No. 27-1 ¶ 55.

In other words, independent claim 9 explains how to couple a fracturing tree to the fracturing system, and dependent claim 12 simply covers adding another fracturing tree in the same

---

Cir. 2010)). The relevant term of degree in *Enzo* was "substantially." 599 F.3d at 1335 ("not interfering substantially"). But Butch's provides no authority to show that "at" is a term of degree.

way. While Dr. Wooley confirms that a POSITA would understand this with reasonable certainty (*Id.* ¶ 23), Butch's has provided no contrary evidence. The Court should thus find claim 12 not indefinite and construe this term as having its plain and ordinary meaning.

## B.    '645 Patent

The '645 patent teaches, among other things, systems and methods for providing a single rigid fluid pathway between a fracturing manifold and a fracturing tree, instead of multiple rigid fluid pathways (*e.g.*, prior-art frac iron). ECF No. 1-2 at 9:25–28 ("Like some other embodiments described above, the fracturing system depicted in Fig. 11 uses only a single fluid conduit 26 per fracturing tree 20 rather than using multiple, smaller fluid conduits."); ECF No. 27-1 ¶¶ 56–64.

While some claims require adjustable components, not all do, including the asserted claims. And the specification teaches embodiments that do not require adjustable components. ECF No. 1-2 at 8:37–43. For instance, these embodiments may comprise fixed components and involve "rotat[ing] [the pipes and connection blocks] to desired positions before assembling these components together (*e.g.*, via studded connections)." *Id.*; ECF No. 27-1 ¶ 60.

As with the '132 patent, Butch's strains the claim language and ignores the patent's disclosures to formulate its indefiniteness arguments. But as Cameron explains below, the disputed claim terms are not indefinite.

### 1. "one and only one rigid fluid pathway"

| Claims 1, 10, 20 | |
|---|---|
| Cameron's Proposed Construction | Butch's Proposed Construction |
| Plain and ordinary meaning | Indefinite |

Independent claims 1, 10, and 20 describe fracturing systems where there is "one and only one rigid fluid pathway" between the fracturing manifold and any well (or fracturing tree) in the system. Comparing Claim 1 to Figure 11 (shown below), a single fluid conduit comprising several



FIG. 11

blue pipes (170, highlighted yellow) connect through blue connection blocks (172, highlighted green). ECF No. 27-1 ¶¶ 56–58 (citing ECF No. 1-2).

A POSITA would thus understand that the single fluid conduit (blue) in the annotated Figure 11 at left provides the "one and only one rigid fluid pathway" to the fracturing tree 20 (red). *See id.* ¶ 58 (explaining that in Figure 11 "there is 'one and only one rigid fluid pathway from the fracturing manifold to the fracturing tree'").

Butch's is wrong that a POSITA would reach a different conclusion simply because claims 1 and 20 describe "a plurality of fluid conduits coupled between the fracturing manifold and the plurality of fracturing trees." The claims clarify what this means: the "one and only one rigid fluid pathway" to the fracturing tree (or well) includes "at least one rigid fluid conduit" of this plurality of fluid conduits "so as to provide" the one and only one rigid fluid pathway. *See, e.g.*, ECF No. 1-2 at claim 1. Setting aside Butch's contention the patentee could have described this better (which is not the standard for indefiniteness), its meaning is reasonably certain. *See* ECF No. 27-1 ¶¶ 58–59 (explaining how a POSITA would understand these limitations).

***First***, there must be a plurality of fluid conduits if there is a plurality of fracturing trees because each fracturing tree must have its own fluid pathway. *See, e.g.*, ECF No. 1-2 at claim 1 ("the one and only one rigid fluid pathway is not coupled to the fracturing manifold to provide the fracturing fluid from the fracturing manifold to any other fracturing tree").

**Second**, the claims allow that several of the plurality of fluid conduits may form the fluid pathway only if they together provide one and only one fluid pathway. *See, e.g.*, *id.* ("coupled to the fracturing manifold by **at least one** rigid fluid conduit of the plurality of fluid conduits **so as to provide** one and only one rigid fluid pathway" (emphasis added)). For instance, Figure 11 above shows one and only one rigid fluid pathway (blue) comprising multiple pipes 170 connecting in series through the connection blocks 172.

**Third**, the one and only one fluid pathway must be rigid. In the claims, rigid modifies the "fluid pathway" comprising one or more rigid fluid conduits. *See, e.g.*, *id.* (requiring the plurality of fluid conduits must "provide one and only one **rigid** fluid pathway").

Dr. Wooley shares these understandings. *See* ECF No. 27-1 ¶¶ 58–59. Which is to say, a POSITA would understand this term with reasonable certainty. *Id*. ¶ 23. Butch's nonetheless suggests this term is indefinite because (according to Butch's) it might encompass two implementations: (1) those where there is only one fluid pathway to a fracturing tree, and that one fluid pathway is rigid; and (2) an amorphous hypothetical system that Butch's proposes where there are multiple fluid pathways to the fracturing tree, only one of which is rigid.

