# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| | § | |
| | § | |
| CAMERON INTERNATIONAL | § | |
| CORPORATION, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 6:20-cv-00124-ADA |
| | § | |
| v. | § | |
| | § | **JURY TRIAL REQUESTED** |
| BUTCH'S RATHOLE & ANCHOR | § | |
| SERVICE, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

## DEFENDANT BUTCH'S RATHOLE & ANCHOR SERVICE, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

<u>T</u>ABLE OF <u>C</u>ONTENTS

I.     PRINCIPLES OF CLAIM CONSTRUCTION ...................................................... 1

II.    DISPUTED CLAIM TERMS ............................................................................... 2

    A.    U.S. Patent No. 9,915,132 (the "'132 patent") ....................................... 2

        1.    "a single fluid conduit" / "a single fluid conduit coupled to the well fracturing tree" ............................................................... 2

            a.    The scope of Claim 9 is not reasonably certain in view of the claim's unclear meaning and arrangement of "a single fluid conduit" in a fracturing system. ............................. 2

            b.    The scope of Claim 9 is not reasonably certain in view of the claim's unclear meaning of "fluid conduit" as well as the arrangement of "a single fluid conduit" in a fracturing system. ..... 5

            c.    The manner in which "a single fluid conduit" can be "coupled to" the well fracturing tree in accordance with the claim is also unclear. .......................................................... 6

        2.    "positioned at" ........................................................................ 8

        3.    "comprising an additional well fracturing tree" ........................ 10

    B.    U.S. Patent No. 10,385,645 (the "'645 patent") .................................. 10

        1.    "one and only one rigid fluid pathway" .................................... 11

        2.    "at least one rigid fluid conduit" / "the at least one rigid fluid conduit" .. 13

        3.    "pipe joints" ........................................................................... 14

        4.    "outlet branch(es)" ................................................................. 16

            a.    Claims 2, 10, and 13 are indefinite because the structural composition of "outlet branches" is not reasonably certain.......... 16

            b.    Claims 3, 4, and 13 are indefinite because there is no reasonable certainty with respect to how "outlet branches" are incorporated into the claimed systems. ........................................................... 18

            c.    Claims 3 and 18 are indefinite because there is no reasonable certainty as to the number of valves required for inclusion in their respective "outlet branches." ..................................................... 18

        5.    "the second connection block"; "the second pipe"; "the third studded

connection" ................................................................................................... 19

      6.    "the second pipe"; "the first pipe"; "the third pipe" ................................. 20

III.    CONCLUSION ............................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.,*
   512 F.3d 1338 (Fed. Cir. 2008)...................................................................13, 19

*Digital Retail Apps, Inc. v. H-E-B, LP,*
   6:19-cv-00167-ADA (W.D. Tex. Jan. 23, 2020) ...................................................1

*Enzo Biochem, Inc. v. Applera Corp.,*
   599 F.3d 1325 (Fed. Cir. 2010).............................................................................9

*Helmsderfer v. Bobrick Washroom Equip., Inc.,*
   527 F.3d 1379 (Fed. Cir. 2008)...........................................................................15

*Hubbell Inc. v. Watt Stopper, Inc.,*
   A-08-CV-616-LY, 2010 WL 11519467 (W.D. Tex. Apr. 8, 2010) .........................1

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
   572 U.S. 898 (2014)..............................................................................................1

*Stasher, Inc. v. Zip Top et al.,*
   W-18-CV-00312-ADA (W.D. Tex. June 19, 2019) ................................................2

*True Chemical Solutions v. Performance Chemical Co.,*
   MO-18-CV-00078-ADA (W.D. Tex. Sept. 25, 2019).............................................1

Defendant Butch's Rathole & Anchor Service, Inc. (hereinafter "Butch's") respectfully submits this opening claim construction brief for asserted U.S. Patent Nos. 9,915,132 (Ex. 1) and 10,385,645 (Ex. 2).[1]

As demonstrated below, the Claims of both asserted patents fail at multiple stages to satisfy "the 'primary purpose' of the statutory-definiteness requirement" in providing Butch's and others like Butch's, the scope of the claims, and the ability to avoid infringement. *Hubbell Inc. v. Watt Stopper, Inc.*, A-08-CV-616-LY, 2010 WL 11519467, at *3 (W.D. Tex. Apr. 8, 2010) (citing *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002)).

During prosecution of both asserted patents, Cameron made substantially narrowing amendments, adding particular structural arrangements of parts to the claim limitations to overcome the Examiners' rejections. The issued claims, however, include numerous logical flaws, omissions, contradictions and/or other ambiguities that in each instance fail to apprise a person of ordinary skill in the art ("POSITA") of what arrangement of structures are within or without the scope of the claims—far short even of the level of "reasonable certainty" prescribed most recently by the United States Supreme Court. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Butch's addresses these issues in its indefiniteness arguments below, along with the construction of one term which Cameron has applied inconsistently in related patents.

## I.     PRINCIPLES OF CLAIM CONSTRUCTION

The legal standards applicable to claim construction need not be repeated here, and are well summarized in this Court's recent opinions, such as, for example, *Digital Retail Apps, Inc. v. H-E-B, LP*, 6:19-cv-00167-ADA at 2-6 (W.D. Tex. Jan. 23, 2020); *True Chemical Solutions v. Performance Chemical Co.*, MO-18-CV-00078-ADA at 2-5 (W.D. Tex. Sept. 25, 2019); and

---

[1] The prosecution histories of the '132 and '645 patents produced by Cameron in this case are attached as Exs. 6 and 7, respectively.

*Stasher, Inc. v. Zip Top et al.*, W-18-CV-00312-ADA at 1-4 (W.D. Tex. June 19, 2019).

## II.    DISPUTED CLAIM TERMS

### A.    U.S. Patent No. 9,915,132 (the "'132 patent")

The '132 patent purports to teach a configuration of components for oil well fracturing—involving only well-known industry components, all performing conventional functions. This assemblage of pipes and connectors: (1) at some point, directs the flow of fracturing fluid through a "single" conduit, rather than several conduits; (2) allows for adjusting pipes and pipe joints for lining them up with connection points of other frac system components; and (3) involves positioning a common "manifold" an undefined degree closer to ("positioned at") the well bores than perhaps in most prior fracturing setups. *See* '132 pat., Cols. 1:44-48, 1:65-2:6 and 4:13-22. Cameron asserts Claims 9, 10, and 12 from the '132 patent in this case.

As remarkably simple as the subject matter of the '132 patent is (and could have been claimed), the asserted claims represent an incoherent web of undefined terms, with undecipherable relationships, yielding multiple bases of indefiniteness-based claim invalidity.

### 1.    "a single fluid conduit" / "a single fluid conduit coupled to the well fracturing tree"

| Term: | Butch's: | Cameron: |
|---|---|---|
| "a single fluid conduit" (Cl.: 9) | Indefinite | Plain and ordinary meaning |
| "a single fluid conduit coupled to the well fracturing tree" (Cl.: 9) | Indefinite<br><br>(plain and ordinary meaning as to "fracturing tree") | Plain and ordinary meaning: "a single fluid conduit coupled to a specific type of Christmas tree installed specifically for the fracturing process." |

#### a.    The scope of Claim 9 is not reasonably certain in view of the claim's unclear meaning and arrangement of "a single fluid conduit" in a fracturing system.

Claim 9 recites "a *single* fluid conduit *coupled* to the well fracturing tree such that, during

a fracturing operation, fracturing fluid is delivered to the well fracturing tree *through only* the single fluid conduit . . . ." (Emphasis added). These limitations purport to confine Claim 9's scope to exactly one "fluid conduit" that is "coupled to" the fracturing tree, in some uncertain manner, such that fracturing fluid is to be delivered "through only" this undefined structure. Aside from providing no way to define "fluid conduit" in this context (to be discussed later), the claim language provides no guidance as to what in this context is otherwise excluded from the claim's scope through the limiting use of "through *only*" and "*single*." There is no source of cognizable guidance for providing reasonable notice as to what point an operator has (or has not) a "*single*" fluid conduit, much less whether it is arranged in a system in which fluid is delivered "through *only*" that conduit. Also, as discussed below, the addition of the undefined limitations of "coupled" and "positioned at" only further compounds the ambiguities of Claim 9.

The claim language allows for inconsistent interpretations of Claim 9's "a single fluid conduit," including that it is:

(1) the *only* structure (albeit an unlimited and unspecified assemblage of pipes, hoses, etc.) through which fracturing fluid flows all the way from a fracturing fluid source to a fracturing tree (necessarily excluding all but its own components that it may "include"); or

(2) one among several possible structures that is in direct fluid communication with a fracturing tree and through which all fracturing fluid must pass before reaching the fracturing tree while allowing for additional, upstream conduit(s) or component(s).

Through its starkly restrictive "single" and "only" terms alone, Claim 9 is clearly limited in scope, and it is crucial that the public be on notice of at what point a "single fluid conduit" begins and ends. In other words, when can a system be said to no longer have a "*single* fluid conduit" and when is fluid "delivered through *only*" such structure? The claim itself offers no meaningful guidance in this regard.

Fatal to Claim 9 is that the above interpretations (*with differing scope*) remain equally

plausible, even after proper claim construction analysis. The first interpretation excludes from its scope any system that includes a *plurality* of "fluid conduits" (and/or other fluid-pathway defining structures) arranged in series to form a fluid pathway from a fracturing fluid source to a fracturing tree. By contrast, the second interpretation would extend coverage to such a system, so long as all fluid passes through ("delivered through only") whatever might be the "single fluid conduit" at the downstream-most of the multiple fluid conduits. These competing and inconsistent interpretations are not mere machinations, but are drawn from the '132 patent's own specification.

The specification, without any guidance on the element's outer limits (particularly those established through its use of "*single*" or "through *only*"), states in part:

> "In FIG. 1, a connector **30** receives fracturing fluid from the supply **28** through a conduit or fluid connection **32** (e.g., pipes or hoses) and then transmits the fluid to the fracturing manifold **22** by way of a subterranean conduit or fluid connection **34** (e.g., pipes). In one embodiment, the fracturing fluid supply **28** is provided by one or more trucks that deliver the fracturing fluid, connect to the connector **30**, and pump the fluid into the fracturing manifold **22** via the connector **30** and connections **32** and **34**." '132 pat., Col. 4:2-10.

This first embodiment describes the "single fluid conduit" element of Claim 9 in accordance with the second interpretation (but not the first interpretation). It includes a *plurality* of "fluid conduits" (specifically conduits **32**, **34**, and conduit **42** of manifold **22**), arranged in series, with all fracturing fluid being delivered to the tree passing directly to it "through only" a single "fluid conduit." In this instance, the "*single* fluid conduit" would be the manifold conduit **42**—a structure that is in direct fluid communication with the tree through which all fluid delivered to the tree must flow.

The specification continues to describe a second, alternative configuration:

> "In another embodiment, the fracturing fluid supply **28** is in the form of a reservoir from which fluid may be pumped into the fracturing manifold **22**." '132 pat., Col. 4:10-13.

Here, the first interpretation *would* encompass this alternative configuration (with respect to "single fluid conduit" alone, and without reference to any ambiguity of "fluid conduit") because

4

fracturing fluid is solely conveyed from a fluid source to the fracturing tree ("delivered through only") via manifold (conduit **42**).

The remainder of the specification focuses primarily on the utility of conventional adjustment joints and also fails to provide any insight into what interpretation of "delivered . . . through only" is appropriate as applied to "a single fluid conduit." Furthermore, the '132 patent prosecution history is likewise devoid of any discussion of, or guidance on these issues.

With the unresolvable ambiguity of the claim language itself, and with no better source of clarity from either the specification or prosecution history, the scope of "a single fluid conduit" and thus that of Claim 9, is undiscernible. Claim 9 is indefinite on this basis alone.

> **b.** **The scope of Claim 9 is not reasonably certain in view of the claim's unclear meaning of "fluid conduit" as well as the arrangement of "a single fluid conduit" in a fracturing system.**

Claim 9's "fluid conduit" (whether "single" or not) is similarly ambiguous, even if one could resolve in what configuration the fracturing fluid is "delivered through only" such structure. Claim 9 recites:

> "wherein the single fluid conduit ***includes***: a first connection block positioned at the well fracturing tree; a second connection block; and one or more pipe sections coupled between the first connection block and the second connection block such that fracturing fluid ***can be*** routed from the second connection block to the first connection block through the one or more pipe sections and then to the well fracturing tree through the first connection block." (emphasis added).