The first arrangement is not hypothetical—it is what Butch's practices and part of Cameron's commercial embodiment. The second hypothetical arrangement is something not at issue in any Butch's arrangement or any prior art. Butch's is thus seeking an indefiniteness ruling based on the argument that it is unclear to Butch's if the claims cover an imagined, perhaps unworkable, embodiment that is not at issue. This cannot be the basis of indefiniteness. *Nevro Corp.*, 955 F.3d at 41 ("The [indefiniteness] test is not merely whether a claim is susceptible to differing interpretations.").

Setting aside whether Butch's is right that this term might encompass multiple implementations, claim language having "a reasonable range of implementations" is not indefinite. *See Capital Sec. Sys., Inc. v. NCR Corp.*, 725 F. App'x 952, 957 (Fed. Cir. 2018). It is impossible to understand Butch's hypothetical second implementation because the hypothetical is vague and incomplete. But if Butch's is right that there is a second possible implementation, two is not an unreasonable range of potential implementations. It is rather the smallest possible range of multiple implementations. This cannot render the claims indefinite.

As with Butch's other arguments, it provides no evidence that a POSITA confronted with any implementation would fail to understand with reasonable certainty whether a given system includes one and only one rigid fluid pathway. Butch's has thus not met its burden to show that this term renders the challenged claims invalid as indefinite.

**2. "at least one rigid fluid conduit" / "the at least one rigid fluid conduit"**

| Claims 1, 20 | |
|---|---|
| Cameron's Proposed Construction | Butch's Proposed Construction |
| Plain and ordinary meaning | Indefinite |

Claims 1 and 20 both introduce "a plurality of fluid conduits." ECF No. 1-2. They go on to require coupling the fracturing manifold to the fracturing tree by "at least one rigid fluid conduit of the plurality of fluid conduits." *Id.* The claims also require that "the at least one rigid fluid conduit" described earlier includes various elements, like pipe joints and connection blocks. *Id.* The claims clarify that the "at least one rigid fluid conduit" must "provide one and only one rigid fluid pathway" between the fracturing manifold and the fracturing tree (or well). *Id.*

Despite this clear introduction, Butch's argues that "'***the*** at least one rigid fluid conduit' (emphasis added) lacks proper antecedent basis." ECF No. 28 at 13. Not so. "[T]he at least one rigid fluid conduit" follows the claim introducing "at least one rigid fluid conduit of the plurality

11

of fluid conduits." Butch's is also wrong "there is no reference back to 'each fracturing tree' or any provision of a connection to a specific 'at least one rigid fluid conduit.'" *Id.* The claims explain that for "***each*** fracturing tree" the "at least one rigid fluid conduit" connects "***the*** fracturing manifold to ***the*** fracturing tree." *Id.* (emphasis added). The claims also explain what the rigid fluid conduit must include (*e.g.*, connection blocks and pipes). *Id.*

As this shows, there is no reason a POSITA would not understand with reasonable certainty that the claims introduce "the at least one rigid fluid conduit" as being "of the plurality of fluid conduits." Dr. Wooley agrees. ECF No. 27-1 ¶¶ 56–64 (applying this term), 67 ("[A] a POSITA would have understood all of these terms with reasonable certainty. . . . I have applied or explained many of these terms within the context of the patents, and with the understanding of a POSITA.").

The only authority Butch's uses to suggest otherwise is *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1340 (Fed. Cir. 2008). But *Baldwin* did not go Butch's way. The *Baldwin* court found that the "[relevant] limitations . . . all relate to proper antecedent bases," including a "said fabric roll" that related back to a plurality of fabric rolls introduced as "a pre-soaked fabric roll." *Id.* at 1343. In other words, the Federal Circuit found that "a pre-soaked fabric roll" was a sufficient antecedent basis for multiple fabric rolls, of which one was the "said fabric roll." *See id.* Butch's provides no analysis for why the Federal Circuit would reach the opposite conclusion on these facts to find that "the at least one rigid fluid conduit" cannot have a proper antecedent basis as being "of the plurality of fluid conduits."

Even so, Butch's arguments fail for a more fundamental reason: Butch's has not met its high burden to show these claims are invalid as indefinite. While Cameron has provided evidence that a POSITA would understand this term with reasonable certainty, Butch's has provided no

evidence at all—much less clear and convincing evidence—only argument. The Court should thus find that this term is not indefinite and give it its plain and ordinary meaning.

### 3. "pipe joints"

| Claim 1 | |
|---|---|
| Cameron's Proposed Construction | Butch's Proposed Construction |
| "lengths of pipe" | "structures for joining pipes" |

Claim 1 requires "a plurality of **pipe joints** and connection blocks coupled to one another," and describes "the plurality of pipe joints and connection blocks" as including "a first pipe that is



FIG. 10

attached for a first connection block" and "a second pipe that is . . . attached to a second connection block." ECF No. 1-2 (emphasis added). As this claim language shows, the "pipe joints" recited in the claim are lengths of pipe that are attached to connection blocks. ECF No. 27-1 ¶¶ 70–72. This is consistent with the specification, which in Figure 10 (shown at left) describes element 170 alternately as "pipe joints 170" and "pipes 170." *See* ECF No. 1-2 at 8:29–43. Thus, the depicted "pipe

joints 170" (blue) are lengths of pipe—exactly as in Cameron's proposed construction. *Id.*[6]

---

[6] The same is true in Figure 11, which also shows element 170 as lengths of pipe.