While it is clear that a "single fluid conduit" must have at least two connection blocks and one or more intervening pipe sections, the claim language itself is ambiguous as to when an assembly of interconnected pipes, by "includ[ing]" more components, no longer constitutes a "***single*** fluid conduit," or even a "fluid conduit," and instead amounts respectively to multiple "fluid conduits" or non-conduit fracturing system components (a portion of a frac tree, for example). Even less clear is when fluid would still be "delivered through only" such structure.

Particularly confounding is that fracturing fluid "*can* be" routed through the specified structures, *but is not required to be* so routed. This introduces further ambiguity as to what configurations of conduit components are encompassed by the claim, as well as those that are *excluded* by the restrictive "single" and "through only." As written, the permissive "can be" language allows for the possibility of systems having some alternate fluid pathway to the tree so long as: (1) the pathway is still part of the "single fluid conduit"; and (2) the configuration of the "single fluid conduit" would simultaneously permit fluid communication between the first connection block and the fracturing tree. Given the lack of any additional description in the claims of what a "fluid conduit" may or may not comprise, a POSITA (as well as an accused infringer or a jury) is left to guess at what point an assembly of pipes having multiple fluid pathways each in fluid communication with a fracturing tree transitions from a single to multiple conduits.

While this ambiguity could have easily been resolved by simply reciting that "fracturing fluid *is* routed from the second connection block," the patentee chose, once again, broader, indefinite language in a fatal attempt to expand the claim's scope. This scope, however, has no determinate bounds. The specification is unhelpful as there is no teaching of any systems that do not *require* fluid to flow "from the second connection block to the first connection block through the one or more pipe sections." '132 pat., Cl. 9. The prosecution history is also silent as to what alternate configurations Claim 9 "can be" read to encompass. As a result, the bounds of "a single fluid conduit" are so ambiguous that the scope of Claim 9 is not reasonably certain thereby rendering the claim indefinite.

        **c.**    **The manner in which "a single fluid conduit" can be "coupled to" the well fracturing tree in accordance with the claim is also unclear.**

As discussed above, a "fluid conduit" per Claim 9 *includes* some assembly of pipe sections and connection blocks. Notwithstanding the ambiguities raised as to the possibility of multiple

fluid pathways, and even assuming for purposes of this discussion that "a single fluid conduit" defines only one fluid pathway between fluid source and fracturing tree, there exists even further uncertainty as to how the claimed "single fluid conduit" and fracturing tree interface. While Claim 9 recites "a single fluid conduit *coupled to* the fracturing tree," the remainder of the claim provides no guidance concerning by what means "coupled to" is (or is not) achieved. A fair meaning of "coupling" may be apparent in many cases, but other terms and phrases in Claim 9 remove any reasonable certainty of its meaning here. Furthermore, Claim 10 only amplifies the ambiguity of Claim 9 by specifying that coupling is by way of the first connection block expressly being "*attached* to a valve of the well fracturing tree." In accordance with claim differentiation, Claim 9 must encompass some broader forms of "coupling" than in Claim 10. The claim itself is devoid of any guidance on the meaning of "coupling" the conduit to the fracturing tree, or the extent to which a POSITA can add components/structures in connecting the "single fluid conduit" to the "well fracturing tree" to design around Claim 9.

As for the specification, it discloses only one manner of coupling, and it mirrors only that of Claim 10—the direct attachment of a connection block to a valve of a fracturing tree. *See, e.g.,* '132 pat., Col. 4:28-30 (For the manifold **22** depicted in Fig. 3, "the connection blocks **48** themselves are coupled to valves **50** (e.g., gate valves) of the fracturing trees **20**."), 4:44-45 ("direct connection [of the manifold] to the valves **50** of the fracturing tree **20**"), Fig. 3. Beyond that, the specification doubles-down on the ambiguity of "coupled" by excluding some (*but not other*) conventional methods of "coupling" to a fracturing tree. Specifically, the specification describes coupling "without using separate *output lines* or *frac iron* to connect fracturing manifold **22** and the fracturing trees **20**." '132 pat., Col. 3:37-39 (emphasis added). The prosecution history also provides no clarification on the scope of "coupled." Therefore, one does not, and cannot know

where a "fluid conduit" begins and ends, when it amounts to a "single" such conduit, and how it (whatever it might be) is "coupled" to a fracturing tree. Thus, a POSITA is, once again on this basis alone, left without fair notice of what other means of coupling are either within or without the scope of Claim 9 (assuming that the clam might otherwise be valid), and Claim 9 is indefinite.

### 2. "positioned at"

| Term: | Butch's: | Cameron: |
|---|---|---|
| "positioned at" (**Cl.:** 9) | Indefinite | "attached to or adjacent to" |

Claim 9 is indefinite also (and independently of the above issues) because there is no way through proper claim construction to reasonably discern the scope of the term "positioned at." Claim 9 recites "a first connection block *positioned at* the well fracturing tree." There is no further explanation in the claim as to the boundaries of the relative spatial relationship between the first connection block and the tree. While Claim 9 recites that fracturing fluid may be routed "to the well fracturing tree *through* the first connection block," this provides no clarity as to what distance from the tree the connection block can be arranged while still being "positioned at" the tree.

Since, as discussed in previous sections above, the "single fluid conduit" is not restricted to only two connection blocks and intervening pipe sections, and is indefinitely "coupled to" the fracturing tree, the conduit may further include additional connection blocks and pipes that serve to extend the fluid pathway defined by the claimed conduit structures. In so doing, these additional, unclaimed structures may increase the distance, or change the relative "position" between the first connection block and the fracturing tree. It is impossible to know, from a reading of the claim language, how far the first connection block may be from, nor at what position it may be relative to the fracturing tree, while remaining (or no longer remaining) "positioned at" the well fracturing tree.

Moreover, Claim 10's recitation that "the first connection block is attached to a valve of the well fracturing tree" highlights the ambiguity of Claim 9. Under the principle of claim differentiation, Claim 9 necessarily includes some other, and broader, relative spatial relationship between a first connection block to a fracturing tree beyond specifically direct attachment to a fracturing tree valve. While "positioned at" would seem to at least include "direct attachment" to a fracturing tree, there is still no guidance with respect to the outer limit of either spatial separation or relative positions of the first connection block relative the fracturing tree.

The specification does not resolve this ambiguity, as it provides no clear delineation of when a particular component of a conduit is or is not considered "positioned at" a fracturing tree. The specification teaches only the configuration of Claim 10—direct attachment of connection blocks to tree valves. *See, e.g.,* '132 pat., Col. 4:28-30 (For the manifold **22** depicted in Fig. 3, "the connection blocks **48** themselves are coupled to valves **50** (e.g., gate valves) of the fracturing trees 20."), 4:44-45 ("direct connection [of the manifold] to the valves **50** of the fracturing tree **20**"), Fig. 3.

In this context, "positioned at" is properly characterized as a term of degree purporting to require how close the connection block must be to the fracturing tree in the claim. "When a 'word of degree' is used, the court must determine whether the patent provides 'some standard for measuring that degree.'" *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010) (citation omitted). Both the claims and the specification fail to provide any guidance on the degree to which a connection block is "positioned at" the tree.

Evidencing either a hedge of the proposed construction, or an admission to their own inability to solve the ambiguity, Cameron proposes a construction of "attached **_or_** adjacent to" (emphasis added). Cameron's proposed construction merely replaces one boundless term of

9

degree ("positioned at") with another—"adjacent"—without articulating any standard for measuring when a connection block is or is not "positioned at"/"adjacent" to a tree.

These ambiguities surrounding "positioned at" further compound the issues described above relating to "a single fluid conduit" (and its equally vague qualifiers) and prevent a POSITA from determining at what distance a connection block arranged relative a fracturing tree might (or might not) infringe the claim and, therefore, how to design around it. Claim 9 is indefinite.

### 3. "comprising an additional well fracturing tree"

| Term: | Butch's: | Cameron: |
|---|---|---|
| "comprising an additional well fracturing tree" (**Cl.:** 12) | Indefinite | Plain and ordinary meaning: "adding another specific type of Christmas tree installed specifically for the fracturing process." |

Here, a POSITA has no way to know when or how the additional well fracturing tree interacts, if at all, with the system of Claim 9. Is the additional well fracturing tree sitting in a crate or on a truck as a backup to Claim 9's well fracturing tree? Is it a fracturing tree on the same site or within some proximate distance from the system of Claim 9? Such a disconnected claim limitation cannot inform a POSITA of the scope of the claim or when or how another fracturing tree, somewhere, implicates the requirements of Claim 12. Thus, Claim 12 is indefinite.

### B. U.S. Patent No. 10,385,645 (the "'645 patent")

The '645 patent relates to a fracturing system designed to communicate fracturing fluid through a fracturing manifold to multiple well fracturing trees. *See* '645 pat., Col. 1:59-2:4. More specifically, the '645 patent discloses (and describes in great detail) numerous adjustment joints as arranged in otherwise conventional fracturing systems. *See id*. Cols. 4:50-9:24 and Figs. 3-12. These conventional fracturing systems include a manifold assembly having a shared trunk line that feeds into what may be one or more fluid connections to individual fracturing trees. *See id*. Cols. 4:22-37 and 5:42-46.

Cameron asserts claims 1-4, 7-8, 10, 13-15, 17-18, and 20 from the '645 patent in this case.

### 1. "one and only one rigid fluid pathway"

| Term: | Butch's: | Cameron: |
|---|---|---|
| "one and only one rigid fluid pathway"<br>(**Cls.:** 1, 10, 20) | Indefinite | Plain and ordinary meaning |

Claims 1, 10, and 20 are indefinite because the term "one and only one rigid fluid pathway" cannot be given a reasonably certain meaning. Each of these claims recites "one and only one rigid fluid pathway" between a fracturing manifold and a fracturing tree. Nothing in the claims indicates whether this limitation means:

(1) exactly one *rigid* fluid pathway between the manifold and tree (permitting additional, *non-rigid* fluid pathways); or

(2) exactly one fluid pathway between the manifold and tree (excluding the possibility of any other manifold-tree pathways) that itself must be wholly rigid.

Claims 1 and 20 each recite "*a plurality of fluid conduits* coupled between the fracturing manifold and the plurality of fracturing trees" (not in any way specifying how the "plurality" is allocated between a fluid source and any given fracturing tree(s)).  Among these conduits which may be rigid or non-rigid, these claims encompass that "each fracturing tree . . . is coupled to the fracturing manifold by *at least* one rigid fluid conduit of the plurality of fluid conduits so as to provide *one and only* one rigid fluid *pathway* . . . ." Thus, these claims appear to encompass multiple conduits between a manifold and a tree wherein at least one is, but not necessarily all are, rigid. As a result, neither a POSITA nor anyone else can determine whether the "one-and-only" limitation is intended to claim the first or second above interpretation. There is likewise nothing in any of the respective dependent claims to indicate on which of the interpretations one may rely for notice of these claims' scope.

Claim 10 recites that "the fracturing fluid manifold is coupled to provide fracturing fluid from the trunk line to the first well by one and only one rigid fluid pathway . . . ." As with claims 1 and 20 above, there is no indication from the claim language itself whether or not the claimed system excludes the presence of other, non-rigid pathways between the manifold and any given well.

The specification does not resolve this ambiguity. It states, in relevant part:

> "Further, while the depicted fluid connection **26** includes a single flow path or conduit (which may be a fracturing line with a seven-inch bore in one instance) between fracturing tree **20** and the fracturing manifold **22**, *a fracturing system may include a greater number of conduits between the fracturing manifold and a fracturing tree in other embodiments*." '645 pat., Col. 4:31-37 (Emphasis added).

This explains that, despite the claims' emphatic "one and only one" limitation, a system could include numerous connections between a manifold and any given well, but does not distinguish between "rigid" pathways (as defined by rigid conduits) and otherwise. Additionally, the specification concedes that "conduits" may be rigid or non-rigid structures (referencing both "pipes" and "hoses"). *See* '645 pat., Col. 4:2-6. The specification continues "[c]onsequently, as depicted in FIG. 3, a single fluid connection **26** *may be* provided in the form of a large-bore fracturing line, rather than using multiple smaller-bore fracturing lines between the fracturing manifold and a given fracturing tree." (Emphasis added) 5:42-46. This again in no way informs the claims' limits with respect to "*one and only one rigid* fluid pathway" as it contemplates multiple parallel pathways (with no indication as to whether they be rigid or non-rigid). Indeed, prior art arrangements involving multiple conduits (rigid and non-rigid) were known in the oilfield, including as reflected in prior art cited on the face of the '645 patent. *See, e.g.*, Ex. 3, U.S. Patent No. 9,127,545 (from cover of '645 patent), Fig. 6 & Cols. 7:65-8:4, 8:16-18 (describing "Distribution pipelines **84**" (plural) that enable distribution of fracturing fluid to a "frac tree **88**"

12

which "may be high-pressure *flexible* piping.") (emphasis added). The prosecution history is silent on this particular topic.