Annotated Figure 12 at right similarly shows the same element (170, green) as a length of pipe. Butch's argues that because the "rotatable pipe joint" shown in Figure 10 (above) contains a flange at the top end (rather than threading), which allows any component attached to the top end to rotate around the pipe's axis, this somehow morphs what is plainly a length of pipe into a "structure for joining pipes." Figure 12 shows this "rotatable pipe joint" as a length of pipe (170) with a flanged end on top (182) and a threaded surface (184) on the bottom. ECF No. 1-2 at 8:58–9:7. Element 170 shaded green (which the specification describes elsewhere as a pipe joint) clearly is a length of pipe.



Butch's argues that *Helmsderfer v. Bobrick Washroom Equip., Inc.* obligates the Court to ignore these clear disclosures because it should instead presume the claim means different things when it uses the words "pipe joints" instead of "pipes" to introduce "a first pipe" and "a second pipe." ECF No. 28 at 14–15 (citing 527 F.3d 1379 (Fed. Cir. 2008)). But the presumption from *Helmsderfer* does not apply when there is "evidence to the contrary." 527 F.3d 1379 at 1382 (quoting *CAE Screenplates Inc. v. Heinrich Fiedler GmbH*, 224 F.3d 1308, 1317 (Fed. Cir. 2000)). As explained above, the claim language, the written specification, and the figures clarify that "pipe joints" means lengths of pipe, rebutting any such presumption.

Lacking a toehold in fact or law, Butch's pivots to misrepresenting Cameron's position on the term "pipe joints" during an IPR of a related patent. ECF No. 28 at 15. Cameron did not take a different position in the IPR. Cameron said in the IPR that based on the **petitioner's** read of Surjaatmadja's Figure 17 (annotated below), which requires a straight run of a single pipe from



FIG. 17

the central manifold to the respective pads, it was not inherent to use elbows and pipe joints (*i.e.*, multiple lengths of pipe). *See* ECF No. 28-4 (Surjaatmadja). Since there would be no change in direction because the figures (according to petitioner) show a single length of pipe (*i.e.*, one pipe joint), this is a true statement and not inconsistent with Cameron's position here.

Butch's proposed construction of "pipe joints" as "structures for joining pipes" is nonsensical in the oilfield in general and in this patent specifically. Reading Claim 1 with Butch's construction would require joining connection blocks (which are structures joining lengths of pipe) with "structures for joining pipes," while omitting the pipes themselves. This results in a series of only connection components. The construction is thus wrong because "[a] claim construction that renders asserted claims facially nonsensical 'cannot be correct.'" *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) (quoting *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1357 (Fed. Cir. 2006)).

Claim 1 clearly states that the plurality of pipe joints includes "a first pipe that is attached to a first connection block" and "a second pipe that is . . . attached to a second connection block." The specification also uses "pipes" and "pipe joints" interchangeably to describe what plainly is a length of pipe in the patent figures (element 170). *See* ECF No. 1-2 at 8:29–43. And industry technical definitions confirm that lengths of pipe is an ordinary and customary meaning of "pipe joints" in the art. *See, e.g.*, ECF No. 27–1 ¶ 74 (citing ECF No. 27-4 (defining "joint" as "length

of pipe") and ECF No. 27-12 (defining "joint" as "length of pipe")). The Court should thus adopt Cameron's proposed construction of "pipe joints."

### 4. "outlet branch(es)"

| Claims 2–4, 10, 13, 18 | |
|---|---|
| Cameron's Proposed Construction | Butch's Proposed Construction |
| Plain and ordinary meaning: "extension(s) from the shared trunk line" | Indefinite |

The claims at issue for this term require outlet branches. For instance, claim 2 requires "a shared trunk conduit for routing fracturing fluid to multiple fracturing trees of the plurality of fracturing tree" and "outlet branches for routing fracturing fluid from the shared trunk conduit to individual fracturing trees of the multiple fracturing trees." As Dr. Wooley confirms, a POSITA would understand this term to have its plain and ordinary meaning, which describes "extension(s) from the shared trunk line." ECF No. 27-1 ¶ 63; *see also* ECF No. 1-2 at claims 3, 10 ("the fracturing fluid distribution manifold including a trunk line and multiple outlet branches in fluid communication with the trunk line for routing fracturing fluid from the trunk line toward the plurality of wells via the multiple outlet branches"), 13, 18.

The specification confirms that the claims use "outlet branches" in accord with its plain and ordinary meaning to describe extensions from the shared trunk line. *See, e.g.*, *id.* at 1:66–2:4 ("In some instances, a fracturing manifold includes a trunk line for providing fracturing fluid to multiple outlet branches of the manifold. Further, the multiple outlet branches can include valves for controlling flow of fracturing fluid toward wells from the trunk line."), Abstract ("The fracturing manifold can include a trunk line that provides fracturing fluid to multiple outlet branches, which can include valves for controlling flow of fracturing fluid to wells downstream of the valves."); ECF No. 27-1 ¶¶ 62–64 (annotating outlet branches).