There is no way to reasonably determine whether the scope of Claims 1, 10, and 20 covers (or excludes), for example, a system that (a) includes multiple conduit-defined pathways leading to each fracturing tree/well, only one of which is "rigid," or (b) a system that excludes all but a single "rigid" conduit-defined pathway leading to each frac tree/well. While, as with other terms, the patentee could have easily resolved this issue, such as by claiming "one and only one fluid pathway, wherein the fluid pathway is rigid," they failed to do so. As a result, the scope of claims 1, 10, and 20 are not reasonably certain and they are, therefore, indefinite.

> ## 2. "at least one rigid fluid conduit" / "the at least one rigid fluid conduit"

| Term: | Butch's: | Cameron: |
|---|---|---|
| "at least one rigid fluid conduit" / "the at least one rigid fluid conduit" **(Cls.: 1, 20)** | Indefinite | |

Claims 1 and 20 are indefinite because the limitation "*the* at least one rigid fluid conduit" (emphasis added) lacks proper antecedent basis. One cannot determine to what prior claim element the "the" limitation references. A claim lacks proper antecedent basis "where it would be unclear as to what element the limitation was making reference." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008) (quoting Manual of Patent Examining Procedure (MPEP) § 2173.05(e)); *id.* ("[I]f two different levers are recited earlier in the claim, the recitation of 'said lever' in the same or subsequent claim would be unclear where it is uncertain which of the two levers was intended.").

Claims 1 and 20 recite: "a plurality of fracturing trees," where "*each fracturing tree* of the plurality of fracturing trees [that is] coupled to the fracturing manifold *is coupled* to the fracturing manifold *by at least one rigid fluid conduit* . . . ." Later, the same claims then indicate that:

"wherein _the_ _at least one rigid fluid conduit_ includes a plurality" of other structures. In this subsequent limitation, there is no reference back to said "each fracturing tree" or any other provision of a clear connection to a specific "at least one rigid fluid conduit."

As a result, "_the_ at least one rigid fluid conduit" is ambiguous in its linkage to any prior claim element. This limitation fails to specify which of the many possible "at least one rigid fluid conduit[s]" it might reference, or exclude. Thus, there is no guidance as to which "at least one rigid fluid conduit" the claim language requires to include "a plurality of pipe joints and connection blocks . . . ." The applicant could have drafted this language to refer to "each of the at least one rigid fluid conduit includes . . ." or "at least one of the at least one rigid fluid conduit includes," depending on which he intended to cover. As a result, Claims 1 and 20 fail to apprise one of ordinary skill (or anyone) whether "the at least one rigid fluid conduit" applies the additional limitations to each, some, or all of the claimed "at least one rigid fluid conduit[s]" and are, therefore, invalid as indefinite.

### 3. "pipe joints"

| Term: | Butch's: | Cameron: |
|---|---|---|
| "pipe joints" (**Cl.:** 1) | "structures for joining pipes" | "lengths of pipe" |

Claim 1 recites "the at least one rigid fluid conduit includes a plurality of _pipe joints_ and connection blocks . . . including: a first _pipe_ that is attached to a first connection block . . .; and a second _pipe_ that is in fluid communication with the first _pipe_ and is attached to a second connection block . . . ." (Emphasis added). Both parties agree that the term "pipe joints" requires construction, however, the construction sought by Cameron—that "pipe joints" means "lengths of pipe"—is inconsistent with the claim, the specification, and Cameron's own position for related patents. In Claim 1, the patentee chose "pipe joints" and "pipe" as separate, distinct terms giving rise to the

presumption they have distinct meanings. *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) (holding "different claim terms are presumed to have different meanings.").

The specification provides no support for Cameron's proposed construction of "lengths of pipe." The only instance of the term "pipe joints" in the written description relates specifically to "rotatable pipe joints" that serve as part of the "adjustment joints" in one disclosed embodiment. '645 pat., Col. 8:29-32. This passage indicates that "pipe joints" refers to a particular structure for joining pipes rather than a length of pipe itself.

Furthermore, despite its current proposed construction, Cameron has affirmatively taken the position that a "pipe joint" does *not* correspond to a length of pipe to distinguish prior art. Specifically, in an *Inter Partes* Review of another Cameron patent (U.S. Pat. No. 9,932,800) with the same specification as the asserted '645 patent, Cameron attempted to distinguish prior art U.S. Patent Appl'n Pub. No. 2009/0194273 ("Surjaatmadja") (Exhibit 5), which is also asserted as prior art by Butch's in this case. In the IPR, Cameron distinguished what it called "straight runs of pipe" in Figure 17 of Surjaatmadja arguing that "Figure 17 does not depict elbows or pipe joints." *See* Ex. 5, Cameron's '800 IPR Surreply at 16; *see also* Ex. 4, Surjaatmadja Fig. 17. Cameron cannot have it both ways—here urging that a "pipe joint" and a length of "pipe" are the same (even within a single claim), while previously, in a public forum and on the basis of the very same specification as here, explicitly relying for survival of their patent claims on the position that "pipe joint" and a length of "pipe" are distinct structures.

With neither intrinsic claim language, specification, nor prosecution history guidance to the contrary, the only proper construction of "pipe joint" is the plain and ordinary meaning —"a structure for joining pipes."

4.      "outlet branch(es)"

| Term: | Butch's: | Cameron: |
|---|---|---|
| "outlet branch(es)"<br>(**Cls.:** 2, 3, 4, 10, 13, 18) | Indefinite | Plain and ordinary meaning:<br>"extension(s) from the shared trunk line." |

a.      **Claims 2, 10, and 13 are indefinite because the structural composition of "outlet branches" is not reasonably certain.**

Claims 2 and 13 include "outlet branches" limitations for routing fracturing fluid to fracturing trees. Other than simply some structure capable of performing this particular function, there is no explanation as to what does or does not constitute an "outlet branch." While Claim 3 recites that outlet branches *may* "include valves," under the principles of claim differentiation, Claim 2 must encompass some broader scope of structure(s) that includes, but is not limited to "valves." Claim 13 is similarly devoid of any description or limitations as to what an "outlet branch" is (or is not). Additionally, outlet branches, for both Claims 2 and 13, are characterized as part of the manifold. This characterization, however, provides no clarity as to what particular structural component of the manifold corresponds to an outlet branch—where an "outlet branch" begins and ends, and what it includes or excludes.

The structural ambiguity of "outlet branches" becomes even more apparent when comparing the systems of Claims 1 and 2.  Claim 2 purports to further limit the system of Claim 1 as having a manifold which includes "a shared trunk conduit" *and* "outlet branches" that work in concert to facilitate the communication of fracturing fluid to a fracturing tree. As Claim 1 already requires a manifold with some shared fluid channel for routing fracturing fluid to individual trees of the plurality of trees, it is entirely unclear what more, if anything, is specified by Claim 2. At best, an "outlet branch" is some undefined structure that serves to interface the "at least one rigid

fluid conduit" and the "shared trunk conduit" portion of the manifold. The boundaries between a manifold and conduit for purposes of identifying the "outlet branch" structure remain unclear.

Since the manifold and fluid conduits are assemblies as claimed (and described in the specification), there is no way to tell which components of either assembly can, or cannot, be considered "outlet branches" in Claims 2 and 13. The same problem infects the determination of what structures delineate "outlet branches" in Claim 10. In Claim 10, the "outlet branches" are part of the claimed "fracturing fluid distribution manifold" and also included in the claimed pathway assemblies. Although Claim 10 includes additional detail reciting that each outlet branch includes a "pair of valves in series," there is no further indication of what structures define an "outlet branch" or their encompassed arrangement relative the remaining pathway assembly components. The claims fail to apprise a POSITA with reasonable certainty how to design around the claimed structure, leaving them to guess as to when having any valves in a system would be considered outside of the "outlet branch."

Moreover, the specification contains no reference to "outlet branches" outside of the abstract and summary, which mirror the claim language. Cameron has proposed that "an outlet branch" is an "extension from the shared trunk line." This is no less ambiguous than the term itself. Returning to an earlier discussion, the "at least one rigid fluid conduit" of Claim 1 is necessarily an extension from the shared fluid channel of the manifold. If the "outlet branch" is some other structure that intervenes between two assemblies, there is no clear guidance as to what that structure is or what the relevant boundaries are. Because the specification does not inform a POSITA any further regarding the metes and bounds of "outlet branches," Claims 2, 10, and 13 are indefinite.

        **b.**      **Claims 3, 4, and 13 are indefinite because there is no reasonable certainty with respect to how "outlet branches" are incorporated into the claimed systems.**

Even assuming that one can delineate "outlet branches" from other claimed system components, Claims 3, 4, and 13 fail to provide sufficient description of how the claimed "outlet branches" fit into a fracturing system. All three Claims recite generally that outlet branch(es) is/are used to route fracturing fluid to a fracturing tree. There is little, if any, connection to any previously claimed structures or other description. As a result, these claims could be read to encompass: (1) systems in which outlet branch(es) are only connected to, or otherwise form part of, the claimed pathway(s) between fracturing manifold and fracturing tree(s); or (2) systems in which the outlet branch(es) can form separate, previously undescribed, fluid connections between a manifold and fracturing tree(s).

Looking to the discussion of "one and only one rigid fluid pathway," a similar ambiguity exists here. Claims 3, 4, and 13 give rise to the possibility that their respective scopes encompass numerous pathways between a manifold and a fracturing tree. Here again, there is no guidance in the specification (as discussed above) or in any dependent claims as to the boundaries or arrangement of "outlet branches" in a fracturing system. Accordingly, Claims 3, 4, and 13 are indefinite.

        **c.**      **Claims 3 and 18 are indefinite because there is no reasonable certainty as to the number of valves required for inclusion in their respective "outlet branches."**

Claims 3 and 18 recite "wherein the outlet branches … include valves" or "outlet branches having valves," respectively. As written, these limitations can be interpreted to mean either: (1) *each* outlet branch must include more than one valve; or (2) the outlet branches must *collectively* include more than one valve. There is no further explanation in the claims themselves, or any respective dependent claims, that resolve this ambiguity.

The specification supports both interpretations stating: "Although the present embodiment includes two valves **44** and two valves **46**, any other suitable number of valves may instead be used to control flow of fracturing fluid to fracturing trees **20**." '645 pat., Col. 4:28-31. This leaves open the possibility that any number of valves may be used (or not used) as appropriate for a particular fracturing application. It therefore remains unclear what number of valves are recited by Claims 3 and 18 for inclusion in an "outlet branch." Accordingly, Claims 3 and 18 are indefinite.

5. **"the second connection block"; "the second pipe"; "the third studded connection"**

| Term: | Butch's: | Cameron: |
|---|---|---|
| "the second connection block" "the second pipe" "the third studded connection" (**Cl.:** 14) | Indefinite | Plain and ordinary meaning |

Similar to Section II.B.2, above, Claim 14 is indefinite because the disputed terms lack proper antecedent basis. *See, e.g., Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008) (noting a claim lacks proper antecedent basis "where it would be unclear as to what element the limitation was making reference.") (citing MPEP § 2173.05(e)). Independent Claim 10 recites "wherein each of the one and only one *rigid fluid pathway* and the one and only one *additional rigid fluid pathway* include:" and specifies that "each of" these pathways includes "a second pipe," "a second connection block," and "a third studded connection." Claim 14, which depends from Claim 10, recites "wherein the second connection block is attached to the second pipe with the third studded connection." This limitation lacks antecedent basis, and renders Claim 14 indefinite, because it fails to specify which "second pipe," "second connection block," and "third studded connection" is being referenced—the one in the "one and only one rigid fluid pathway" or the one in the "one and only one *additional* rigid fluid pathway." The applicant could have drafted this language to refer to each pathway (as in Claim 10 and even later in Claim 14) or

to "at least one of" such pathways depending on which he intended to cover. As noted above in Section II.B.2, the applicant was able deploy this language to provide clarity elsewhere, but failed to here and cannot now fix this logical flaw in the claims. Claim 14 is indefinite.

### 6. "the second pipe"; "the first pipe"; "the third pipe"

| Term: | Butch's: | Cameron: |
|---|---|---|
| "the second pipe"<br>"the first pipe"<br>"the third pipe"<br>(**Cl.:** 15) | Indefinite | Plain and ordinary meaning |

Claim 15 is indefinite for the same reasons in Section II.B.5, above. Claim 15 indirectly depends on Claim 10 and recites "wherein the second pipe is orthogonal to the first pipe, and the third pipe is orthogonal to the second pipe." This limitation lacks antecedent basis, and renders Claim 15 indefinite, because it fails to specify whether it refers to structures in the "the one and only one rigid fluid pathway," "the one and only one additional rigid fluid pathway," or both. This logical flaw renders Claim 15 indefinite for the same reasons addressed above in Section II.B.5.