Butch's is wrong that this term is indefinite because of "structural ambiguity" about where an outlet branch is in the system. ECF No. 28 at 16. Where an outlet branch is in the system would be a fact issue that a factfinder could easily resolve applying a common, readily understandable term. Butch's attorney argument about ambiguity provides no evidence a POSITA would fail to understand with reasonable certainty whether there is a branch at the outlet of a trunk line. Dr. Wooley, however, details how a POSITA would understand the structure of outlet branches. ECF No. 27-1 ¶¶ 62–64. Butch's is likewise wrong that a POSITA would not understand with reasonable certainty where the fracturing manifold ends and the fluid conduit to the fracturing tree begins. As Dr. Wooley explains, a POSITA would have extensive knowledge and experience with the prior art and in the industry, including understanding how fracturing manifolds connect to fracturing trees using fluid conduits. *Id.* ¶¶ 33–51.

Nor is it true that claims 3 and 18 are indefinite because they require that the "outlet branches . . . include valves." The claim language is clear. Butch's provides no authority (because none exists) for its proposition that the claim must enumerate a precise number of valves. And again, Butch's provides no evidence to suggest a POSITA would not understand with reasonable certainty what it means for a fracturing manifold to have valves in its outlet branches. Given the evidence that a POSITA would understand this term with reasonable certainty (*see, e.g.*, *id.* ¶ 23), the Court should find the term not indefinite and apply its plain and ordinary meaning.

### 5. "the second connection block"; "the second pipe"; "the third studded connection"

| Claim 14 | |
|---|---|
| Cameron's Proposed Construction | Butch's Proposed Construction |
| Plain and ordinary meaning | Indefinite |

The claims and the specification describe the terms "connection block," "pipe," and "studded connection," including in various figures. *See, e.g.*, ECF No. 27-1 ¶¶ 56–64 (describing

and illustrating embodiments from the specification incorporating connection blocks, pipes, and studded connections). The Court should give all these terms their plain and ordinary meanings. Claim 14 depends from claim 10, which introduces "a second connection block," "a second pipe," and "a third studded connection." Claim 14 simply requires a more specific arrangement of the second connection block, the second pipe, and the third studded connection introduced in claim 10. A POSITA would understand this arrangement with reasonable certainty. *See* ECF No. 27-1 ¶ 23.

Butch's is wrong that this term lacks an antecedent basis for the same reasons as in Section III.B.2, *supra*. As explained above, independent claim 10 introduces each term. And claim 10 uses these terms to describe the arrangement of components in the rigid fluid pathway for each respective fracturing tree. A POSITA would understand with reasonable certainty that claim 14 describes the more specific arrangement for the components in the respective rigid fluid pathways of claim 10. Butch's has produced no evidence otherwise. *But see* ECF No. 27-1 ¶ 23. As a result, the Court should find this term not indefinite.

### 6. "the second pipe"; "the first pipe"; "the third pipe"

| Claim 14 | |
|---|---|
| Cameron's Proposed Construction | Butch's Proposed Construction |
| Plain and ordinary meaning | Indefinite |

*See* Section III.B.5, *supra*.

## IV.    CONCLUSION

As the above discussion shows, a POSITA would understand all the identified terms with reasonable certainty. The Court should therefore find all the claims not indefinite; adopt Cameron's proposed constructions for "positioned at" and "pipe joints"; and give the remaining terms their plain and ordinary meanings.

DATED: August 5, 2020

Respectfully submitted,

By: */s/ John R. Keville*
John R. Keville
Texas Bar No. 00794085
jkeville@winston.com
Merritt D. Westcott (*Pro Hac Vice*)
Texas Bar No. 24027091
mwestcott@winston.com
William M. Logan
Texas Bar No. 24106214
wlogan@winston.com
Evan D. Lewis (*Pro Hac Vice*)
Texas Bar No. 24116670
edlewis@winston.com
WINSTON & STRAWN LLP
800 Capitol Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 651-2600
Facsimile: (713) 651-2700

ATTORNEYS FOR PLAINTIFF,
CAMERON INTERNATIONAL
CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of August, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David G. Henry, Sr.
DHenry@GrayReed.com
Eric S. Tautfest
etautfest@GrayReed.com
Jared Hoggan
jhoggan@GrayReed.com
GRAY REED & MCGRAW LLP
900 Washington Avenue, Suite 800
Waco, Texas 76701


M. Jill Bindler
jbindler@GrayReed.com
David T. DeZern
ddezern@GrayReed.com
David M. Lisch
dlisch@GrayReed.com
GRAY REED & MCGRAW LLP
1601 Elm Street, Suite 4600
Dallas, Texas 75201

ATTORNEYS FOR DEFENDANT BUTCH'S
RATHOLE & ANCHOR SERVICE, INC.