## III. CONCLUSION

For the foregoing reasons, Butch's respectfully requests that the Court adopt its positions on claim construction, reject those put forward by Cameron, and find the asserted claims indefinite.

Dated: July 15, 2020                    Respectfully submitted,

By:     */s/ David G. Henry, Sr.*
        David G. Henry, Sr. – Lead Counsel
        State Bar No. 09479355
        DHenry@GrayReed.com
        Eric S. Tautfest
        State Bar No. 24028534
        etautfest@GrayReed.com
        Jared Hoggan
        Texas Bar No. 24065435
        jhoggan@GrayReed.com
        **GRAY REED & MCGRAW LLP**
        900 Washington Avenue, Suite 800
        Waco, Texas  76701
        Telephone: (254) 342-3000
        Facsimile: (254) 342-3100

        M. Jill Bindler
        Texas Bar No. 02319600
        jbindler@GrayReed.com
        David T. DeZern
        Texas Bar No. 24059677
        ddezern@GrayReed.com
        David M. Lisch
        State Bar No. 24077179
        dlisch@GrayReed.com
        **GRAY REED & MCGRAW LLP**
        1601 Elm Street, Suite 4600
        Dallas, Texas 75201
        Telephone: (214) 954-4135
        Facsimile: (469) 320-6901

        **ATTORNEYS FOR DEFENDANT BUTCH'S
        RATHOLE & ANCHOR SERVICE, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document and accompanying attachments has been served on all counsel of record via the Court's ECF system on July 15, 2020.

*/s/ David Lisch*
David M. Lisch

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| | § | |
| | § | |
| CAMERON INTERNATIONAL | § | |
| CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 6:20-cv-00124-ADA |
| | § | |
| v. | § | |
| | § | **JURY TRIAL REQUESTED** |
| BUTCH'S RATHOLE & ANCHOR | § | |
| SERVICE, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |
| | § | |

**DEFENDANT BUTCH'S RATHOLE & ANCHOR SERVICE, INC.'S
RESPONSE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     CLAIM CONSTRUCTION PRINCIPLES ......................................................... 2

    A.      The intrinsic record is the "single best guide" to the construction of any claim term. ........................................................................................................ 2

III.    ARGUMENT .......................................................................................................... 4

    A.      Cameron's characterizations of the '132 and '645 patents lack support in their respective disclosures and illustrate the confusion within each that is ultimately reflected in the claims. ........................................................................................ 4

        1.      Cameron's assertion that the '132 patent provides "a single fluid pathway between a manifold and a fracturing tree" is inconsistent with the specification's clear language. .................................................................... 5

        2.      The '645 patent disclosure is not limited to systems providing "a single fluid pathway between a manifold and a fracturing tree." .......................... 6

    B.      Cameron's Brief and the Wooley Declaration not only fail to provide any support for a definite construction of the challenged claim terms, but introduce additional reasons to find the asserted claims indefinite. ........................................................ 8

        1.      The '132 Patent ........................................................................................... 8

            a.      "a single fluid conduit" ................................................................... 8

            b.      "positioned at" .............................................................................. 10

            c.      "comprising an additional well fracturing tree" ............................ 12

        2.      The '645 Patent ......................................................................................... 14

            a.      "one and only one rigid fluid pathway" ........................................ 14

            b.      "at least one rigid fluid conduit" / "the at least one rigid fluid conduit" ......................................................................................... 16

            c.      "pipe joints" .................................................................................. 16

            d.      "outlet branch(es)" ....................................................................... 17

            e.      "the second connection block"; "the second pipe"; "the third studded connection" .................................................................... 19

            f.      "the second pipe"; "the first pipe"; "the third pipe" .................... 20

IV.   CONCLUSION...................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008)..................................................................................16

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................................2, 3

*True Chem. Sols., LLC v. Performance Chem. Co.*,
    No. MO-18-CV-00078-ADA (W.D. Tex. Sept. 25, 2019) .........................................3

*Whirlpool Corp. v. Ozcan*,
    No. 2:15-CV-2013-JRG, 2016 WL 7474517 (E.D. Tex. Dec. 29, 2016) ..................3

## I.    INTRODUCTION

Although Cameron's opening claim construction brief (ECF No. 27) ("Cameron's Brief") and its associated expert declaration of Dr. Gary Wooley (ECF No. 27-1) (the "Wooley Declaration") take the position that all ten of the challenged claim terms have a clear meaning discernible from the intrinsic record, they provide no genuine support for this position and rely instead on mischaracterizations of the patents' disclosures and unfounded conclusory statements. Both Cameron's Brief and the Wooley Declaration opine at length on certain prior art systems and purported "embodiments" of the two patents. These embodiments, however, conflate the respective systems disclosed by the '132 and '645 patents[1] despite their plain language that defines completely different systems, from different inventors, in different patent families. Cameron only directly addresses two terms ("positioned at" and "pipe joints"). It discusses other terms briefly, when mischaracterizing the two patents, in an apparent attempt to improperly construe them based on its conflation of the two patents. Moreover, for the terms that lack a clear antecedent basis, Cameron offers no explanation as to how a person of ordinary skill in the art (a "POSITA") would be able to decipher the facial ambiguity of the claim language and makes only conclusory statements in defense of the limitations.

Regarding the terms argued individually ("positioned at" and "pipe joints"), Cameron takes similarly confusing and unsupported positions. Cameron and its expert both contend that a POSITA would understand "positioned at" to mean the equally ambiguous "attached to or *adjacent to*" (emphasis added) then further assert, with no support or reasoning, that "attached to" should be understood to mean essentially "integral to." With respect to this latter point, Cameron's

---

[1] Cameron asserts Patent Nos. 9,915,132 (the "'132 patent") and 10,385,645 (the "'645 patent") in this case.

arguments are analogous to urging that an individual can stand next to one's self. Notwithstanding that such a construction would entirely undermine other limitations in the claim as explained below, Cameron also fails to provide any support that a POSITA would understand the extent to which "adjacent to" in any way prescribes the relative spatial positioning of the "first connection block" and "fracturing tree." As for "pipe joints," Cameron maintains its proposed construction as "lengths of pipe" despite having previously taken a contrary position before the USPTO when defending a related patent. Cameron should not now be permitted, as a matter of circumstantial convenience, to refute their prior public pronouncement on this very issue – a position on which those needing to know the meets and bounds of the subject patent have every right to rely.  In any event, one looking for ways to avoid the scope of the asserted claims with a non-infringing "work-around," once again, has no way to discern their limits from these claim elements.

Additionally, while Cameron asserts that the lack of an opposing expert somehow undermines Butch's positions, Cameron's use of an expert in this context is particularly meaningless as employed and risks impropriety to the extent the expert's opinions attempt to diminish clear logical ambiguities present in the claims.  The intrinsic record fully and adequately supports Butch's positions, while Cameron's reliance on extrinsic expert pronouncements amount to nothing more than conclusory statements that are devoid of any foundation or support and, at times, are internally inconsistent and contradict the intrinsic record. For these reasons, the Court should adopt Butch's claim construction positions.

## II.      CLAIM CONSTRUCTION PRINCIPLES

### A.      The intrinsic record is the "single best guide" to the construction of any claim term.

As the Court well knows, the intrinsic record is the starting point and basis for any claim construction analysis and, if sufficient, is the ending point as well. Not only "must [the claims] be

read in view of the specification," but the specification usually "is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). Cameron acknowledges this in its brief, quoting this Court in stating: "Although extrinsic evidence can also be useful, it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" Cameron's Brief, at 14 (citing *True Chem. Sols., LLC v. Performance Chem. Co.*, No. MO-18-CV-00078-ADA, at 3 (W.D. Tex. Sept. 25, 2019)(quoting *Phillips*, 415 F.3d at 1317))).

Despite this, Cameron argues that an expert is required for questions of indefiniteness, citing to *Whirlpool Corp. v. Ozcan*, No. 2:15-CV-2013-JRG, 2016 WL 7474517, at *3 (E.D. Tex. Dec. 29, 2016) (stating that the court found an indefiniteness argument unpersuasive when: "[i]nstead of submitting evidence, such as an expert declaration, to demonstrate the understanding of a person of ordinary skill in the art, [the defendant] relie[d] entirely on attorney argument based on the patent's intrinsic evidence."). Cameron's Brief, at 16-17. Unlike *Whirlpool*, however, where the Court found the *intrinsic* evidence alone did not support the defendant's arguments (*Whirlpool*, 2016 WL 7474517, at *3[2]), the intrinsic evidence in this case is, *without more*, full and adequate support for Butch's positions as discussed in Butch's Opening Claim Construction Brief (ECF No. 28) ("Butch's Brief") and in the plain language of the '132 and '645 patents. There are clear, logical ambiguities in the claim language, and the specifications identify several embodiments to

---

[2] Both parties argued the term's construction in the context of the patent's specification and without relying on expert testimony. The defendant argued that it was unclear as to how "about 2 cm" could result in lengths "both less than and greater than" 2 cm. The court found this argument unpersuasive, since no exactitude was required, because "about 2 cm" logically encompasses lengths that may be slightly less or greater than 2 cm. The present case is distinguishable as "positioned at," for example, provides no manner to gauge whether a particular relative spatial configuration satisfies the limitation.

which the claims might be directed depending on which of several reasonable, alternative constructions is applied but without any guidance on which, if any, are the appropriate references.

Cameron has thus far offered no explanation as to how these ambiguities and the decisions between alternative constructions are resolved in the intrinsic record, but merely attempts to cure such fatal flaws in a bandage approach of an expert's unsupported testimony that is inconsistent with that record.

## III.     ARGUMENT

### A.     Cameron's characterizations of the '132 and '645 patents lack support in their respective disclosures and illustrate the confusion within each that is ultimately reflected in the claims.

Cameron's Brief and the Wooley Declaration assert that both the '132 and '645 patents "enable the use of a single, large-diameter fluid conduit . . . providing one and only one fluid pathway between the fracturing manifold and each fracturing tree." Cameron's Brief, at 9; *see also* Wooley Declaration ¶ 56 (stating: "The '645 Patent similarly [to the '132 patent] teaches providing a single fluid pathway between a fracturing manifold and a fracturing tree.").  Enablement and "teaching" aside, the wholly separate issue here is, of course, what those patents *claim*.  As mentioned, Cameron conflates the two patents to suggest that both disclose the same invention despite the fact that they are unrelated and have different inventors and specifications. Were these two patents to actually disclose the same invention (inventorship and other factors set aside for the moment), such would raise a host of other issues that are also not relevant in this context. Cameron's characterization of the two patents wholly ignores language in each that makes clear their distinct, respectively-disclosed inventions, and in doing so only highlights the indeterminate scope of the asserted claims.

1. **Cameron's assertion that the '132 patent provides "a single fluid pathway between a manifold and a fracturing tree" is inconsistent with the specification's clear language.**

In arguing that both patents provide "a single fluid pathway" between a manifold and tree, Cameron likens the "single fluid conduit" of the '132 patent's Claim 9 to the conduit(s) between the '645 patent's fracturing manifold and fracturing trees. *See* Cameron's Brief, at 9; *see also* Wooley Declaration ¶ 52 (opining that frac iron, conventionally arranged between a fracturing manifold and a fracturing tree, may be replaced by a "single fluid conduit" to provide a single fluid pathway). The '132 patent disclosure, however, intentionally avoids having ***any*** conduits ***between*** the fracturing manifold and the trees serviced by that manifold, instead favoring direct engagement of the structures. *See* '132 patent, Cols. 3:34-39 and Figs. 1-5 (e.g., teaching that "the fracturing manifold 22 is integrated with the fracturing trees 20 (i.e., coupled without using separate output lines or frac iron to connect the fracturing manifold 22 and the fracturing trees 20)"). When addressing the prior art, the '132 patent states:

> That is, rather than more conventional fracturing manifolds that are constructed to be installed (e.g., on the ground or a skid) apart and separate a distance from fracturing trees on wellheads and then connected to each fracturing tree with *one* or more manifold output lines (e.g., frac iron) specifically assigned to that fracturing tree, the manifold **22** is positioned right up to the fracturing trees *without intervening* frac iron, *pipes*, or fracturing heads.