                                         */s/ John R. Keville*
                                         John R. Keville

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| CAMERON INTERNATIONAL CORPORATION, | § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. 6:20-cv-00124 |
| v. | § § | |
| BUTCH'S RATHOLE & ANCHOR SERVICE, INC., | § § § | **JURY TRIAL REQUESTED** |
| Defendant. | § § § § | |

**PLAINTIFF CAMERON INTERNATIONAL CORP.'S**
<u>**CLAIM CONSTRUCTION REPLY BRIEF**</u>

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  Introduction ....................................................................................................... 1

II.  Disputed Claim Terms ...................................................................................... 2

    A.  '132 Patent ............................................................................................... 2

        1. "a single fluid conduit" / "a single fluid conduit coupled to the well fracturing tree" ............................................................................. 2

        2. "positioned at" ............................................................................... 3

        3. "comprising an additional well fracturing tree" .......................... 5

    B.  '645 Patent ............................................................................................... 6

        1. "one and only one rigid fluid pathway" ....................................... 6

        2. "at least one rigid fluid conduit" / "the at least one rigid fluid conduit" ............. 7

        3. "pipe joints" .................................................................................. 8

        4. "outlet branch(es)" ....................................................................... 9

        5. "the second connection block"; "the second pipe"; "the third studded connection" ........................................................................ 9

        6. "the second pipe"; "the first pipe"; "the third pipe" ................... 10

III.  Conclusion ....................................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*CyWee Group, Ltd. v. Huawei Device Co. Ltd.*,
   No. 2:17-cv-00495, 2018 WL 6419484 (E.D. Tex. Dec. 6, 2018) ...........................................6

*In re Gardner*,
   427 F.2d 786 (C.C.P.A. 1970) ................................................................................................6

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)................................................................................................................4

*Quest Diagnostics Invests. LLC v. Lab. Corp. of Am. Holdings*,
   No. 18-1436, 2020 WL 210799 (D. Del. Jan. 14, 2020) .........................................................2

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005)...............................................................................................6

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012)...............................................................................................2

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
   587 F.3d 1339 (Fed. Cir. 2009)...............................................................................................7

## I.    INTRODUCTION

Butch's proposes ten terms for construction. It contends nine are indefinite. Yet despite having the burden to prove indefiniteness by clear and convincing evidence, Butch's provides no evidence. Butch's instead relies only on attorney argument and tries to shift the burden onto Cameron to show that the claims are definite. Although that burden is not Cameron's, it has nonetheless provided evidence that a person of ordinary skill in the art would understand the claims' respective scopes with reasonable certainty. This includes through the testimony of Dr. Gary R. Wooley, a person of ordinary skill in the art, who explains and applies the claim terms using his education and experience. Dr. Wooley supports his opinions with prior art, technical dictionaries, and industry textbooks. Given this record, the Court should find no terms indefinite.

As to the one term for which Butch's proposes a construction—pipe joints—Cameron has shown with intrinsic and extrinsic evidence that this term refers to lengths of pipe. The claim language introduces pipe joints as elements connecting to connection blocks, and it uses this introduction to describe more specific arrangements of pipes and connection blocks. The patentee describes the same element (170) interchangeably in the specification as "pipe joints" and "pipes." The patent's figures depict element 170 as lengths of pipe. And Dr. Wooley's testimony and two industry dictionaries confirm that this accords with the term's customary and ordinary use.

Butch's, by contrast, provides no intrinsic or extrinsic evidence to suggest that "pipe joints" means "structures for joining pipes." Nor does it justify imposing a nonsensical construction that would require joining "structures for joining pipes" to connection blocks—which are themselves structures for joining pipes. The Court should thus reject Butch's proposal and adopt Cameron's.

Finally, the Court should adopt Cameron's proposal that "positioned at" means "attached to or adjacent to." Butch's proposes no alternative construction. Nor does it provide any evidence that Dr. Wooley is wrong about how a POSITA would understand this term.

## II.     DISPUTED CLAIM TERMS

### A.     '132 Patent

### 1. "a single fluid conduit" / "a single fluid conduit coupled to the well fracturing tree"

Claim 9 describes a "well fracturing tree" and "a single fluid conduit coupled to the well fracturing tree." ECF No. 1-1. The Court should apply plain and ordinary meaning because these are uncomplicated words, and because the patentee did not give them any special meaning. *See, e.g.*, *Quest Diagnostics Invests. LLC v. Lab. Corp. of Am. Holdings*, No. 18-1436, 2020 WL 210799, at *5 (D. Del. Jan. 14, 2020); *cf. Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (noting plain and ordinary meaning applies absent a clear definition or a clear disavowal). Facing this simple language (and having no contrary evidence), Butch's contrives three ambiguity theories based only on attorney argument. Each is wrong because it ignores the words in the claims and the knowledge and experience of a POSITA.

First, Butch's is wrong that a POSITA would not understand with reasonable certainty whether claim 9's single fluid conduit means a single length of pipe or instead comprises several elements that together provide a single fluid conduit. The claim language requires a single fluid conduit comprising different elements (*e.g.*, connection blocks and pipe sections). ECF No. 1-1 at claim 9. It also requires that the fracturing fluid flows to the well through only that single fluid conduit comprising those multiple elements. *Id.* A POSITA would understand this as distinct from prior-art systems that use multiple fluid conduits to provide multiple pathways, like frac iron. ECF No. 27-1 ¶¶ 30–32, 37–41, 51. And a POSITA would understand that fluid conduits often comprise multiple elements, like the pipe sections and hammer unions in prior-art frac iron. *See id*.