'132 patent, Col. 4:13-22 (emphasis added). As noted above, the '132 patent's design specifically addresses *eliminating* the conventionally known "one[3] or more" output lines between a fracturing manifold and trees through installation of a variable-length manifold[4] directly onto a tree. Despite

---

[3] Here, the '132 patent acknowledges the prior existence of systems in which a fracturing manifold is connected to a tree via one ("a single") output line.

[4] The particular boundaries of the "manifold **22**" and its "conduit **42**" remain unclear, particularly in relation to other identified conduits that are separately identified through which fracturing fluid flows for delivery to fracturing trees. Similarly unclear is the particular positioning of the various

this, Cameron's Brief and the Wooley Declaration assert that the '132 patent's claims are directed to systems that include an output line (or some other unspecified conduit) between a fracturing manifold and a tree. *See* Cameron's Brief, at 9 (explaining that the '132 patent discloses "a single fluid conduit to the fracturing tree" that is similar to the '645 patent's teaching of "a single fluid pathway between a fracturing manifold and a fracturing tree" as embodied by "fluid conduit 26."); *see also* Wooley Declaration ¶¶54 and 56 (making the same comparison). Cameron provides no support for this contention. Cameron's position here, undoubtedly driven by an attempt to support their infringement allegations, once again, only highlights the uncertainty discussed in Butch's Brief as even the patentee is unable to understand or explain the plain language of its own patent.

### 2. The '645 patent disclosure is not limited to systems providing "a single fluid pathway between a manifold and a fracturing tree."

Cameron also mischaracterizes the scope of the '645 patent's disclosure. To the extent that Cameron is arguing that the specification and claims mandate "a single fluid pathway between a manifold and a fracturing tree," Cameron overstates the importance of various disclosed embodiments to which the disclosure "is not intended to be limited[5]" and one vague statement added through a continuation-in-part while ignoring the rest of the '645 patent. In particular, both Cameron's Brief and the Wooley Declaration point to col. 9:25-28 as support for their narrow reading of the '645 patent. *See* Cameron's Brief, at 9-10; *see also* Wooley Declaration ¶56 (citing Col. 9:25-28 ("Like some other embodiments described above, the fracturing system depicted in Fig. 11 uses only a single fluid conduit 26 per fracturing tree 20 rather than using multiple, smaller fluid conduits.")). Even within these three lines, however, the '645 patent indicates that the

---

components of "manifold **22**" relative a fracturing tree as required by Claim 9. *See* Butch's Brief, at 4-5.

[5] *See* '645 patent, Col. 9:42-44.

presence of only a single pathway between a fracturing manifold and a tree, as opposed to multiple

pathways[6], is consistent with only "*some* other embodiments described above"('645 patent, Col.

9:25)—not *all* contemplated or described embodiments. The specification explicitly recognizes

other embodiments that include multiple pathways between a fracturing manifold and a tree.

Moreover, with respect to alternate embodiments, the '645 patent states:

> Further, *while the depicted fluid connection **26** includes a single flow path* or conduit
> (which may be a fracturing line with a seven-inch bore in one instance) between the
> fracturing tree **20** and the fracturing manifold **22**, *a fracturing system may include a greater
> number of conduits between the fracturing manifold and a fracturing tree in other
> embodiments*.

'645 patent, Col. 4:31-37 (emphasis added). This confirms what Cameron's referenced section

suggested—that the '645 patent envisions embodiment(s) having one or more pathways between

a fracturing manifold and a fracturing tree. The specification further indicates that such conduits,

fluid connections, or pathways may be comprised of rigid or non-rigid structures. *See* '645

patent, Col. 4:3-4 (describing conduits as "e.g., pipes or hoses."). Beyond these relatively brief

descriptions in relation to the various disclosed embodiments, the '645 patent remains otherwise

silent as to the significance of having one or more pathways. Butch's does not argue that the '645

patent does not teach a system wherein there is only one pathway but rather that there is no clear

indication in the specification whether the asserted claims are limited to such a system[7] or not.

Despite Cameron's assertions to the contrary, the teachings of the '645 patent have little to

do with the number of pathways between a fracturing manifold and a fracturing tree let alone the

---

[6] The patent uses the term "conduit" rather than "pathway," but Cameron (and the patent itself)
appears to use these terms (and "flow path," as shown below) interchangeably.
[7] As discussed in Butch's Brief, and thus far unaddressed by Cameron or their expert, the asserted
claims can be read to encompass systems with only one pathway (wherein said pathway is rigid)
or claims with multiple pathways (wherein only one of the multiple pathways is rigid). Neither the
specification nor the claims provide any guidance as to which is the proper construction—
rendering the claim's scope uncertain to one of ordinary skill and therefore indefinite *See* Butch's
Brief, at 11-13.

number of *claimed* pathways. Rather, the '645 patent directs most of its written description to the manner in which pathways may be formed between the manifold and a tree through use of its particularly described adjustment joints. *See* '645 patent, Cols. 4:50-9:38 (including lengthy discussion of adjustment joints and their role in a fracturing system with little discussion of the rest of the system) and Figs. 3-12 (depicting specific adjustment joint components or systems utilizing such adjustment joints). Viewed as a whole, there is simply no support for a position that the '645 patent limits its disclosure to "a single fluid pathway between a fracturing manifold and a fracturing tree." To argue that it is so limited, without such support as Cameron does, only serves to illustrate the '645 patent's genuine lack of clarity that undermines even the patentee's understanding of its disclosure.

B.    **Cameron's Brief and the Wooley Declaration not only fail to provide any support for a definite construction of the challenged claim terms, but introduce additional reasons to find the asserted claims indefinite.**

Cameron's Brief and the Wooley Declaration specifically address only two of the claim terms identified for construction ("positioned at" and "pipe joints"). However, many of the statements made in both documents, with respect to the patents generally, are relevant to the analysis of the remaining, unaddressed terms. Through their conflation and mischaracterization of the '132 and '645 patents' disclosures discussed above and their confusing use of particular claim terms as discussed below, both Cameron and its expert actually highlight the uncertainty of the asserted claims' respective scopes.

1.    **The '132 Patent**

a.    **"a single fluid conduit"**

Cameron's Brief and the Wooley Declaration both opine on the role and arrangement of a "conduit," or multiple "conduits," in the context of the '132 and '645 patent disclosures. Butch's

position, as set out more fully in its opening brief, is that "a single fluid conduit" as recited by Claim 9 of the '132 patent is indefinite because: (1) there is no clear indication which of two incompatible interpretations of "single" and "delivered through only" as applied to "fluid conduit" is correct (*see* Butch's Brief at 2-5); (2) the boundaries of a conduit's structural composition are unclear (*see id.*, at 5-6); and (3) the manner in which such a conduit is coupled to a tree is likewise unclear (*see id.*, at 6-8). Neither Cameron's nor its expert's statements address any of these deficiencies. Rather, Cameron's Brief and the Wooley Declaration emphasize the unclear boundaries of conduit configuration.

Despite arguing for a "plain and ordinary meaning" of "a single fluid conduit," Cameron and its expert provide no guidance as to what that meaning is and otherwise use "conduit" to describe different structures, or elements thereof, in a manner that renders the identification of a *single* conduit, as opposed to multiple conduits, within a system (a key distinction for evaluating the asserted claims) uncertain. In Cameron's Brief, the '132 patent is described as having "a conduit" that itself *comprises* "connection blocks 42 connecting *lengths of conduit* (e.g., pipe sections)." *See* Cameron's Brief, at 9 (emphasis added). Similarly, in the Wooley Declaration, Cameron's expert refers to a "conduit" at times as an assembly and at others as simply a section of pipe. *See* Wooley Declaration ¶¶ 57 (indicating that the blue-shaded assembly of annotated Fig. 11 is a "conduit") and 64 (identifying "conduit 42," an individual section of pipe, and connection blocks 48 and 50 as separate components of the "shared trunk line[8]").

Cameron's definition of a "conduit" as both a single pipe section and an assembly of fluid components leaves a POSITA with no clear way to determine under what circumstances one or

---

[8] Earlier in the Wooley Declaration (at ¶ 62), "shared trunk line" is equated to a "shared trunk conduit," thereby again giving rise to a scenario in which a "conduit" is an assembly (the shared trunk conduit) comprising a single pipe section that is also defined as a "conduit."

the other alternative meanings would be appropriate and when an assembly of pipes or other components comprise a "single" conduit or multiple conduits. *See* Butch's Brief, at 2-6. Most notably, in the case of a system having numerous discrete fluid-communicating structures arranged in series between a fracturing fluid source and a fracturing tree, such as that described in the '132 patent at Col. 4:2-10, Cameron's ambiguous definition of a "conduit" further illustrates the inability of a POSITA to determine at what point a system transitions from having only a "single" conduit to multiple conduits. Consider an even simpler hypothetical structure defined by three pipe sections coupled end-to-end. When determining if such a structure is one or three conduits, under Cameron's varying meanings, the answer is both. It is entirely uncertain whether or not this structure satisfies the limitation of "a *single* fluid conduit."

Nothing in the '132 patent or its prosecution history provide any additional guidance on how to interpret the challenged term. As a result, Claim 9 of the '132 patent is indefinite because a POSITA cannot determine the bounds of "a single fluid conduit."

### b. "positioned at"

As discussed in Butch's Brief, the '132 patent provides no "standard for measuring [the] degree" to which a first connection block may be arranged relative to a fracturing tree to be considered "positioned at" said tree. *See* Butch's Brief, at 9-10. Cameron's request that the Court construe this term with the equally ambiguous phrase "adjacent to" does not resolve this problem. *See id.*, at 8-10. In its brief, Cameron makes the conclusory statement that a "POSITA would understand with reasonable certainty how the first connection block is positioned at the well" citing to its expert's declaration. *See* Cameron's Brief, at 17. The Wooley Declaration, however, does not support this conclusion.

The Wooley Declaration asserts that the construction of "attached to or adjacent to" is evident from the claim language. *See* Wooley Declaration ¶69. Cameron's expert continues by describing "in some configurations, this indicates that the connection block *could be a part of* the stack of valves and other components *comprising the fracturing tree*" and indicating that this "does not limit the scope of the claim to exclude embodiments where the connection block *is not part* of the stack of valves comprising the fracturing tree *but is instead positioned adjacent to* the fracturing tree." *Id.* (emphasis added). Essentially, the Wooley Declaration asserts (and Cameron agrees[9]) that two configurations of fracturing systems satisfy the claims' "positioned at" limitation. Those in which the "first connection block," and as a result the "single fluid conduit," is: (1) integral to the fracturing tree; and (2) separate from, but adjacent to, the fracturing tree.

Looking first to the plain language of Claim 9, it recites the "single fluid conduit" (which itself comprises at least the "first connection block") and the "fracturing tree" as two *discrete* structures. While the structures are recited as coupled together in some unclearly defined manner (*see* Butch's Brief, at 6-8), they are otherwise independent of one another. There is no basis in the claims for a POSITA to read them as encompassing systems in which the conduit is *integral* to the fracturing tree. Claim 9 repudiates the expert's conclusions. Even the specific language he cites, that "fracturing fluid can be routed . . . to the well fracturing tree through the first connection block," undermines this position as any fluid that reaches the first connection block is already at the tree (if that block is part of the tree)—no further routing would occur. *See* Wooley

_____
[9] Cameron's Brief, at 1 (stating: "the connection block is 'positioned at' the fracturing tree to provide fracturing fluid to the well can be either 'attached to' the fracturing tree (*e.g.*, included as part of the stack of valves and conduits composing the fracturing tree), or 'adjacent to' the fracturing tree.")

Declaration ¶69. Despite this, the expert is emphatic that not only can a connection block be *integral* to a fracturing tree, but that this is expressly within the scope of Claim 10.

Setting aside this error in Dr. Wooley's analysis, Cameron's Brief and the Wooley Declaration fail to explain what "adjacent to" means other than being *not integral to* a fracturing tree. Dr. Wooley provides no insight into how far, or at what spatial location, relative a fracturing tree a "first connection block" can be disposed while still satisfying the limitation of being "positioned at," or under Cameron's construction "adjacent to," the tree. *See* Butch's Brief, at 8-10. Accordingly, Claim 9 is indefinite because its scope is indeterminate in view of the unclear bounds of "positioned at."