Second, Butch's is incorrect that the fluid conduit's "structural composition" is not reasonably certain. ECF No. 30 at 9. Butch's argues (without support) that a POSITA would not understand whether a particular fracturing tree couples to one fluid conduit or to multiple fluid

conduits. ECF No. 28 at 5. This ignores common sense and a POSITA's background working with fluid conduits, including prior-art frac iron. ECF No. 27-1 ¶¶ 30–32, 37–41, 51. From that background, a POSITA would understand that the single fluid conduit differentiates claim 9 from the multiple fluid conduit systems that provide multiple fluid pathways in the prior art. *Id.* Given this knowledge and experience, a POSITA would have no trouble determining with reasonable certainty whether a single fluid conduit (like in claim 9) or multiple fluid conduits (like prior-art frac iron) deliver fracturing fluid to a fracturing tree. *See id*. Butch's offers no contrary evidence.

Third, Butch's is mistaken that a POSITA would not understand with reasonable certainty what it means to couple a fluid conduit to a fracturing tree. Butch's agrees that fracturing trees are common oilfield equipment with a plain and ordinary meaning in the art. ECF No. 28 at 2. As Dr. Wooley explains, a POSITA would be familiar with coupling fluid conduits to fracturing trees from the prior art. ECF No. 27-1 ¶¶ 30–32, 37–41, 51. Butch's offers no contrary evidence. There is thus no basis to find that a POSITA having the requisite knowledge and experience would not understand with reasonable certainty what it means to couple a fluid conduit to a fracturing tree.

As the claim language and the knowledge and experience of a POSITA resolve all of Butch's purported ambiguities, it has failed to show these terms are indefinite.

**2. "positioned at"**

Claim 9 requires "a first connection block ***positioned at*** the well fracturing tree." ECF No. 1-1 (emphasis added). This claim also requires that "fracturing fluid can be routed . . . to the well fracturing tree through the first connection block." A POSITA would understand this to mean that the "first connection block" is attached to the fracturing tree (*e.g.*, as part of the stack), or is adjacent to the fracturing tree to facilitate flowing fracturing fluid into the wellbore. ECF No. 27-1, ¶¶ 68–69. This accords with dependent claim 10, which further narrows the claim scope to require that the "first connection block" is "attached to a valve of the well fracturing tree." Butch's

3

apparently disagrees with the proposition that the first connection block can be attached to the fracturing tree as part of the stack. But it does not propose any alternative constructions.

Instead, Butch's argues (without evidence) that a POSITA would not understand with reasonable certainty what it means to position a connection block at a fracturing tree. Butch's premises this on its misunderstanding that definiteness requires "boundaries of the relative spatial relationship between the first connection block and the tree" and the "distance from the tree the connection block can be arranged while still being positioned at the tree." ECF No. 28 at 8. But definiteness does not demand "absolute precision" because it "must take into account the inherent limitations of language" and allow for "some modicum of uncertainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 899 (2014).

The proper question is whether a POSITA would understand with reasonable certainty what it means for a connection block to be "positioned at" the fracturing tree. *See id.* As Dr. Wooley explains, a POSITA would be familiar with positioning valves, fluid conduits, and other equipment at the fracturing tree. *See* ECF No. 27-1, ¶¶ 68–69. Nothing in the record suggests a POSITA would not understand how to do so with a connection block.

In the end, Butch's has offered no evidence that suggests a POSITA would not understand with reasonable certainty what it means for a first connection block to be "positioned at" a well fracturing tree. It has thus failed to show that the term is indefinite. Butch's has also not shown any clear disclaimer of scope that would justify excluding embodiments where the connection block is positioned at the fracturing tree as part of the stack of connections and valves, particularly given dependent claim 10 that requires attachment to a valve on the fracturing tree. The Court should therefore construe "positioned at" to mean "attached to or adjacent to."

### 3. "comprising an additional well fracturing tree"

Claim 12 simply requires incorporating another fracturing tree into the system of claim 9. ECF No. 1-1. The term "fracturing tree" has an ordinary and customary meaning in the art: it is a "specific type of Christmas tree installed specifically for the fracturing process." ECF No. 27-1 ¶ 49. Butch's agrees that the term has a plain and ordinary meaning in the art. *See* ECF No. 28 at 2. But Butch's does not explain what it believes that meaning is, other than to say it disagrees with Cameron's clarification. *See* ECF No. 30 at 12 n.10.

Cameron's clarification is important. As Dr. Wooley explains, fracturing sometimes takes place through standard Christmas trees, like production trees. ECF No. 27-1 ¶ 47. It is thus not inherent that if fracturing takes place through a tree, then the tree must be a fracturing tree. By clarifying that a fracturing tree is not a standard Christmas tree, the Court will give better guidance to the jury and will narrow the potential disputes between the parties. It will also honor the narrower scope the patentee chose by using the more specific term fracturing tree rather than more general terms like Christmas tree, production tree, wellhead, or well.

That aside, dependent claim 12 is remarkably simple. It requires claim 9's fracturing system to incorporate another fracturing tree. A POSITA who has relevant education and experience would understand how to add a fracturing tree to such a fracturing system—particularly given the instructions in claim 9. Butch's attorney arguments to the contrary all ignore this education and experience, and insist the claim is indefinite because (according to Butch's) a POSITA would not understand whether to add the fracturing tree using another single fluid conduit, or whether the fracturing tree may couple to the same single fluid conduit from claim 9.