### c.      "comprising an additional well fracturing tree"

As discussed in Butch's Brief, Claim 12 lacks any further limitations that describe the manner in which any additional well fracturing tree[10] is to be incorporated into the claimed fracturing system. *See* Butch's Brief, at 10. Accordingly, the claim is indefinite because a POSITA cannot determine at what point the presence of a second fracturing tree, in any capacity (be it a

---

[10] Butch's also disagrees with Cameron's proposed construction of "well fracturing tree" that such a tree is one "installed specifically for the fracturing process." Cameron's Brief, at 4. There is nothing in the specification that Cameron points to that mandates such a construction. Furthermore, being "installed specifically for the fracturing process" inserts an element of intent into the infringement and validity analysis that is improper for a structural element such as this. To the extent that Cameron is attempting to read into this construction "generally larger bores and higher pressure ratings" as described in Cameron's Brief (on page 5), again, there is no support for importing such a limitation into this claim language. Claim 1 specifies that "each fracturing tree of the plurality of fracturing trees *coupled to the fracturing manifold* is coupled to the fracturing manifold . . ." indicating that, ignoring the potential indefiniteness issues this may raise, the claimed system encompasses a plurality of fracturing trees, only some of which are installed—such as a system having one tree installed and coupled to the manifold (subject to any other relevant limitations) and one tree that is not. It would not be logically consistent to then construe a "fracturing tree" to require that a tree be "installed," especially for a particular purpose, when that would otherwise undermine the structure of the claim.

potential replacement, installed but not coupled to a manifold, coupled to a manifold by conventional means, etc.), would be considered within the scope of the claim or not. *Id*.

Cameron's expert, in discussing the '132 patent generally, states that "a POSITA would understand Claim 12 to require adding a fracturing tree to the fracturing system in Claim 9 *in the same manner* described for the original fracturing tree in Claim 9 (*i.e.*, using *another single fluid conduit* to connect the additional fracturing tree to the fracturing system)." *See* Wooley Declaration ¶55 (emphasis added). This conclusory assertion lacks any support or reasoning. Cameron's expert not only disregards the absence of any claim language addressing the installation or incorporation of the claimed "additional well fracturing tree" into a fracturing system, but imagines the claim to encompass a system that: (1) includes a wholly separate "single fluid conduit" coupled to the additional tree (without any explanation of how the two "single fluid conduits" are arranged relative one another); and (2) is never described in the '132 patent.

As previously discussed, the '132 patent describes an in-line manifold that is mounted directly on fracturing trees *with no* intervening connections. *See* '132 patent, Col. 4:13-22. Cameron's expert ignores this design, and the stated advantages of the invention identified in the patent (to minimize manifold-tree connections), and concludes that a POSITA would understand this limitation to mean one just adds more intervening connections. The absurdity of this proposed construction is further illustrated when considering how such an additional connection, as proposed by Cameron's expert, could be implemented since no description exists in the patent. In any practical configuration, such would require the system to include some form of shared conduit that ultimately facilitates the delivery of fluid to both trees, thereby completely undermining the requirement of "delivery through only the single fluid conduit" as required by Claim 9. Absent

such a shared conduit, this proposed, hypothetical system would involve two completely separate manifolds which similarly finds no support in the patent. For these reasons, Claim 12 is indefinite.

### 2. The '645 Patent

#### a. "one and only one rigid fluid pathway"

Butch's maintains, as argued in its opening brief, that there is no clear indication in the '645 patent's specification, claims, or prosecution history as to whether "one and only one rigid fluid pathway" means that there is: (1) exactly one *rigid* fluid pathway between the manifold and tree (wherein additional, *non-rigid* fluid pathways are permitted); or (2) exactly one fluid pathway between the manifold and tree that itself must be wholly rigid (excluding the possibility of any other manifold-tree pathways). *See* Butch's Brief, at 11. Cameron's Brief (in a footnote) and the Wooley Declaration argue that there is evidence in the prosecution history that the Examiner found the limitation of "one and only one rigid fluid pathway" to "exclude embodiments, like those using prior-art frac iron, where there are multiple fluid pathways between the fracturing manifold and the fracturing tree." *See* Cameron's Brief, at 10-11 n.1; *see also* Wooley Declaration ¶59. This is a gross mischaracterization and overstatement of what the prosecution history reflects.

Within the Office Action cited by Cameron, the Examiner rejected Claim 1 of the '645 patent on the basis of nonstatutory double patenting in view of U.S. Patent Nos. 9,932,800 (the "'800 patent") and 10,094,195 (the "'195 patent"). *See* ECF No. 27-14 (Cameron's Ex. N) at CMRN000290-291. Despite Cameron's assertion that "[t]he Examiner understood the '800 Patent to require that 'the fracturing trees are coupled to the fracturing manifold by only one rigid fluid conduit,'" the Examiner never stated this in the Office Action. *See id.*; *see also* Cameron's Brief, at 10 n.1; *see also* Wooley Declaration ¶59. Rather, the Examiner indicated that, *with respect to the '195 patent*, "[t]he instant claim is broader than the claim of '195 and completely encompasses

all the elements" because the '195 patent required that the manifold be coupled to the tree by only a single fluid conduit as opposed to "at least one rigid fluid conduit." *See* ECF No. 27-14 (Cameron's Ex. N) at CMRN000290-291. The Examiner made no statement whatsoever as to the scope of the '800 patent's claims.

Notably, in amending the claims after an interview with the Examiner, the patentee adopted the same "recitations added by amendment" to the '800 patent *and* included "additional recitations relating to pipes, blocks, and connections. . . ." *See* ECF No 27-15 (Cameron's Ex. O) at CMRN000329. This suggests that simply amending the claims to incorporate the limitations present in the '800 patent (the "one and only one rigid fluid pathway") did not resolve the issue raised in the Office Action—the '645 patent's claims were still broader than those of the '195 patent absent the component-related limitations. Whereas the limitations in claims of the '195 patent restricted coupling between the manifold and tree to, as stated in the Office Action, via only a single fluid conduit, the '645 patent claims including the "one and only one rigid fluid pathway" limitation were not so limited. Rather, the '645 patent's claims as amended could still be read to encompass systems excluded from the earlier patent including those having: (1) additional, non-rigid fluid conduits arranged in parallel or in series to form non-rigid pathways between the manifold and tree in addition to the claimed rigid pathway; or (2) multiple rigid fluid conduits arranged in series to form the expressly claimed rigid fluid pathway.

These two possibilities are consistent with the competing interpretations presented in Butch's Brief. Nothing in the prosecution history excludes either interpretation. The patentee was only able to narrow the scope of the claim to overcome the double patenting rejection through its inclusion of additional, component-related limitations. As there is no clear guidance from the '645 patent's specification, claims, or prosecution history as to the scope of the claims with respect to

what systems are excluded as a result of the "one and only rigid fluid pathway limitation," claims reciting such a limitation are indefinite.

**b. "at least one rigid fluid conduit" / "the at least one rigid fluid conduit"**

Cameron has not addressed the lack of a clear antecedent basis for the term "the at least one rigid fluid conduit" of Claims 1 and 20 as discussed in Butch's Brief. *See* Butch's Brief, at 13-14. Butch's maintains that this term renders the claims indefinite as there is no manner in which a POSITA would be able to reasonably determine the scope of the claims in the absence of any guidance as to which rigid conduit of the multiple "at least one rigid fluid conduit" the term refers. *Id*.

**c. "pipe joints"**

Cameron reiterates its position, relying on its expert for support, that "pipe joints" are simply "lengths of pipe." Cameron maintains this position despite having previously taken the contrary position, as described in Butch's Brief, that a "pipe joint" does *not* correspond to a length of pipe. *See* Butch's Brief, at 15. Cameron's earlier position is consistent with Butch's position that the use of both terms in a single claim clearly indicates that these "pipes" and "pipe joints" are different things. *See id*., at 14-15 (citing *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1982 (Fed. Cir. 2008). The Court should not permit Cameron to now assert their presently proposed position on the boundaries of "pipes joints" having already argued, in a public forum and on the basis of the very same specification as here, that "pipe joints" and "a length of pipe" are distinct structures to overcome prior art that challenged patent validity (prior art that is also at issue in this case).

Moreover, while Cameron points to the '645 patent specification's use of the reference numeral "**170**" to identify both "pipe joints" and "pipes" to support its proposed construction that

"pipe joints" are simply "lengths of pipes," the cited passage does not directly equate the two structures. *See* Cameron's Brief, at 18; *see also* Wooley Declaration ¶28. Specifically, Cameron points to col. 8:29-43 which reads:

> In this embodiment, the adjustment joints for the fracturing system are provided in the form of rotatable pipe joints **170** and connection blocks **172** (e.g., elbow blocks) of the fluid conduits **26**. The ability to rotate components of the fluid conduits **26** provides rotational degrees of freedom similar to those described above, and enables the fluid conduits **26** to be more easily positioned and connected between the fracturing manifold **22** and the fracturing trees **20**. As presently illustrated, the fluid conduits **26** with rotatable components have three rotational degrees of freedom, although other embodiments could have fewer than three. In some instances, the adjacent pipes **170** and connection blocks **172** could be rotated to desired positions before assembling these components together (e.g., via a studded connection).

While it is true that both "pipe joints" and "pipes" are referred to via the same reference numeral **170**, Cameron ignores the context that indicates "pipe joints" are not co-extensive with "pipes" or simply lengths thereof. Notably, there is only one instance of "pipe joints" in the '645 patent—in the passage reproduced above. Although "pipes **170**" appears numerous times to reference actual lengths of pipe present in various connections, the '645 patent refers to the particular embodiment depicted in Fig. 10 as defining "rotatable pipe joints **170**" which serve as that embodiment's "adjustment joints."

More than simply being a "length of pipe," a "pipe joint," according to this portion of the specification, must be something that facilitates the rotation of a pipe relative a connection block. This is consistent with Butch's construction of "structure for joining pipes" as such a structure would play an integral role in enabling that rotation.

### d.    "outlet branch(es)"

Butch's maintains its position, as set forth in Butch's Brief, that "outlet branch(es)" is indefinite given the absence of any clear guidance as to: (1) what structures other than valves may define an outlet branch (*see* Butch's Brief at 16-17); (2) the manner in which an outlet branch

must be incorporated into a fracturing system to fall within the scope of the asserted claims (*see id.*, at 17-18); and (3) the numbers of valves required in each of multiple outlet branches (*see id.*, at 18-19). While Cameron does not address this term separately, both Cameron's Brief and the Wooley Declaration use the term when discussing the '645 patent generally. *See* Cameron's Brief, at 12-13; *see also* Wooley Declaration ¶¶62-64. Cameron's Brief and the Wooley Declaration point to the '645 patent's abstract; specification cols. 1:66-2:4, 4:16-31, and 8:26-48; and Fig. 10 in support of their position that the term should be construed according to its "plain and ordinary meaning" of "extensions from the shared trunk line." *See id*. None of these sections provide such support.

Notably, cols. 1:66-2:4[11] are part of the patent's summary and only briefly mention that a manifold *can* include "outlet branches" and that such branches "*can* include valves." There is no other mention of "outlet branch(es)" in the written description of the '645 patent including in those sections referenced by Cameron. What remains entirely unexplained in the patent is what configuration of a manifold *does not* include outlet branches (as they are described as optional—further reflected in the difference between Claims 1 and 2). Moreover, despite Cameron's and its expert's insistence that "the outlet branches may not have valves," one is left with no guidance as to even one structure, other than valves, that *can* define outlet branches. *See* Cameron's Brief, at 13; *see also* Wooley Declaration ¶64.

Looking to each of Cameron's specification citations it relies on to support its position, the section found at '645 patent col. 4:16-31 hints at some guidance, but even it merely discloses that

---

[11] Both this section's and the abstract's mention of "outlet branches" constitute new matter added to the patent family by the '645 patent's parent—U.S. Patent No. 10,385,643—which was filed on October 8, 2018. Even assuming the term does not render the claims indefinite, this addition may undermine Cameron's purported priority date.

valves may be used to regulate flow to fracturing trees without identifying any criteria to determine whether or not a particular valve, or some other structure that comprises the manifold, is properly considered to define an "outlet branch." Curiously, the Wooley Declaration relies on col. 4:16-31, which describes Figure 3, to support its reading that outlet branches are present in the embodiment depicted by Figure 10. Despite the embodiments sharing many similarities, the Wooley Declaration did not utilize Figure 3 as support for its position on "outlet branch(es)" which suggests that there must be some structural difference between the embodiments that renders the embodiment of Figure 3 to be missing "outlet branches." Neither Cameron nor its expert provide any explanation as to what that difference is.

Regarding col. 8:26-48, this section describes only the composition of "fluid connection **26**" that Cameron has asserted corresponds to a conduit separate from the manifold. Again, there is no clear identification of any structure within this section as corresponding to an outlet branch or a manner in which a POSITA could determine the presence of an outlet branch. Given that not even valves are discussed in this section, Cameron's reliance on it at all speaks to the uncertainty inherent to "outlet branch(es)."

For these reasons, the term "outlet branch(es)" renders Claims 2-4, 10, 13, and 18 indefinite.