But claim 13 (which depends from claim 12) confirms that the patentee did not limit claim 12 to one of these proposals. Claim 13 limits the system to embodiments where the second fracturing tree couples to the single fluid conduit from claim 9. Because claim 12 is broader, it

encompasses embodiments claim 13 excludes, such as those where the additional fracturing tree couples to another single fluid conduit. Reading claim 12 with this context—and given the instructions in claim 9 about how to configure a single fluid conduit—there is no reason a POSITA would not understand with reasonable certainty what it means to add an additional fracturing tree to claim 9's fracturing system. As Butch's has identified no clear disclaimers that would limit claim 12, the Court should find this term not indefinite and apply its plain and ordinary meaning.

## B.    '645 Patent

### 1. "one and only one rigid fluid pathway"

Claims 1, 10, and 20 describe fracturing systems having "one and only one rigid fluid pathway" between the fracturing manifold and a well (or fracturing tree). As Dr. Wooley explains, such a pathway is evident in Figure 11, where a single fluid conduit comprises several pipe joints 170 connecting through connection blocks 172. ECF No. 27-1 ¶¶ 56–58 (citing ECF No. 1-2). A POSITA would understand that this system of pipe joints and connection blocks in Figure 11 provides the "one and only one rigid fluid pathway" to fracturing tree 20. *See id.* ¶ 58.

Butch's still incorrectly contends that this term is indefinite. According to Butch's, this is because it might have two embodiments: (1) preferred embodiments like Figure 11, where there is only one fluid pathway and that fluid pathway is rigid; and (2) other embodiments where there may be multiple fluid pathways, but only one of those fluid pathways is rigid. ECF No. 30 at 14.

The Federal Circuit has long explained, however, that "[b]readth is not indefiniteness." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005) (quoting *In re Gardner*, 427 F.2d 786, 788 (C.C.P.A. 1970)). So even if Butch's is right that these claims encompass two embodiments, "[t]hat the claim is drafted broadly enough to cover multiple embodiments does not render the claim indefinite." *CyWee Group, Ltd. v. Huawei Device Co. Ltd.*, No. 2:17-cv-00495, 2018 WL 6419484, at *20 (E.D. Tex. Dec. 6, 2018), *15 ("Merely because a

claim is drafted broadly and could cover a variety of methods does not automatically render a claim indefinite." (citing *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2009))).

The correct question is whether a POSITA would understand the scope of the claim with reasonable certainty, not whether the plain and ordinary meaning might encompass multiple embodiments. As Dr. Wooley has shown, the meaning of "one and only one rigid fluid conduit" is well within a POSITA's grasp. ECF No. 27-1 ¶¶ 58–59. Any dispute about whether a particular embodiment satisfies that limitation is a question for fact-finding, not claim construction. The Court should therefore find this term not indefinite and apply its plain and ordinary meaning.

**2. "at least one rigid fluid conduit" / "the at least one rigid fluid conduit"**

Claims 1 and 20 both introduce "a plurality of fluid conduits" and require coupling the fracturing manifold to the fracturing tree by "at least one rigid fluid conduit of the plurality of fluid conduits." ECF No. 1-2. The claims also require that "the at least one rigid fluid conduit" they reference earlier includes various elements, like pipe joints and connection blocks. *Id.* The claims clarify that the "at least one rigid fluid conduit" must "provide one and only one rigid fluid pathway" between the fracturing manifold and the fracturing tree (or well). *Id.*

Given this language, Butch's is wrong that the term "the at least one rigid fluid conduit" lacks an antecedent basis. A POSITA would understand with reasonable certainty that the claims introduce "the at least one rigid fluid conduit" as being "of the plurality of fluid conduits." Dr. Wooley's application accords with this understanding. *See* ECF No. 27-1 ¶¶ 56–64, 67. Butch's has provided no contrary evidence, much less clear and convincing evidence. The Court should therefore find that this term is not indefinite and apply its plain and ordinary meaning.

### 3. "pipe joints"

Claim 1 requires "a plurality of ***pipe joints*** and connection blocks coupled to one another," and describes "the plurality of pipe joints and connection blocks" as including "a first pipe that is attached for a first connection block" and "a second pipe that is . . . attached to a second connection block." ECF No. 1-2 (emphasis added). As this shows, the "pipe joints" in the claim are lengths of pipe that attach to connection blocks. ECF No. 27-1 ¶¶ 70–72. This follows the specification's description of element 170 as both "pipe joints 170" and "pipes 170." *See* ECF No. 1-2 at 8:29–43. These pipe joints/pipes 170 appear in various figures as lengths of pipe. *See id.* at Figs. 10–12. Dr. Wooley explains, with the support of technical dictionaries, that using "pipe joints" to mean "lengths of pipe" adheres to ordinary and customary use in the industry. ECF No. 27–1 ¶ 74 (citing ECF No. 27-4 (defining "joint" as "length of pipe"); ECF No. 27-12 (defining "joint" as "length of pipe")). The intrinsic and extrinsic evidence thus confirm Cameron's proposal: the term "pipe joints" means "lengths of pipe."