> **e.    "the second connection block"; "the second pipe"; "the third studded connection"**

Cameron has not addressed the lack of a clear antecedent basis for the terms "the second connection block," "the second pipe," and "the third studded connection" of Claim 14 as discussed in Butch's Brief. *See* Butch's Brief at 19-20. Butch's maintains that this term renders Claim 14 indefinite as there is no manner in which a POSITA would be able to reasonably determine the scope of the claim in the absence of any guidance as to which of the multiple "the second

connection block," "the second pipe," and "the third studded connection" the term refers. Moreover, for both this and the term below, Cameron's expert's conclusory statement that "a POSITA would understand them with reasonable certainty" should be given no weight as Cameron's expert provides no support for this position and plainly ignores the inherent ambiguity of the claims' language. *See* Wooley Declaration ¶23.

<blockquote>f.      **"the second pipe"; "the first pipe"; "the third pipe"**</blockquote>

Cameron has not addressed the lack of a clear antecedent basis for the terms "the second pipe," "the first pipe," and "the third pipe" of Claim 15 as discussed in Butch's Brief. *See* Butch's Brief, at 20. Butch's maintains that this term renders Claim 15 indefinite as there is no manner in which a POSITA would be able to reasonably determine the scope of the claim in the absence of any guidance as to which of the multiple "the second pipe," "the first pipe," and "the third pipe" the term refers.

## IV.    CONCLUSION

For the foregoing reasons, the Court should reject Cameron's claim construction positions and adopt Butch's claim construction positions.

Dated: August 5, 2020                    Respectfully submitted,

                    By:     */s/ David G. Henry, Sr.*
                           David G. Henry, Sr. – Lead Counsel
                           State Bar No. 09479355
                           DHenry@GrayReed.com
                           Eric S. Tautfest
                           State Bar No. 24028534
                           etautfest@GrayReed.com
                           Jared Hoggan
                           Texas Bar No. 24065435
                           jhoggan@GrayReed.com
                           **GRAY REED & MCGRAW LLP**
                           900 Washington Avenue, Suite 800
                           Waco, Texas  76701
                           Telephone: (254) 342-3000
                           Facsimile: (254) 342-3100

                           M. Jill Bindler
                           Texas Bar No. 02319600
                           jbindler@GrayReed.com
                           David T. DeZern
                           Texas Bar No. 24059677
                           ddezern@GrayReed.com
                           David M. Lisch
                           State Bar No. 24077179
                           dlisch@GrayReed.com
                           **GRAY REED & MCGRAW LLP**
                           1601 Elm Street, Suite 4600
                           Dallas, Texas 75201
                           Telephone: (214) 954-4135
                           Facsimile: (469) 320-6901

                           **ATTORNEYS FOR DEFENDANT BUTCH'S RATHOLE & ANCHOR SERVICE, INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document and accompanying attachments has been served on all counsel of record via the Court's ECF system on August 5, 2020.

*/s/ David Lisch*
David M. Lisch

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| CAMERON INTERNATIONAL | § | |
| CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 6:20-cv-00124-ADA |
| | § | |
| v. | § | |
| | § | JURY TRIAL REQUESTED |
| BUTCH'S RATHOLE & ANCHOR | § | |
| SERVICE, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |
| | § | |

## DEFENDANT BUTCH'S RATHOLE & ANCHOR SERVICE, INC.'S
## REPLY CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I. CLAIM CONSTRUCTION PRINCIPLES ................................................................. 1

II. ARGUMENT ............................................................................................................. 3

    A.    The '132 patent ............................................................................................... 3

           1.    "a single fluid conduit" / "a single fluid conduit coupled to the well fracturing tree" (Cl. 9).................................................................... 3

           2.    "positioned at" (Cl. 9) ......................................................................... 5

           3.    "comprising an additional well fracturing tree" (Cl. 12) ..................... 6

    B.    The '645 patent ............................................................................................... 6

           1.    "one and only one rigid fluid pathway" (Cls. 1, 10, 20)...................... 6

           2.    "at least one rigid fluid conduit" / "the at least one rigid fluid conduit" (Cls. 1, 20)................................................................................ 8

           3.    "pipe joints" (Cl. 1)............................................................................. 9

           4.    "outlet branch(es)" (Cls. 2, 3, 4, 10, 13, 18) .................................... 10

           5.    "the second connection block"; "the second pipe"; "the third studded connection" (Cl. 14) / "the second pipe"; "the first pipe"; "the third pipe" (Cl. 15) ........................................................................ 10

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
   512 F.3d 1338 (Fed. Cir. 2008)...............................................................8, 9

*Capital Sec. Sys., Inc. v. NCR Corp.*,
   725 F. App'x 952 (Fed. Cir. 2018) ...........................................................7

*Nautilus, Inc. v. Boston Scientific Corporation*,
   572 U.S. 898 (2014)...................................................................................1

*Nevro Corp. v. Boston Sci. Corp.*,
   955 F.3d 35 (Fed. Cir. 2020).....................................................................2

*Quest Diagnostics Investments LLC v. Lab Corp. of Am. Holdings*,
   No. CV-18-1436 (MN), 2020 WL 210799 (D. Del. Jan. 14, 2020) ..........5

**Other Authorities**

MPEP § 2173.05(e)............................................................................................9

Cameron has failed to address the ambiguities present in the claims of the '132 and '645 patents. Relying on the unsupported and conclusory statements of its expert, Dr. Wooley, Cameron disregards language in the patent's disclosure that undermines its positions and illustrates the uncertainty of the asserted claims' respective scopes.

The asserted patents, even in the broadest sense, are about alleged differences from the prior art with respect to very specific connections (or lack of connections); *limits* of specific numbers of components; *specific* characterizations of component properties (e.g., "rigid" or not); relative component arrangements and sequences; and relative proximities of components (e.g., "adjacent to"). The public, of right, must be capable of knowing which specific characteristics are within or without the scope of the asserted claims. Yet, as explained in previous briefs in detail, this is an impossible determination in view of the ambiguity in the contested '132 and '645 patents' claim terms. For these reasons, Butch's respectfully urges that its proposed constructions and positions on indefiniteness are correct as a matter of law.

## I. CLAIM CONSTRUCTION PRINCIPLES

As Cameron acknowledges, a claim is indefinite if, when "read in light of the specification delineating the patent, and the prosecution history, [it] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Cameron's Resp. Br. at 2 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)).

Cameron argues that Butch's reliance on the intrinsic record is insufficient to support a finding of indefiniteness. As explained before, the claim terms at issue are at times inexact (with no further definition from any intrinsic or extrinsic evidence), contextually at-odds with any "plain meaning" that might otherwise be drawn from industry, internally inconsistent, contradictory, and/or ambiguous. *See* Butch's Op. Br. at 2-20; *see also* Butch's Resp. Br. at 8-20. Rather than, as

Cameron alleges, simply presenting possible interpretations of the challenged claim terms without a basis in the patents (as was the case in *Nevro Corp. v. Boston Sci. Corp.*[1]), Butch's has identified multiple ambiguities inherent to Cameron's chosen claim language and pointed to descriptions in the respective specifications that support several competing and inconsistent interpretations, each of which would produce differing scopes of claim coverage. *See* Butch's Op. Br. at 2-8 and 11-13. Butch's demonstrates that certain claim terms and the record (intrinsic or extrinsic) do not support any interpretation for reliably ascertaining the resulting claim scope. *See id*. at 2-20. Each of these circumstances render the respective host claims invalid as indefinite.

While Cameron asserts, through their expert, that a person of ordinary skill in the art (a "POSITA") would understand the challenged terms, the expert's opinions are conclusory at best. Cameron's expert generally provides no explanation as to why a POSITA would either wholly ignore or selectively harvest guidance from the patents' specifications to arrive at Cameron's constructions that are needed to save its patents. In like fashion, Cameron's expert disregards the claim language itself and fails to address the irresolvable structural and linguistic ambiguities contained therein. As Cameron acknowledges in their opening brief, an expert's opinions may be helpful when they are "supported and well-reasoned." Cameron's Op. Br. at 14. Such is not the case here. Cameron's expert testimony consists of broad statements made without considering the substance of the two patents' disclosures. The evidence in the record supports Butch's indefiniteness positions.

---

[1] 955 F.3d 35 (Fed. Cir. 2020). In considering the multiple interpretations of claim terms, the court in *Nevro Corp.* indicated that the presence of possible interpretations *alone* does not render a term indefinite as most terms are likely susceptible to several readings. *See id*. Rather, the court followed a typical claim construction analysis to determine if a proper interpretation could be gleaned from the patent. *See id*. In the present case, Butch's contends that the '132 and '645 patents' specifications and file histories fail to provide clear meaning for a number of terms and would leave a POSITA guessing as to which among several interpretations of these terms is correct.

## II.    ARGUMENT

### A.    The '132 patent

Cameron continues to ignore the patent's language in an attempt to avoid the irreconcilable ambiguities apparent when reading the claims in view of the specification.

### 1.    "a single fluid conduit" / "a single fluid conduit coupled to the well fracturing tree" (Cl. 9)

Much like a politician who wants to avoid addressing an uncomfortable issue, Cameron "pivots" on Butch's Opening Brief's arguments. Cameron asserts that "the words are not complicated" and that "Butch's does not argue that they are . . . ." Cameron's Resp. Br. at 3. But, a POSITA does not analyze words of claim limitations separately from the claim in which they are recited or the specification which provides context for them. The recitation of "a single fluid conduit" in Claim 9 is unclear because: (1) the particular arrangement of the claimed "single fluid conduit" relative to possible other structures in a fracturing system is unclear; (2) the boundaries of a "single" conduit are unclear; and (3) the structure of the claims renders unclear the manner in which the conduit is "coupled to" the fracturing tree. *See* Butch's Op. Br. at 2-8.

In response, Cameron argues generally that a POSITA would understand[2] what "a single fluid conduit" is because of the "extensive use of these components in the prior art." Cameron's Resp. Br. at 4. Butch's is certainly not challenging that the components were known and used in the prior art. Rather, Butch's spotlights the claims' evident failure to make clear how the recited,

---

[2] As noted in Butch's Responsive Brief, Cameron also takes the position that "conduit" can mean an assembly of pipes or alternatively a single length of pipe. Where, as here, the system is limited to "a single fluid conduit" which is itself an assembly, the uncertainty as to whether the addition of another length of pipe would cause the system to comprise a single or multiple conduits renders the claim indefinite. *See* Butch's Resp. Br. at 8-10. Cameron continues this confusing characterization in their Responsive Brief, with respect to the '645 patent, pointing to Fig. 11 as having "a single fluid conduit" that is later referred to as being formed by "a plurality of fluid conduits." Cameron's Resp. Br. at 8-10.

well-known components must be arranged to infringe the claims. While Cameron argues that systems having "a single fluid conduit" cannot include multiple conduits directly attached to a fracturing tree, it ignores the ambiguity presented by the "delivered to . . . through only" language which raises *at least* the question of whether systems having multiple conduits *in series* would avoid the claim. *See* Butch's Op. Br. at 2-5.

Cameron also pivots on Butch's Opening Brief's second argument for this term. Once again, Butch's does not argue that it is unclear if the claimed "a single fluid conduit" comprises multiple components but rather that it is unclear how many additional components can be incorporated into the recited assemblage and still be a "single" conduit. Cameron chose such an extreme limitation and must now live with its requirement for definiteness. There is no guidance in the patent as to when an assembly of components transitions from a single to multiple conduits.[3] With respect to the manner in which the conduit is "coupled to" a fracturing tree, Butch's does not argue that "coupled to" is per se unclear in perhaps other contexts, but that its use in Claim 9 is vague particularly in view of Claim 10's recitation of direct coupling and the specification's lack of description regarding any other manner of coupling. *See* Butch's Op. Br. at 6-8.

Cameron's response regarding the claim recitation that fracturing fluid "can be" routed (as opposed to, e.g., "is routed") is yet another pivot that fails to address Butch's actual argument in its opening brief. *See id*. at 6. Even assuming that the use of the word "is" would require actual use, Cameron could have instead used "must be" or other similar language to clearly define the scope of Claim 9. Instead, the claims require "a single fluid conduit" through which fracturing fluid "is delivered . . . only," and yet the specific structures described as part of that "single fluid

---

[3] The '132 patent itself discloses an embodiment having multiple conduits arranged in series. *See* Butch's Op. Br. at 4-5; *see also* '132 patent, Col. 4:2-10.

conduit" are merely those through which fracturing fluid "*can be routed*." This language highlights the ambiguity in the claims and the inability for a POSITA to determine what configurations of structures are within or without the claims.