In contrast, Butch's provides no support for its proposal that the term "pipe joints" means "structures for joining pipes." Butch's does not identify any support in the specification. Nor does Butch's provide a single piece of extrinsic evidence that suggests its proposal reflects an ordinary and customary use in the industry. And Butch's proposal is inconsistent with the claim language, as it would produce a nonsensical construction that requires connecting "structures for joining pipes" to connection blocks, which are themselves structures for joining pipes.

Butch's is also wrong that the specification limits "pipe joints 170" to adjustable embodiments. Figure 12 shows element 170 as a length of pipe, and separately labels the optional adjustable element as swivel ring 176. Dependent claims (*e.g.*, claim 5) introduce the adjustability limitations, and Butch's has shown no explicit definition or clear disavowal of claim scope that

would justify reading those limitations into claim 1, as it suggests. The Court should therefore adopt Cameron's proposal and construe "pipe joints" as "lengths of pipe."

### 4. "outlet branch(es)"

Some claims require the fracturing manifold to include extensions from the shared trunk line. The claims describe these extensions as outlet branches. Claim 2, for example, requires "a shared trunk conduit for routing fracturing fluid to multiple fracturing trees of the plurality of fracturing trees" and "outlet branches for routing fracturing fluid from the shared trunk conduit to individual fracturing trees of the multiple fracturing trees." This tracks claim 10, which describes a "fracturing fluid distribution manifold *including* a trunk line *and multiple outlet branches*." *See* ECF No. 1-2 at claims 10 (emphasis added), 2–3, 13, 18. The specification confirms that "outlet branches" means extensions of the manifold from the shared trunk line. *See, e.g.*, *id.* at 1:66–2:4 (describing the trunk line as delivering fracturing fluid to "outlet branches of the manifold").

Dr. Wooley confirms that this would be a POSITA's understanding. ECF No. 27-1 ¶ 63. Dr. Wooley annotates one embodiment of outlet branches in Figure 10. *Id.* ¶¶ 62–64. Butch's admits Figure 3 shows another consistent embodiment. ECF No. 30 at 19. Nothing other than Butch's bare attorney argument suggests that a POSITA would not understand with reasonable certainty where a fracturing manifold ends and where a fluid conduit to the fracturing tree begins. Rather, as Dr. Wooley explains, a POSITA would have extensive education and experience with the prior art, including with connecting fracturing manifolds to fracturing trees using fluid conduits. ECF No. 27-1 ¶¶ 33–51. The Court should therefore find this term not indefinite.

### 5. "the second connection block"; "the second pipe"; "the third studded connection"

Independent claim 10 introduces "a second connection block," "a second pipe," and "a third studded connection." Claim 14 simply requires a more specific arrangement of these components. Butch's is wrong that this does not provide a proper antecedent basis. Instead, as

Dr. Wooley explains, a POSITA would understand this arrangement with reasonable certainty. *See* ECF No. 27-1 ¶ 23. The Court should therefore find these terms not indefinite.

### 6. "the second pipe"; "the first pipe"; "the third pipe"

Claim 10 introduces a system including "a first pipe," "a second pipe," and "a third pipe." Dependent claim 15 limits claim 10's system to a specific arrangement of those elements. Given the introductions in claim 10, Butch's is wrong that these terms lack an antecedent basis in dependent claim 15. *See* ECF No. 27-1 ¶ 23. The Court should thus find these terms not indefinite.

## III. CONCLUSION

As the above discussion shows, a POSITA would understand all the identified terms with reasonable certainty. The Court should therefore find all the claims not indefinite; adopt Cameron's proposed constructions for "positioned at" and "pipe joints"; and give the remaining terms their plain and ordinary meanings.

DATED: August 19, 2020

Respectfully submitted,

By: */s/ John R. Keville*
John R. Keville
Texas Bar No. 00794085
jkeville@winston.com
Merritt D. Westcott (*Pro Hac Vice*)
Texas Bar No. 24027091
mwestcott@winston.com
William M. Logan
Texas Bar No. 24106214
wlogan@winston.com
Evan D. Lewis (*Pro Hac Vice*)
Texas Bar No. 24116670
edlewis@winston.com
WINSTON & STRAWN LLP
800 Capitol Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 651-2600
Facsimile: (713) 651-2700

ATTORNEYS FOR PLAINTIFF,
CAMERON INTERNATIONAL
CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of August, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David G. Henry, Sr.
DHenry@GrayReed.com
Eric S. Tautfest
etautfest@GrayReed.com
Jared Hoggan
jhoggan@GrayReed.com
GRAY REED & MCGRAW LLP
900 Washington Avenue, Suite 800
Waco, Texas 76701


M. Jill Bindler
jbindler@GrayReed.com
David T. DeZern
ddezern@GrayReed.com
David M. Lisch
dlisch@GrayReed.com
GRAY REED & MCGRAW LLP
1601 Elm Street, Suite 4600
Dallas, Texas 75201

ATTORNEYS FOR DEFENDANT BUTCH'S
RATHOLE & ANCHOR SERVICE, INC.


 */s/ John R. Keville*
John R. Keville