Butch's maintains that, in view of the intrinsic record, "a single fluid conduit" is so unclear as to render the scope of Claim 9 not reasonably certain and, accordingly, indefinite.

### 2. "positioned at" (Cl. 9)

As discussed in Butch Opening Brief, the term "positioned at" leaves unclear the relative spatial relationship of a "first connection block" and a "well fracturing tree." *See* Butch's Op. Br. at 8-10. While Cameron correctly points out that "absolute precision" is not required, it cannot identify language in the patent that provides *any* guidance as to the relative arrangements of a connection block and fracturing tree that, other than direct engagement, would satisfy this limitation. The principle of claim differentiation indicates that the scope of Claim 9 must encompass additional configurations in view of Claim 10 which itself specifically recites direct engagement. Moreover, and notwithstanding that the opinion of a Delaware district court[4] is not binding on this one, Cameron's argument that "common words with common meaning" are not indefinite[5] is inapplicable here where any common meaning (such as Cameron's proposed "adjacent to") still renders unclear the required spatial relationship of the claimed connection block and fracturing tree.

Cameron's expert addresses this term in his declaration, but, as pointed out in Butch's

---

[4] *See* Cameron's Responsive Brief at 4 (citing *Quest Diagnostics Invests. LLC v. Lab. Corp. of Am. Holdings*, No. CV-18-1436 (MN), 2020 WL 210799, at *5 (D. Del. Jan 14, 2020)).

[5] Additionally, while the individual meaning of words is relevant, the indefiniteness analysis is concerned more specifically with scope of the claim. In this case, even assuming that "positioned at" may be generally understood, the phrase itself is ambiguous and lacking any standard for determining the degree to which the claimed structure is "positioned at" (or "adjacent to") another.

Responsive Brief, he both provides no basis for his conclusions and ignores claim language that would contradict them. *See* Butch's Resp. Br. at 11-12. Because neither the specification nor the prosecution history provide any guidance to determine when a structure is (or is not) "positioned at" a tree, Claim 9 is indefinite.

### 3. "comprising an additional well fracturing tree" (Cl. 12)

Cameron concludes, without support, that a POSITA would understand this dependent claim. Although Dr. Wooley recites the same conclusion in his declaration, he provides no explanation, and, as discussed in Butch's Responsive Brief, takes the bizarre position that the limitation requires "using another *single* fluid conduit" despite there being no support for this in the claims or specification which instead teaches away from such a reading. *See* Butch's Resp. Br. at 13. There is no guidance as to how the claimed "additional well fracturing tree" must be incorporated, if at all, into a fracturing system to infringe the claim. *See id*. at 12-14. Accordingly, Claim 12 is indefinite.

### B. The '645 patent

The '645 patent discloses systems using one or multiple pathways between a fracturing manifold and a fracturing tree. Cameron's attempts to save the '645 patent's claims from indefiniteness is both without support and, in fact, refuted by the intrinsic evidence.

### 1. "one and only one rigid fluid pathway" (Cls. 1, 10, 20)

While Cameron selectively discusses the limitation in the context of one embodiment depicted in the '645 patent, it ignores the others that undermine its construction. *See* Butch's Op. Br. at 12. As explained in Butch's prior briefing, the specification supports two inconsistent interpretations for this limitation while providing no clear indication as to which is correct.

The '645 patent discloses numerous fracturing systems including those having multiple pathways between the manifold and an individual tree. *See id*; *see also* '645 patent, Col. 4:31-37 (describing a "single flow path" in one embodiment and noting that others may feature "a greater number" between the manifold and a fracturing tree). The conduits making up such pathways are disclosed as being rigid or non-rigid. *See id*; *see also* '645 patent, Col. 4:3-4 (describing "conduit or fluid connection **32** (e.g., pipes or hoses) . . ."). Although Cameron argues that the interpretation in which there may be multiple, non-rigid pathways is purely "hypothetical," the specification teaches all the relevant details of such a system.[6] Furthermore, the claims themselves recite additional limitations that support the competing interpretations.[7]

Cameron argues that multiple interpretations do not render the terms so unclear as to warrant finding the claims indefinite, but this argument fails for the reasons outlined previously with respect to a proper indefiniteness analysis. The issue here is not resolved by simply asserting "a reasonable range of implementations." Cameron's Resp. Br. at 11. Unlike in *Capital Sec. Sys., Inc. v. NCR Corp.,* where the question to be resolved related to ways to achieve an understood limitation ("to ascertain an apparent signature"),[8] the problem in this case is that the limitation itself is ambiguous. Butch's does not presently challenge that a POSITA would be able to implement "the one and only one rigid fluid pathway" in numerous ways (various pipes,

---

[6] Cameron's expert, Dr. Wooley, has likewise previously testified that it was known in the prior art to use "flexible hose or rigid pipe" or some combination thereof to form fluid pathways between a manifold and a fracturing tree. Cameron's '800 IPR Expert Decl. at ¶ 76.

[7] Reciting "a plurality of *fluid conduits*" coupled between the manifold and plurality of fracturing trees of which at least one is rigid without specifying if the remaining conduits are rigid or non-rigid. As rigid and non-rigid conduits are contemplated between the manifold and trees "to enable receipt of fracturing fluid by the plurality of fracturing trees from the fracturing manifold," the claim supports an interpretation which includes systems having multiple pathways (of which only one is wholly rigid). Cameron offers no justification from the intrinsic record as to why its preferred reading should be favored.

[8] 725 F.App'x 952, 957 (Fed. Cir. 2018).

connectors, etc.) assuming an understanding of how "one and only one" must be applied. Rather Butch's asserts that it is unclear *what* needs to be implemented – is it one fluid pathway that must be rigid or can there be multiple pathways only one of which is rigid? The scopes of the host claims hinge on this unanswerable question. Thus, Claims 1, 10, and 20 are indefinite.

2.    **"at least one rigid fluid conduit" / "the at least one rigid fluid conduit"
(Cls. 1, 20)**

For these terms, Cameron pivots once again on issues raised by Butch's and mischaracterizes the issue. That Claim 1 recites "wherein each fracturing tree . . . is coupled to the fracturing manifold by at least one rigid fluid conduit of the plurality of fluid conduits. . .," does nothing to cure the indefiniteness that Butch's identifies. Butch's does not challenge, as Cameron suggests, that a POSITA would not understand "at least one rigid fluid conduit" to be part of the "plurality of fluid conduits" or that there must be "at least one rigid fluid conduit" between each tree and the manifold. Rather, the claim expressly describes multiple rigid fluid conduits[9] (each of which is part of the plurality of all fluid conduits) with no clear indication as to which of these multiple conduits is "the" conduit to which the challenged term refers. As a result, it is unclear if the limitations following the term apply to a specific rigid conduit, any single one of multiple rigid conduits, or to all such rigid conduits. The structure of the claim, wherein the term is set out in a separate paragraph from the limitation reciting "at least one rigid fluid conduit" creates additional ambiguity as to which of the several conduits the term refers.

While Cameron argues that *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*[10] somehow undermines Butch's position, it mischaracterizes the point for which Butch's cited (and quoted)

---

[9] As claimed, there is "at least one rigid fluid conduit" between the manifold and each tree. Furthermore, Cameron indicates in its responsive brief that the "one and only one rigid fluid pathway" may itself comprise multiple conduits. Cameron's Resp. Br. at 10.
[10] 512 F.3d 1338 (Fed. Cir. 2008).

the case in its opening brief. Cameron focuses on the Federal Circuit's holding that use of the definite article "the" to refer to "a pre-soaked fabric roll" does not limit the scope of the claim to systems having only a *single* roll. *See Baldwin*, 512 F.3d at 1342-43. But, the issue in the present case is not whether "at least one rigid fluid conduit" refers to one or more rigid fluid conduits. Rather, the issue here is that "the at least one rigid fluid conduit" in claims 1 and 20 is unclear as to which of multiple rigid fluid conduit the term refers. In *Baldwin*, the Federal Circuit cited MPEP § 2173.05(e) with approval for the unremarkable proposition that "if two different levers are recited earlier in the claim, the recitation of 'said lever' in the same or subsequent claim would be unclear where it is uncertain which of the two levers was intended." *Id.* at 1343. Cameron's claims in the asserted patents suffer from this very problem and are indefinite for lack of antecedent basis.

### 3. "pipe joints" (Cl. 1)

The only disclosure Cameron can point to for support of its construction of "pipe joint" is a specialized "rotatable pipe joint" which it acknowledges includes a flange (i.e., a structure for joining pipes). Cameron Br. at 14. Cameron's argument that Butch's proposed construction is "nonsensical" is premised on Cameron's inexplicably narrow reading of the proposed construction in which "structures for joining pipes" must necessarily be separate joints rather than also encompassing pipes configured with a structure that facilitates joining with other components.

Moreover, despite Cameron's recharacterization of their statements in the IPR, Cameron previously sought to exclude a straight run of pipe from its construction of "pipe joints" in the related patent. In the IPR, Cameron asserted that prior art would not "inherently include ordinary pipe fittings such as elbows and pipe joints." Cameron's '800 IPR Surreply at 16. Cameron at no point contested, and urged through its exclusionary argument, that "pipe joints" are considered "ordinary pipe fittings" as opposed to "lengths of pipe." Cameron's expert in the IPR, Dr. Wooley

(the same expert as this case), did not disagree with the petitioner's characterization of "pipe joints" as "pipe fittings" as set out in *Perry's Chemical Engineer's Handbook* and as embodied by a "goat head" in other prior art. *See* Cameron's '800 IPR Expert Decl. (Ex. 1) at ¶¶143, 144, 155, and 156.

Cameron's earlier position and its expert's prior opinion that "pipe joints" are simply "pipe fittings," support Butch's proposed construction which is consistent with the use of "pipe joints" in the specification. The term "pipe joints" should be construed as "structures for joining pipes."

### 4.    "outlet branch(es)" (Cls. 2, 3, 4, 10, 13, 18)

Despite Cameron's repeated assertions that "outlet branch(es)" would be easily understood by a POSITA, it has provided no explanation as to what defines an outlet branch. As set forth in Butch's Opening and Responsive Briefs, the claims and specification fail to ascribe any discernible meaning for outlet branch. *See* Butch's Op. Br. at 16-17. Neither Cameron nor its expert have been able to identify a single structure to address the claim differentiation argument[11] raised in Butch's Opening Brief. *See* Cameron's Resp. Br. at 16-17. With respect to the number of required valves, Cameron again misunderstands Butch's position. Butch's does not argue that the number of valves must be specified, but that it is unclear in claims 3 and 18 whether each branch must have at least one valve or that there must simply be multiple valves among the multiple branches. The intrinsic record illustrates the ambiguity introduced by "outlet branch(es)" which Cameron has failed to address. Accordingly, claims 2-4, 10, 13, and 18 are indefinite.

### 5.    "the second connection block"; "the second pipe"; "the third studded connection" (Cl. 14) / "the second pipe"; "the first pipe"; "the third pipe" (Cl. 15)

As discussed above for "the at least one rigid fluid conduit," there is no clear antecedent basis to indicate to which of multiple structures is referred. Claims 14 and 15 are thereby indefinite.

---

[11] Claim 3's dependency on Claim 2, for example, indicates that Claim 2's "outlet branch(es)" encompass structures other than the valves recited in Claim 3. *See* Butch's Op. Br. at 16-17.

Dated: August 19, 2020          Respectfully submitted,

By:     */s/ David G. Henry, Sr.*
          David G. Henry, Sr. – Lead Counsel
          State Bar No. 09479355
          DHenry@GrayReed.com
          Eric S. Tautfest
          State Bar No. 24028534
          etautfest@GrayReed.com
          Jared Hoggan
          Texas Bar No. 24065435
          jhoggan@GrayReed.com
          **GRAY REED & MCGRAW LLP**
          900 Washington Avenue, Suite 800
          Waco, Texas  76701
          Telephone: (254) 342-3000
          Facsimile: (254) 342-3100

          M. Jill Bindler
          Texas Bar No. 02319600
          jbindler@GrayReed.com
          David T. DeZern
          Texas Bar No. 24059677
          ddezern@GrayReed.com
          David M. Lisch
          State Bar No. 24077179
          dlisch@GrayReed.com
          **GRAY REED & MCGRAW LLP**
          1601 Elm Street, Suite 4600
          Dallas, Texas 75201
          Telephone: (214) 954-4135
          Facsimile: (469) 320-6901

          **ATTORNEYS FOR DEFENDANT BUTCH'S
          RATHOLE & ANCHOR SERVICE, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document and accompanying attachments has been served on all counsel of record via the Court's ECF system on August 19, 2020.

*/s/ David Lisch*
David M. Lisch