```
 1                     IN THE UNITED STATES DISTRICT COURT
                      FOR THE WESTERN DISTRICT OF TEXAS
 2                            WACO DIVISION

 3   CAMERON INTERNATIONAL CORPORATION
                                         *
 4   VS.                                 *      October 16, 2020
                                         *
 5   NITRO FLUIDS LLC                    * CIVIL ACTION NO. W-20-CV-125
     BUTCH'S RATHOLE & ANCHOR SERVICE, INC.   W-20-CV-124
 6
                     BEFORE THE HONORABLE ALAN D ALBRIGHT
 7                       MARKMAN HEARING (via Zoom)

 8   APPEARANCES:

 9   For the Plaintiff:        John R. Keville, Esq.
                               William M. Logan, Esq.
10                             Merritt D. Westcott, Esq.
                               Winston & Strawn LLP
11                             800 Capitol Street, Suite 2400
                               Houston, TX 77002
12
     For Defendant Nitro Fluids:
13
                               J. David Cabello, Esq.
14                             James H. Hall, Esq.
                               Stephen D. Zinda, Esq.
15                             Cabello Hall Zinda, PLLC
                               801 Travis Street, Suite 1610
16                             Houston, TX 77002

17   For Defendant Butch's Rathole & Anchor Service:

18                             David T. DeZern, Esq.
                               David M. Lisch, Esq.
19                             Gray Reed & McGraw LLP
                               1601 Elm Street, Suite 4600
20                             Dallas, TX 75201

21                             David Greer Henry, Esq.
                               Gray Reed
22                             900 Washington Ave., 8th Floor
                               Waco, TX 76706
23
     Court Reporter:           Kristie M. Davis, CRR, RMR
24                             PO Box 20994
                               Waco, Texas 76702-0994
25                             (254) 340-6114
```

1      Proceedings recorded by mechanical stenography, transcript

2      produced by computer-aided transcription.

09:02    3      (October 16, 2020, 9:01 a.m.)

09:02    4      MS. MILES:  Markman hearing in Civil Actions W-20-CV-125,

09:02    5      styled Cameron International Corporation versus Nitro Fluids

09:02    6      LLC, and Case No. W-20-CV-124, styled Cameron International

09:02    7      Corporation versus Butch's Rathole and Anchor Service,

09:02    8      Incorporated.

09:02    9      THE COURT:  Good morning, everyone.  If I could hear

09:02   10      announcements first from the plaintiff and then from each of

09:02   11      the defendants.

09:02   12      MR. KEVILLE:  Good morning, Your Honor.  For the plaintiff

09:02   13      Cameron, John Keville from Winston and Strawn.  With me are

09:02   14      Merritt Westcott and William Logan.  And also on today is Robin

09:02   15      Nava and Brigitte Echols, both at home, are in-house Cameron's

09:02   16      parent, Schlumberger.

09:03   17      THE COURT:  Very good.  Thank you, sir.

09:03   18      MR. HENRY:  Good morning, Your Honor.  David Henry on

09:03   19      behalf of Butch's Rathole and Anchor Service, Inc.  And along

09:03   20      with me is David DeZern, and though not yet admitted to the

09:03   21      Western District, our colleague Alex Uber is along with us as

09:03   22      well.

09:03   23      THE COURT:  Okay.  Someone's on mute, I think.

09:03   24      MR. CABELLO:  My apologies, Your Honor.  David Cabello,

09:03   25      Cabello Hall Zinda, on behalf of the defendant Nitro.  And I

09:03   1   have with me Stephen Zinda.  And Mr. Hall also is in the

09:03   2   background here.  He hasn't logged on, but he's here with us.

09:03   3       THE COURT:  Very good.  And to anyone who's here that is

09:03   4   not counsel but a client representative or in-house, I

09:03   5   appreciate you taking the time to be here and attend this

09:03   6   hearing.

09:03   7       Give me one second to get ready.  Okie dokie.

09:04   8       We sent out yesterday our preliminary constructions and

09:04   9   what we are going take up this morning.  The first claim terms

09:04   10  we are going to take up are "fluid conduit" and a "single fluid

09:04   11  conduit."

09:04   12      The Court's preliminary construction was plain and

09:04   13  ordinary meaning.  To the extent someone would like to argue

09:04   14  why that -- they -- in support of the argument that it was

09:04   15  indefinite, I'm happy to hear that.  You may begin.

09:04   16      MR. HENRY:  Yes, Your Honor.  I'll start my screen share

09:04   17  here.

09:04   18      THE COURT:  Okay.

09:04   19      MR. HENRY:  Yes.  We'll be arguing both the "single fluid

09:04   20  conduit" and the other term on the slide here.  Couple of --

09:05   21      THE COURT:  Mr. Henry, let me interrupt you.  I failed to

09:05   22  put on the record that you all have absolutely the best case

09:05   23  style that I've had yet, Butch's Rathole and Anchor Service,

09:05   24  Inc.  It may be the winner for the year.  So it's great to have

09:05   25  a case that -- I never get any publicity, but if I were to

09:05  1  happen to, this would be one I would be happy to be attached

09:05  2  to.

09:05  3      (Laughter.)

09:05  4      MR. HENRY:  Thank you, Your Honor.

09:05  5      Well, a couple of over-arching comments that really apply

09:05  6  to both of the terms we'll be arguing today on indefiniteness.

09:05  7  Now, I'll certainly not read these slides to you.

09:05  8      But because each and every one of the building blocks of

09:05  9  these patents at issue are, you know, old elements, every

09:05  10  single element, which is of course not unusual, but the

09:06  11  specific arrangement and sequence and constituency of the claim

09:06  12  combinations with precision are what are going to be needed to

09:06  13  inform the public what they can and cannot do.

09:06  14      Now, with respect to both of the terms that we're arguing

09:06  15  today are indefinite, we have a problematic, in our opinion,

09:06  16  situation where we have a combination basically consisting of

09:06  17  type elements, "one and only one," and in the case of the other

09:06  18  term, and "single" in this case, consisting of only a certain

09:06  19  constituency of elements.

09:06  20      But then we also have comprising elements.  In this case

09:06  21  the "fluid conduit" as we'll get through in just a moment --

09:06  22  and we'll be skipping to Slide 11 when we get to "single fluid

09:06  23  conduit" by the way.

09:06  24      But we have -- so this combination of elements or parts of

09:06  25  the element that include certain things.  But then we also have

09:07 1    this limitation but they can only include certain things.  And,

09:07 2    respectfully, we believe that plain and ordinary meaning just

09:07 3    does not inform the public what they can't do.

09:07 4          So if we can skip now to Slide 11.

09:07 5          By way of context, and following in that same theme, we

09:07 6    have of course the element we're arguing, a "single fluid

09:07 7    conduit."  But as I pointed out, just again putting it in

09:07 8    context, the claim speaks of the single fluid conduit

09:07 9    "including," and it talks about connection blocks, and it talks

09:07 10   about one or more pipe sections.  Then it talks about

09:07 11   "coupled."  And, you know, it doesn't say necessarily joined

09:07 12   together or linked.  It's just coupled.  So there -- we have

09:07 13   things that will include things that couple.

09:08 14         There could be other constituents, but we don't know what

09:08 15   they are.  So we have multiple layers of ambiguity here.  So

09:08 16   "single fluid conduit."  Okay.  That in patentese, basically we

09:08 17   would suggest, translates to consisting of one, exactly one,

09:08 18   fluid conduit that comprises.  And again, as you saw in the

09:08 19   claim, you know, a connection block, a first one, a second

09:08 20   connection block, one or more pipe sections.  And then this

09:08 21   "coupled" between.

09:08 22         As is clear from the patent itself and general knowledge

09:08 23   in the industry, "coupled" doesn't always necessarily mean

09:08 24   connected together.  So what else is there?  Because of this

09:08 25   upper limit of "single," you know, at some point adding

```
09:08   1   something as compared to most normal claim limitations, adding
09:08   2   something avoids the scope of this claim.  But how much is too
09:09   3   much?  Where in the specification, where in the prosecution
09:09   4   history, how do we, how does the public, how does somebody
09:09   5   involved in fracking know when we've reached that one thing too
09:09   6   many?
09:09   7       The second layer of ambiguity has to do with another
09:09   8   limiting term "through only."  The claim talks about that the
09:09   9   fracturing fluid can be delivered to the tree through only the
09:09  10   single fluid conduit.  And again, there's something that if you
09:09  11   add -- you get outside the scope of the claim, there's an upper
09:09  12   limit here.
09:09  13       So where does that leave us?  Well, one option possibly is
09:09  14   that fluid is delivered through only, you know, a pipe and two
09:09  15   connection blocks.  And what I have here in the diagram
09:09  16   possibly could satisfy that.  That could be the outer bounds.
09:09  17   One more thing than what's shown here, you know, pipe or pipes
09:10  18   between two connection blocks may get you -- that may be the
09:10  19   limit.  And adding one more element gets us outside of that.
09:10  20       But then there's an option two, because we don't know the
09:10  21   limit.  We don't know what includes, or is included, in that
09:10  22   fluid conduit.  There's no really specified limit.  And so here
09:10  23   in this diagram perhaps this is the outer limit.  We don't
09:10  24   know.  But you could have a connection block up at the tree.
09:10  25   You could have a connection block all the way down at the
```

09:10   1   source.  Because there's only this coupling language, we don't
09:10   2   know what's in between.  And so, you know, this could be the
09:10   3   outer limit.
09:10   4        And so there's always the "so what."  Well, the so what
09:10   5   is, if it's first option, then the design around, the thing
09:10   6   that the public can do, is in the case on the right in the
09:10   7   green, would, for example, represent a hose.  Well, you add a
09:10   8   hose in parallel, and now the fluid is no longer delivered
09:11   9   through only the single fluid conduit.
09:11   10        But then what if it's option two?  Well, here on the right
09:11   11   you see what it would take to design around.  It's dramatically
09:11   12   different.  It's practically adding an entire second section in
09:11   13   order to avoid that "through only" and through this undefined
09:11   14   including who knows what between one connection block and
09:11   15   another.
09:11   16        So, Your Honor, we -- our position is we simply don't
09:11   17   believe this plain and ordinary meaning informs the public,
09:11   18   informs anyone in the fracking business.  What do we add to get
09:11   19   around "single fluid conduit"?  You know, simply staying out of
09:11   20   the fracking business just is not a reasonable option.
09:11   21        So, Your Honor, that's our position on that element.
09:11   22        THE COURT:  Got it.  That makes sense.
09:11   23        I'll hear from the plaintiff.
09:12   24        MS. WESCOTT:  Your Honor, this is Merritt Wescott with
09:12   25   Cameron.  Can you hear me all right?

09:12  1        THE COURT:  Yes, ma'am.  Thank you for asking.

09:12  2        MS. WESCOTT:  So how about we start -- and William Logan

09:12  3  is going to be running the slides for me today.

09:12  4        How about we start with Slide 6, please?

09:12  5        Your Honor, I think that Butch's goes to great lengths to

09:12  6  contort claim language that is quite clear, almost to the point

09:12  7  of drawing in the mind's eye exactly what is required for the

09:12  8  claim.

09:12  9        If you read the claim, which is up on the screen right

09:12 10  now, it says, "a single fluid conduit coupled to a well

09:13 11  fracturing tree, such that during a fracturing operation,

09:13 12  fracturing fluid is delivered to the well fracturing tree

09:13 13  through only the single fluid conduit, wherein the single fluid

09:13 14  conduit includes a first connection block positioned at the

09:13 15  well fracturing tree, a second connection block and one or more

09:13 16  pipe sections coupled between the first connection block and

09:13 17  the second connection block, such that fracturing fluid can be

09:13 18  routed from the second connection block to the first connection

09:13 19  block through the one or more pipe sections and then to the

09:13 20  well fracturing tree through the first connection block."

09:13 21        This is claiming a single fluid conduit.  And the

09:13 22  fracturing fluid is entering a fracturing tree only through the

09:13 23  single fluid conduit, and then it is telling you what the

09:13 24  single fluid conduit must include.

09:13 25        Even if it was not so explicit in the claim language,

09:14  1  which it is --

09:14  2        Can we skip to Slide 8, please?  I'm sorry.  Slide 9.

09:14  3        What single fluid conduit means here, and the "single" of

09:14  4  single fluid conduit is drawing a distinction between this

09:14  5  system which requires one single fluid conduit into the tree

09:14  6  and prior art systems which include frac iron.  In frac iron

09:14  7  system multiple smaller diameter pieces of frac iron are

09:14  8  attached to a fracturing tree.  In this system one single fluid

09:14  9  conduit is attached to the fracturing tree.

09:14  10        It's quite plain from the claim language what exactly is

09:14  11 required here.  And there's a lot of effort that's gone to

09:14  12 contort the claim language so that it purportedly covers some

09:15  13 kind of situation where the single fluid conduit somehow runs

09:15  14 all the way to the source of the fracturing fluid, which is a

09:15  15 truck that's backed up into the parking lot at the well site.

09:15  16 There's absolutely nothing in the claim language that indicates

09:15  17 that this single fluid conduit must run all the way back up to

09:15  18 a truck backed up in the parking lot.

09:15  19        Your Honor, we think that this claim language is very

09:15  20 clear and would be reasonably understood by a person of skill

09:15  21 in the art and is not indefinite.

09:15  22        THE COURT:  Would you go back to the claim, please?

09:15  23        So the way I read it, it wouldn't go -- it wouldn't go, to

09:15  24 take Mr. Henry's point, for example, what could we add?  It

09:15  25 could not go beyond the second connection block, right?  For

09:15  1   example, of anything that was added beyond the second

09:15  2   connection block would be outside of what comprises that

09:15  3   element, right?

09:15  4        MS. WESTCOTT:  Yes, Your Honor.

09:15  5        THE COURT:  It says the first connection block -- it says

09:16  6   "one or more pipe sections coupled between the first connection

09:16  7   block and the second connection block."  So that's where it

09:16  8   ends, right?

09:16  9        MS. WESTCOTT:  The second connection block is where this

09:16  10  claim ends.

09:16  11       THE COURT:  Okay.

09:16  12       Mr. Henry, do you want to respond to Ms. Westcott?

09:16  13       MR. HENRY:  Yes, Your Honor.  First of all, if, as with

09:16  14  other elements, they said only second -- only a first and only

09:16  15  a second or only two, that might be accurate.  But, again, we

09:16  16  have this including or effectively comprising language, as I

09:16  17  showed in that earlier diagram where we had a connection block

09:16  18  at the very end.

09:16  19       And when the claim language talks about the elements being

09:16  20  merely coupled, there's nothing whatsoever that rules out there

09:16  21  being a connection block in the middle.  There's nothing that

09:16  22  rules that out.

09:16  23       And the other thing that makes this problematic is the

09:16  24  "through only."  You know, that is where adding -- again,

09:17  25  adding an element gets you around this claim term.  What do we

09:17  1    add?  You know, at what point have you added enough to where

09:17  2    it's no longer a single fluid conduit through only which the

09:17  3    frac fluid gets to the tree?

09:17  4         And so the diagram that was criticized as going all the

09:17  5    way to the source, we would say that given the open-ended

09:17  6    construction that Cameron proposes is entirely reasonable.  It

09:17  7    could be, you know -- that's one of the ambiguities.  It's one

09:17  8    of the options.

09:17  9         So that's my response, Your Honor.

09:17  10         THE COURT:  Ms. Westcott?

09:17  11         MS. WESTCOTT:  Your Honor, in the situation in which

09:17  12    somebody adds a second connection block, has a first connection

09:17  13    block and then has pipes in series as required by the claims,

09:17  14    one or more pipes, and then adds a second connection block, the

09:18  15    second connection block becomes the connection block of the

09:18  16    claim.

09:18  17         So I'm not sure exactly what the ambiguity here would be.

09:18  18    I mean, the idea that the second connection block can be

09:18  19    somewhere downstream of the manifold and the apparatus that

09:18  20    pressurizes the -- that pressurizes the fracturing fluid and

09:18  21    all the way back up at the truck in the parking lot is not how

09:18  22    any person of ordinary skill in the art would read this claim

09:18  23    language.

09:18  24         THE COURT:  Mr. Henry, my concern about your -- my

09:18  25    question about your concern is that it doesn't sound -- and I'm

09:18  1    not one skilled in the art, but it doesn't sound that real
09:18  2    world to me.  That one skilled in the art wouldn't be able to
09:18  3    look at this and know beyond which that it would not be
09:18  4    included.
09:19  5         MR. HENRY:  Well, Your Honor, if we had -- if we had clear
09:19  6    boundaries of what the single fluid conduit was, that might
09:19  7    take care of it.  But it's -- again, it includes comprising
09:19  8    elements.
09:19  9         The problem again, I want to highlight this, is that
09:19 10    according to the claim, the fluid is delivered through only
09:19 11    whatever that is, whatever the components are.  They use
09:19 12    including language, not consisting.  So the question is, at
09:19 13    what point do you add an element where there's no longer fluid
09:19 14    going "through only"?  This is sort of an -- as compared to
09:19 15    like a parallel adding another channel, this is sort of a
09:19 16    linear "through only."
09:19 17         And again, the claim language doesn't limit it in any
09:19 18    shape or form to just two connection blocks.  We put it at the
09:19 19    very end just for ease of visualization, but it could have
09:19 20    easily been further, you know, down the chain toward the tree,
09:20 21    and there would be three connection blocks.  There's nothing in
09:20 22    the claim that rules that out.
09:20 23         But we don't know if adding that third connection block is
09:20 24    no longer a single fluid conduit, nor whether the fluid at that
09:20 25    point is now being delivered only through that single fluid

09:20   1   conduit.

09:20   2        THE COURT:  Ms. Westcott?

09:20   3        MS. WESTCOTT:  Your Honor, the language "through only" the

09:20   4   single fluid conduit means when it touches the tree, that fluid

09:20   5   conduit, and it touches the tree at the first connection block,

09:20   6   that is the only way that the fluid is getting into the tree.

09:20   7   And I think that that's quite explicit in the claim language.

09:21   8   And I think that that is what distinguishes this from the prior

09:21   9   art where there are multiple channels of fluid from the -- and

09:21  10   multiple conduits feeding into the fracturing tree.

09:21  11        THE COURT:  Mr. Henry, anything else?

09:21  12        MR. HENRY:  Your Honor, we stated our position.  I won't

09:21  13   waste any more time repeating myself.

09:21  14        THE COURT:  You're not wasting time.  I will be right

09:21  15   back.

09:21  16        (Pause in proceedings.)

09:24  17        THE COURT:  Would Nitro like to add anything from what

09:24  18   Mr. Henry said?

09:24  19        MR. CABELLO:  With respect to the indefiniteness, Your

09:24  20   Honor?

09:24  21        THE COURT:  With regard to anything about this claim term.

09:25  22        MR. CABELLO:  Well, yes, Your Honor.  I guess when you

09:25  23   look at this single fluid conduit, and I guess adding on to

09:25  24   Mr. Henry's views, certainly I agree that there could be other

09:25  25   connection blocks because it isn't close-ended.

09:25  1          The Court may recall that we also had a view with respect

09:25  2     to this particular issue, arguing that the position that is

09:25  3     indefinite -- and I don't know if the Court wants me to take

09:25  4     that up at this time, because it kind of goes hand-in-glove

09:25  5     with this term.  And if the Court is inviting me to do that, I

09:25  6     will certainly do that, Your Honor.  But other than to say that

09:25  7     we certainly agree that the single fluid conduit is indefinite

09:26  8     for the reasons that Mr. Henry says, I have nothing more to

09:26  9     add.

09:26 10          But I do have plenty to add with respect to fluid conduit,

09:26 11     because we do believe that fluid conduit requires an adjustment

09:26 12     joint or a pivot joint, as we've said in the past.  And the

09:26 13     disputed issue here relates to whether or not this fluid

09:26 14     conduit should be adjustable.

09:26 15          And we know that the -- that Cameron has taken the view

09:26 16     that what we're trying to do is limit the claim term to the

09:26 17     embodiments that are set forth in the figures, and has cited in

09:26 18     a lot of case law, Phillips, Thorner.  And we don't disagree

09:26 19     with the case law there, but we do believe that it's important

09:26 20     to stay focused on what the invention is and the purpose of the

09:27 21     disclosures and what the improvement was over the prior art for

09:27 22     these two inventions, both the '132 and the '645.

09:27 23          I know that the Court doesn't like for us to focus on what

09:27 24     the law is, but we think that certainly the Trustees of

09:27 25     Columbia University, which is on the screen now, is very

09:27   1   important because it is -- it is case law that is directly

09:27   2   relevant to a case such as this where the patent embodiments

09:27   3   are limited to, or exclusively disclose fluid conduits with

09:27   4   some sort of adjustment or some sort of pivot joint.

09:27   5         And so, you know, the focus then is whether or not -- and

09:27   6   you see it there in the highlighted term, "The patentee's

09:27   7   choice of preferred embodiments can shed light on the intended

09:27   8   scope of the claims."

09:27   9         And so if we can go on to the next slide -- Mr. Zinda's

09:28  10   running those slides.  You know, we have some further case law

09:28  11   that relates to the invention such as this where it's confined

09:28  12   to no more than the confined structure or method.

09:28  13         If we can move on to the next slide, you'll see that the

09:28  14   prior art -- and certainly there is a confession of the prior

09:28  15   art in the '132 patent, and that is that there are basically

09:28  16   large lines.  Those are well-known in the art.  And so what

09:28  17   we're trying to solve here is a problem that exists with large

09:28  18   lines.

09:28  19         Let's move on to the next slide.

09:28  20         So what we see here in the prior art is a large line, a

09:28  21   single line.  And so we see a single line basically going to

09:28  22   the well.  So then we have to ask ourselves, well, what

09:28  23   is special, what is different about that single line?  And we

09:29  24   think that that's where these patents are focused.

09:29  25         Can we go to the next slide?

09:29  1       And so when you look at the embodiments set out in the

09:29  2   '132 patent, you see that there is an adjustment piece.  So the

09:29  3   manifold is adjustable so that no frac lines are needed from

09:29  4   the manifold to the tree.  And so you see this concept of

09:29  5   adjustment joints and pivot joints that are illustrated, not

09:29  6   just in one embodiment, but on all the embodiments.  And that's

09:29  7   why we cite the Trustees of Columbia University case, because

09:29  8   it really focuses on our attention on what the patentee

09:29  9   intended -- what the inventor intended was the full scope of

09:29  10  the invention.  And that is that this single line include a

09:29  11  pivot joint or a -- or some sort of adjustment.

09:29  12       If we can go to the next slide.

09:29  13       So you see that those adjustment joints and those pivot

09:30  14  joints help to account for the difference in the elevation and

09:30  15  the spacing differences that were cited as the problem to be

09:30  16  solved by these patents.  The patents confess that large single

09:30  17  pipes are well-known in the art, and we've shown the Court that

09:30  18  prior art.

09:30  19       And so what are we trying to solve?  What is the problem

09:30  20  that the '132 and the '645 patent are trying to solve?  And

09:30  21  that is that they're trying to solve differences in elevation,

09:30  22  differences in alignment which can only be solved using these

09:30  23  adjustment joints and these pivot joints that are disclosed in

09:30  24  the '132 and the '645 patent.

09:30  25       Let's go on to the next slide.

09:30    1    And so we see an illustration of some of those adjustment

09:30    2    joints.  In this case it's a linear adjustment, so you can see

09:30    3    where in Figure 7 and Figure 8, the length of the pipe, if you

09:31    4    will, the length of the single line can be expanded or

09:31    5    contracted to make up for the alignment issues that the patent

09:31    6    teaches us exist with large single lines.

09:31    7    Let's move on to the next one.

09:31    8    And so we've been criticized, Your Honor, for saying that

09:31    9    there has to be an adjustment and a pivot joint, and we've been

09:31   10    criticized by Cameron because they say that it isn't consistent

09:31   11    with the doctrine of claim differentiation.  And certainly as

09:31   12    the Court knows, the doctrine of claim differentiation is

09:31   13    certainly a guiding principle, but it doesn't necessarily

09:31   14    dictate how these claims need to be construed.

09:31   15    We believe that the asserted claims, 9 and 11, and our use

09:31   16    of a pivot or an adjustment joint are certainly very consistent

09:31   17    with the doctrine of claim differentiation if the Court were to

09:32   18    construe the claim term as we have suggested.  Then we've shown

09:32   19    in this Venn diagram that Claim 9 includes both rotational

09:32   20    adjustment and lengthwise adjustment.  And then Claim 11 refers

09:32   21    to a specific type of adjustment joint, and that is one that

09:32   22    can be expanded lengthwise which is illustrated there for Claim

09:32   23    11, that lengthwise adjustment.  But the proffered claim term

09:32   24    construction would include both the rotational and the

09:32   25    lengthwise adjustment.

09:32  1          Let's move on to the next slide.

09:32  2          And, Judge, there's been lot said about Monoline

09:32  3    technology.  And so one of the things that Cameron would like

09:32  4    us to believe is that Monoline means a single line, a single

09:32  5    large line.  But as we know, the prior art teaches that

09:32  6    seven-inch diameter lines, that's a large line because in

09:32  7    reality all of the commercial embodiments, and certainly

09:33  8    Cameron's commercial embodiments, are seven-inch lines.  And so

09:33  9    the seven-inch line was well-known in the art.

09:33  10         But Cameron has coined this word "Monoline technology."

09:33  11   But Monoline doesn't mean a single line.  And you'll see in the

09:33  12   highlighted term that the Monoline technology has both swivel

09:33  13   flanges.  And they talk about these three degrees of freedom

09:33  14   needed to accommodate the misalignment between the frac tree

09:33  15   and the frac manifold.

09:33  16         And so, again, this slide is very consistent with the

09:33  17   teachings of the patent which arose from -- or arose at the

09:33  18   time of this commercial technology or commercial embodiment,

09:33  19   and that is that there has to be some degree of freedom up to

09:33  20   three.

09:33  21         And so Cameron would like to limit the claims of the '132

09:33  22   patent and certainly the '645 patent to rigid pipe lines that

09:34  23   have no adjustment means.  And we believe that the Board of

09:34  24   Columbia University -- or the Trustees of Columbia University

09:34  25   case is right on point, because it requires the Court to look

09:34  1   at what the purpose of the invention is.  And that is disclosed

09:34  2   in all the embodiments.

09:34  3       The cases Cameron cites are certainly on point where the

09:34  4   Court would be -- would be limiting the invention to a single

09:34  5   embodiment that's illustrated.  But if we look at the patents,

09:34  6   both the '132 and the '645 patent, we see that in all

09:34  7   instances, in all embodiments, Cameron has disclosed, and we

09:34  8   believe claimed, embodiments that have at least one degree of

09:34  9   freedom in the claims and certainly in the embodiments that are

09:34  10  disclosed in the patent.

09:34  11      Let's go to the next slide.

09:34  12      And so the next slide basically deals with the connection

09:35  13  block, Your Honor.  And if you'd like, I'm happy to take that

09:35  14  up, the position of that which we contend is indefinite.  But

09:35  15  for that, let me stop and see if the Court has any questions.

09:35  16      But I do have something further to add with respect to the

09:35  17  connection block.

09:35  18      THE COURT:  No.  Why don't you wrap up so I can give

09:35  19  Ms. Westcott an opportunity to respond?

09:35  20      MR. CABELLO:  All right.  Well, then let me go on to the

09:35  21  connection block.  Oh, I'm sorry.  Wrap up with the connection

09:35  22  block or wrap up with the --

09:35  23      (Clarification by the reporter.)

09:35  24      MR. CABELLO:  Your Honor, I'm going to stop there on fluid

09:35  25  conduit.  I think I've said enough.  But as I said, I would

09:35  1  like to at least take up connection block whenever the Court's

09:35  2  ready for it.

09:35  3      (Technical issues.)

09:35  4      (Clarification by the reporter.)

09:36  5      THE COURT:  Can everyone mute other than me?

09:36  6      Mr. Cabello, why don't you tell me what it -- why don't

09:36  7  you wrap up anything you'd like to say with regard to either

09:36  8  fluid conduit or single fluid conduit?

09:37  9      MR. CABELLO:  That's all we have, Your Honor.  As I said,

09:37  10  the next term I believe is "connection block," and so we'll

09:37  11  take that up in order.

09:37  12      THE COURT:  Evan?  I don't -- I'm just checking.  I didn't

09:37  13  see that we had -- I thought the next one was rigid fluid

09:37  14  pathway.

09:37  15      MR. CABELLO:  I'm sorry, Your Honor.  When I say

09:37  16  "connection block," I'm talking about the term "positioned at"

09:37  17  which is with respect to the connection block, but...

09:37  18      THE COURT:  Mr. Cabello, we're missing each other here.

09:37  19  What is it that you want to take up with connection block?  Is

09:37  20  it the claim term?

09:37  21      MR. CABELLO:  It is the "positioned at."  So the term is

09:37  22  "first connection block positioned at" which I thought was --

09:37  23      THE COURT:  We're not at -- we're going to get to

09:37  24  "positioned at" in three more claim terms.

09:38  25      MR. CABELLO:  And that was my understanding, Your Honor.

09:38   1   With that, I'll stop.

09:38   2          THE COURT:  Okay.  Then we're on the same page.

09:38   3          So, Ms. Westcott, would you respond to anything that was

09:38   4   just said about single fluid conduit?

09:38   5          MS. WESTCOTT:  Yes, Your Honor.  So just to be clear,

09:38   6   Nitro did not dispute "single fluid conduit," and it did not

09:38   7   make an argument that that claim term was indefinite.  So we

09:38   8   object to their attempt here to try to tag on an indefiniteness

09:38   9   argument at the last minute.

09:38   10         What Nitro did argue was that "fluid conduit" should be

09:38   11  limited to include either an adjustment joint or a pivot joint.

09:38   12         Looking at Slide 10, you can tell even from the claim

09:38   13  language itself that this is inappropriate.  Basically what it

09:39   14  says here is that the single fluid conduit includes a first

09:39   15  connection block and a second connection block, block and pipe

09:39   16  sections between them.  Okay?  It does not say that it includes

09:39   17  an adjustment joint.  It does not say that it includes a pivot

09:39   18  joint.

09:39   19         Claim 11, which depends directly from Claim 9, does add on

09:39   20  an adjustment joint, and that's the only thing that it adds.

09:39   21         Go to Slide 11, please.  Back up just one.  Thank you.

09:39   22         Case law is quite clear that claim differentiation can

09:39   23  inform the meaning of claim terms, and especially where the

09:39   24  only thing added in a dependent claim is the difference between

09:39   25  that claim and the claim language of the independent claim.

09:39   1    Here there is no indication that there should be any adjustment

09:39   2    components in the language of the independent claim, Claim 9.

09:40   3        With regard to adjustability, though --

09:40   4        Would you please back up to Claim 10 for a moment?

09:40   5        With regard to adjustability though, this system in

09:40   6    Claim 9 is linearly adjustable, because you can add one or more

09:40   7    pipe sections to increase the length of the pipe between the

09:40   8    connection blocks.

09:40   9        So to the extent that Nitro believes that adjustability is

09:40   10   required, that requirement is met by Claim 9.  And it can be

09:40   11   met without having to add a particularized adjustment joint.

09:40   12       Secondly, Nitro is incorrect that the specification states

09:40   13   that the invention must include adjustment joints or pivot

09:40   14   joints.  Specifically, the abstract of the patent says that

09:40   15   adjustment joints may be added and that pivot joints can be

09:40   16   included.  It also states at Column 1, Lines 58 through 64,

09:41   17   which is not what is on the screen right now but I will read to

09:41   18   it you.

09:41   19       It says, "Certain aspects of some embodiments are

09:41   20   disclosed herein and are set forth below.  It should be

09:41   21   understood that these aspects are presented merely to provide

09:41   22   the reader with a brief summary of certain forms the invention

09:41   23   might take and that these aspects are not intended to limit the

09:41   24   scope of the invention.  Indeed, the invention may encompass a

09:41   25   variety of aspects that may not be set forth below."

09:41   1       And it further states at the top of Column 2 that in one

09:41   2   embodiment the fracturing manifold includes an adjustment

09:41   3   joint, which you can see at the top there of Slide 12.

09:41   4       As is well-known case law, the claims should not be

09:41   5   limited to a preferred embodiment shown or described in the

09:41   6   specification even if that is the only embodiment shown or

09:41   7   described in the specification, and that is not the case here.

09:42   8   The specification is clear here, and the claims are clear here,

09:42   9   that "fluid conduit" should not be read to include adjustable

09:42   10   joints of any kind, be that pivot joints or adjustment joints.

09:42   11       And, Your Honor, if there's any response -- essentially it

09:42   12   should be read as its plain and ordinary meaning.  A person of

09:42   13   skill in the art knows what a fluid conduit is.  They can tell

09:42   14   what a fluid conduit is in the specification.  The

09:42   15   specification does not indicate, nor do the claims indicate

09:42   16   that adjustment joints of any kind should be read into the

09:42   17   construction of that term.

09:42   18       THE COURT:  Mr. Cabello?

09:42   19       MR. CABELLO:  Your Honor, I was -- I was pleased to hear

09:42   20   Ms. Westcott agree that there can be some adjustment in the

09:43   21   fluid conduit.

09:43   22       Let me go to Slide 2, Your Honor, of our presentation.

09:43   23   And, you know, given that Ms. Westcott is suggesting that there

09:43   24   can be some adjustment, I'm thinking that one possible

09:43   25   compromise might be that if we change Nitro's proposal to

09:43   1   "adjustable channel for conveying fluid," which comprises this

09:43   2   adjustment that Ms. Westcott is talking about.  So it would be

09:43   3   "adjustable channel for conveying fluid, comprising linear

09:43   4   adjustment or a pivot joint."

09:43   5        This would take care of the adjustable feature that we

09:43   6   believe exists that is different in this patent over the prior

09:43   7   art.

09:43   8        As you'll notice when we display the prior art, there was

09:43   9   a solid channel going from the source of the fracking fluid to

09:44   10  the well.  And if there is going to be an adjustment by adding

09:44   11  different spool pieces, then I would proffer that one comprise

09:44   12  might be in changing this claim term to "adjustable channel for

09:44   13  conveying fluid comprising linear adjustment or a pivot joint."

09:44   14       THE COURT:  My guess is it's unlikely Ms. Westcott is

09:44   15  going to agree to the adjustment joint or pivot joint, but I'll

09:44   16  let her speak for herself.

09:44   17       MS. WESTCOTT:  You're correct, Your Honor.  The

09:44   18  adjustability of Claim 9 is not inherent within the term "fluid

09:44   19  conduit."  It is because of the claim language that allows a

09:44   20  person to add one or more pipe segments between the connection

09:44   21  blocks that allows the adjustability and length.  The fluid

09:44   22  conduit is a fluid conduit.  It is not inherently adjustable,

09:44   23  and there's nothing in the specification that says so.

09:44   24       THE COURT:  Anything else, Mr. Cabello?

09:44   25       MR. CABELLO:  Your Honor, again, I think I'm repeating

09:45  1   myself, but clearly the patent teaches adjustment in pivot

09:45  2   joints.  And there's a confession of what the prior art is, and

09:45  3   that is seven-inch lines.  And the problem to be solved is

09:45  4   adjustment and alignment problems.  And that problem is solved

09:45  5   by having an adjustable fluid conduit of some fashion.

09:45  6          THE COURT:  Anything else, Ms. Westcott?

09:45  7          MS. WESTCOTT:  And it is also solved by having a claim

09:45  8   where you can add multiple pipe sections together to extend the

09:45  9   length of the fluid conduit.

09:45  10          It is -- can also be solved, and is solved additionally in

09:45  11   dependent claims by adding an adjustment joint, for example, in

09:45  12   Claim 11.  And I'll note for the Court that other patents that

09:45  13   issued prior to this one but in the same patent family,

09:45  14   prosecuted by the same prosecuting attorney, examined by the

09:45  15   same examiner, include specific claims for a pivot joint.  This

09:46  16   one does not.

09:46  17          So when the patentee wanted to claim a pivot joint or when

09:46  18   it wanted to claim an adjustment joint, it did so.  And when it

09:46  19   didn't, it didn't.

09:46  20          THE COURT:  And it seems to me that to the extent that

09:46  21   Mr. Cabello's right, this is something that you all will have

09:46  22   to just fight out with respect to issues on validity.  If they

09:46  23   want to make an argument that prior art would invalidate, and

09:46  24   your way of distinguishing it would be, for example, to pivot

09:46  25   or do something, then we'll figure out at that time if this is

09:46    1    an issue or not, correct?

09:46    2         MS. WESTCOTT:  Correct.  Correct, Your Honor.

09:46    3         THE COURT:  I'll be right back.

09:46    4         (Pause in proceedings.)

09:48    5         THE COURT:  So here's what I'm going to do.  I realize I

09:48    6    may just be buying myself time and you all effort.  It seems to

09:48    7    me that this is an issue that -- I have no idea what -- how

09:48    8    this is going to break when the initial expert claims are

09:48    9    exchanged.  I'm going to stick with plain and ordinary meaning.

09:48   10         But in the event that when the plaintiff gets -- I'm

09:49   11    sorry -- when the defendant gets the plaintiff's expert report,

09:49   12    if they feel that the infringement contentions made by the

09:49   13    expert in his report, or when the plaintiff gets the

09:49   14    defendant's validity report, the contentions that are made by

09:49   15    the expert in the validity report fall -- are a position that

09:49   16    is a claim construction position, then you all will just have

09:49   17    to come back to me, and we may -- I'll have to address it.  We

09:49   18    may have another mini Markman.

09:49   19         So, Mr. Cabello, if you feel -- what I don't want to

09:49   20    happen, because I just did a little bit in the trial I just had

09:49   21    was, we got to trial and then there was a fight between the

09:49   22    experts of what was meant by "plain and ordinary meaning," even

09:50   23    though there was an agreement as to what plain and ordinary

09:50   24    meaning was on top of that.  And yet the experts still said the

09:50   25    other one's plain and ordinary meaning was wrong.

09:50  1      I don't want that fight.  That fight is not for the jury,

09:50  2  that's for me.  So my admonition to both sides, especially for

09:50  3  plaintiff, I guess, because they'll have the infringement --

09:50  4  first infringement report is, you know, if you take a -- I

09:50  5  don't want to sound threatening.  I'm just saying that if the

09:50  6  plaintiff takes the position that the defendants' products

09:50  7  infringe the element of fluid conduit or a single fluid

09:50  8  conduit, if the defendants believe that your expert has taken a

09:50  9  position that is not as a matter of law, the plain and ordinary

09:50  10  meaning or vice versa on validity, which actually may come up

09:51  11  because of what Mr. Henry was saying about how -- you know, how

09:51  12  this was novel over the prior art, then you all need to get

09:51  13  back to me and I need to decide what to do.

09:51  14      And the problem for you all is that if I decide that you

09:51  15  haven't stayed within the scope of plain and ordinary meaning

09:51  16  and your expert has gone beyond that, then that's a bad time to

09:51  17  find that out.  So I would use a rule of reason in terms of the

09:51  18  positions you're taking with respect to whether or not the

09:51  19  element -- the fluid conduit and the single fluid conduit

09:51  20  element in the defendants' products infringe or don't infringe.

09:51  21  And if you all feel that the other side isn't -- doesn't have

09:51  22  a -- is not using a methodology that is consistent with what

09:51  23  the plain and ordinary meaning should be, I'll take it up at

09:52  24  that time.

09:52  25      So it's plain and ordinary meaning for both those claim

09:52   1   terms.

09:52   2       The next claim term is "rigid fluid pathway" and "one and

09:52   3   only rigid fluid pathway."

09:52   4       Mr. Henry or Mr. Cabello, which of you is going to start

09:52   5   on that?

09:52   6       MR. HENRY:  Your Honor, I'm going to be speaking to the

09:52   7   "one and only," but I don't know if Mr. Cabello wanted to

09:52   8   address the subset of that first.  Either way is fine with me.

09:52   9       THE COURT:  Mr. Cabello?

09:52   10      MR. CABELLO:  I'll yield to Mr. Henry, and then I'll

09:52   11  follow on, Your Honor.

09:52   12      THE COURT:  Okay.

09:52   13      MR. HENRY:  Thank you, Your Honor.

09:52   14      Well, with the -- or as I've already mentioned, we have,

09:52   15  we believe, in this next element that fatal combination of

09:52   16  consisting and comprising in a single limitation.

09:52   17      Just by way of context to illustrate why this is confusing

09:52   18  and why we just simply cannot determine the outer boundaries,

09:53   19  is if you look at the claim itself, we start with, you know, a

09:53   20  plurality of fluid conduits.  Now, there's no distinction

09:53   21  between rigid or not rigid, you know, pipes or hoses, as it

09:53   22  were.  We just have a bunch of fluid conduits between a

09:53   23  manifold and the various trees.

09:53   24      Then we go down and we have, further in the claim, where

09:53   25  we have at least one, you know -- again, open-ended, at least

09:53  1   one rigid fluid conduit.  And somehow that then translates down
09:53  2   to we're going to end up with one and only one rigid fluid, not
09:53  3   conduit, but pathway.  And that's not a defined term.  We don't
09:53  4   know exactly what that is.
09:53  5        Now, further, when we talk about the "at least one," you
09:53  6   know, including -- upon including here -- we have "rigid fluid
09:53  7   conduit including."  And then it goes down and it talks about a
09:54  8   plurality of pipe joints and connection blocks and then it goes
09:54  9   further, and it's very, very open-ended.
09:54  10       And once again, because of this "one and only one,"
09:54  11  there's an upper limit.  We don't know what that upper limit
09:54  12  is.  And so once again, we look at possibilities.
09:54  13       You know, our first level of ambiguity has to do with the
09:54  14  phrase itself.  Is it that there's several pathways but only
09:54  15  one is rigid?  Or is there only one pathway and it's solely
09:54  16  rigid?
09:54  17       And some of these diagrams the left side -- the right side
09:54  18  is prior art.  The left side has to do with various
09:54  19  possibilities here.  You know, is the one rigid pipe and then
09:54  20  maybe one hose in parallel?  Is that, you know, a one and only
09:54  21  rigid fluid pathway, because one of those pathways or conduits
09:54  22  is rigid?  Or is it the next one?  Is it that there's only one
09:55  23  and it's a pipe, and that's all that this covers?
09:55  24       Or do -- we have on the far right -- and there are other
09:55  25  possibilities as well, but on the far right we have illustrated

09:55  1    two rigid pipes.  You know, is that a pathway?  It's still
09:55  2    going from the manifold to the tree.  It's only going there,
09:55  3    but it's two separate.  Is that still one and only?  So that's
09:55  4    the first level.

09:55  5         The second level is that again, we have this mini conduit
09:55  6    sitting out there per the claim itself, no distinction between
09:55  7    rigid and non-rigid.  It doesn't say where each of those goes.
09:55  8    And then it talks about again somehow those ending up being one
09:55  9    and only one pathway as opposed to conduit.

09:55  10        Now, Ms. Westcott earlier said that, you know, conduit was
09:55  11   well understood and she said we could have, you know, any
09:55  12   number of pipes, for example.  Again, open-ended.

09:55  13        It's that one and only one that's so fatal, in our
09:56  14   opinion, to this claim element.  We don't know what that one
09:56  15   additional element is where we're no longer within the scope of
09:56  16   that claim.

09:56  17        And then finally we don't really know for sure what rigid
09:56  18   is but when applied to a pathway.  We might be able to figure
09:56  19   out what rigid is.  I mean, I think we can probably all agree
09:56  20   that's steel pipe.  But when applied to this pathway, what does
09:56  21   that pathway include?  What does it eliminate?  Because we can
09:56  22   only have one.  Does it include multiple types of conduits,
09:56  23   rigid and non?  We just don't know.

09:56  24        So, Your Honor, we would -- we would suggest that -- well,
09:56  25   you know, the question is what do we add?  Because they created

09:56  1   this upper limit.  They created the one more thing exceeds the

09:56  2   scope of this claim.

09:56  3       And the public has a right -- you know, our clients have a

09:57  4   right, people in the fracking industry have a right to know

09:57  5   what's that one more thing we can add and not infringe this

09:57  6   claim?

09:57  7       That's the sum of my comments on that point, Your Honor.

09:57  8       THE COURT:  Mr. Cabello, is there anything you'd like to

09:57  9   add?

09:57  10      MR. CABELLO:  Yes, Your Honor, if I may.

09:57  11      Go to Slide 16 of our presentation.  Mr. Zinda will put

09:57  12  this up.

09:57  13      MR. ZINDA:  Do you want to wait until they rebut it?

09:57  14      MR. CABELLO:  Oh, I'm sorry.  Mr. Zinda is suggesting that

09:57  15  I wait for rebuttal to be offered on Mr. Henry's position.  I

09:57  16  do have a slightly different position, but I'm not arguing

09:57  17  indefiniteness with respect to this rigid fluid pathway.

09:57  18      THE COURT:  Mr. Cabello, why don't you go ahead and argue

09:57  19  whatever you want to say, and Ms. Westcott or whoever on the

09:57  20  other side can take it up.  And we'll do it all at once.

09:57  21      MR. CABELLO:  Thank you, Your Honor.

09:57  22      What I want to do is go to Slide 16, which is up on the

09:58  23  screen now, Your Honor.

09:58  24      And of course the question -- Cameron offers the plain and

09:58  25  ordinary meaning.  Of course we believe that the question that

09:58   1   a person of ordinary skill in the art would understand is,
09:58   2   given the context of this particular invention.  And again we'd
09:58   3   cite the Court to the Trustees of Columbia University.
09:58   4       But we have to look at not just the claim.  We have to
09:58   5   look at the specification.  How do you construe the claim in
09:58   6   light of the specification?
09:58   7       And with that, we can go on to the next slide.
09:58   8       Because you also have to look at what the patentee said
09:58   9   was well known in the art.  And that is these large fracturing
09:58   10  lines with the seven-inch bore are difficult to adjust and
09:58   11  align.  And so what problem was being solved by the patentee is
09:59   12  adjustability in misalignment problems.  They clearly state it
09:59   13  in the specification, and they teach that in all of their
09:59   14  embodiments.
09:59   15      Now, Cameron would like to focus on the claims, and we
09:59   16  certainly have to focus on the claims for both infringement and
09:59   17  construction.  But we have to look at the specification to see
09:59   18  what the specification teaches is both the problem and how to
09:59   19  solve that problem.
09:59   20      If we can go to the next slide, Your Honor, which is Slide
09:59   21  18 of our presentation.  What we have here on the screen that's
09:59   22  solid -- I'm sorry -- the dotted-red line, if you will, is the
09:59   23  manifold running through the oil field.  And then the purple
09:59   24  certainly is the well to be fractured.
09:59   25      But we have elements of adjustability illustrated.  We

09:59  1   have rotational adjustability shown by Lines 69, 71 and up at
10:00  2   the top of -- next to the wellhead, 73.  So you have this
10:00  3   element of rotational adjustability.
10:00  4       And then we show, and the patent teaches, by lines 68, 70
10:00  5   and 72 is this linear adjustability.  And with this both linear
10:00  6   and rotational adjustability, you can compensate or you can
10:00  7   deal with the problems that the patent teaches us exist with
10:00  8   large seven-inch pipelines.
10:00  9       And so again, going on to the next slide, we've shown you
10:00  10  this, Your Honor, which is the linear adjustability, and I
10:00  11  won't spend any time on it.
10:00  12      And if we can then go to Slide 20.  The patent
10:00  13  specifically talks about these rotatable pipe joints, 170 as
10:00  14  well.  And those are further illustrated in Slide 21.  And so
10:01  15  you see in Figure 12 an example of a rotatable pipe joint.  You
10:01  16  have the flange at the bottom which can be threaded.  They
10:01  17  teach threads and can therefore make up for alignment problems
10:01  18  at the flange joints.
10:01  19      And then you also have this swivel ring, 176, which is at
10:01  20  the top of Figure 12 which can also make up for misalignment
10:01  21  problems with the studded flanges, if you will.  So when we
10:01  22  look at the teachings in the patent, there is an ability to
10:01  23  adjust for both linear and misalignment problems at the studded
10:01  24  pipe joints.
10:01  25      And so again, with the Venn diagram on the next slide, on

```
10:01  1   Slide 22, you'll see that the asserted claims, Claims 1, 10,
10:01  2   14, 17 and 20, we contend include some element of
10:02  3   adjustability, and that is a rotational adjustment and a
10:02  4   lengthwise adjustment.  And so with the subsets that are shown
10:02  5   in this Venn diagram you see the lengthwise adjustment in Claim
10:02  6   5 and you see the rotational adjustment in Claims 6, 9, 16 and
10:02  7   19.
10:02  8        And so again, Your Honor, I know I'm repeating myself and
10:02  9   I apologize for that, but we have to look at the specification
10:02  10  to see what the problem is to be solved and how the patentee
10:02  11  taught us how to solve that problem.  And we think that just
10:02  12  focusing strictly on the claims and the words of the claims in
10:02  13  a vacuum without opening the specification is improper.  And
10:02  14  again we rely on the Trustees of Columbia University.
10:02  15       And with that, Your Honor, I'll stop.
10:02  16       THE COURT:  Mr. Cabello, would you put that slide back up
10:02  17  for just a second?
10:03  18       MR. CABELLO:  The Venn diagram, Your Honor?
10:03  19       THE COURT:  Yes, sir, please.
10:03  20       MR. CABELLO:  Yes, Your Honor.
10:03  21       THE COURT:  Okay.  Thank you.
10:03  22       I will be -- oops.  I'm having difficulties today.  I'll
10:03  23  be right back.
10:03  24       MR. CABELLO:  All right.  Thank you, Your Honor.
10:03  25       (Pause in proceedings.)
```

10:03  1      THE COURT:  Okay.  Thank you for keeping up --

10:04  2  Ms. Westcott, if you don't need that, then I can have -- you

10:04  3  brought slides.

10:04  4      If you want to take that down, Mr. Cabello, or whoever on

10:04  5  your side, and Ms. Westcott can take the screen.

10:05  6      MR. KEVILLE:  Your Honor, this is John Keville for

10:05  7  Cameron.  I'm going to turn it over to William Logan now.

10:05  8      And just by way of introduction, Mr. Logan is a fairly

10:05  9  junior associate.  While I can easily make the argument he's

10:05  10  smarter than me, he's a 2017 grad from the law school at the

10:05  11  University of Alabama.  And so to the extent, you know, I need

10:05  12  to join in, I will.  I trust that he won't have any problem,

10:05  13  and I hope Your Honor will give him a little leeway if

10:05  14  necessary, as a junior associate.

10:05  15      THE COURT:  Well, I'm usually pretty brutal on everyone.

10:05  16  And so -- no.  Mr. Keville, I made a pretty good living for

10:05  17  20 years by never hiring an associate that wasn't smarter than

10:05  18  I was.

10:05  19      (Laughter.)

10:05  20      MR. KEVILLE:  My practice as well.

10:05  21      THE COURT:  I would think less of you if you didn't do

10:05  22  that.

10:05  23      So, Mr. Logan, I look forward to hearing from you.

10:06  24      MR. LOGAN:  Thank you, Your Honor, and I appreciate the

10:06  25  opportunity to address the term.

10:06  1        I want to begin -- and I'll share my screen here.  I want
10:06  2   to begin actually where the Court left off with Mr. Cabello
10:06  3   just to set up this argument, which is this Venn diagram.
10:06  4   Because really it sort of encapsulates Cameron's argument on
10:06  5   this term which is these independent claims, the broader claims
10:06  6   that don't have these in them.  They have a wide swath in this
10:06  7   Venn diagram, all this white area here that's outside the
10:06  8   rotational adjustment, the lengthwise adjustment.  And
10:06  9   Cameron's position is that those independent claims, they claim
10:06 10   territory within this white space that's not within this red
10:06 11   circle or within this green circle.
10:06 12        THE COURT:  Mr. Logan, let me interrupt you and tell you
10:06 13   my worry now is that I didn't do a good job of muting my screen
10:06 14   because when I went on mute, that was exactly the discussion I
10:07 15   had with my law clerk.
10:07 16        So I think Mr. Keville is right, that he did well by
10:07 17   having you make this argument.  That was exactly what struck me
10:07 18   about the Venn diagram.
10:07 19        MR. LOGAN:  Thank you, Your Honor.
10:07 20        Yeah.  So I think it gives us an intuitive place to start
10:07 21   with this argument.  And, you know, obviously we have two
10:07 22   separate issues to address.  One is Butch's arguments that this
10:07 23   term is indefinite.  And then after that, Nitro's argument is,
10:07 24   well, this term actually we need to read in these adjustment
10:07 25   joints and swivel joints to the term.

10:07  1    And we agree with the Court obviously, Your Honor, as we

10:07  2    propose that this term has a plain and ordinary meaning.

10:07  3    THE COURT:  Mr. Logan?

10:07  4    MR. LOGAN:  Yes, Your Honor.

10:07  5    THE COURT:  And, Mr. Logan, you haven't raised this yet,

10:07  6    but you may be getting there.  It usually occurs to me that --

10:07  7    well, Mr. Henry and Mr. Cabello may have a problem that they're

10:08  8    together on this.  And what I mean by that is, it's difficult

10:08  9    for one defendant to be arguing that something is indefinite

10:08  10   and another defendant to be saying it's not indefinite, it

10:08  11   means this.  It usually is not great for the argument that

10:08  12   something is indefinite when Mr. Cabello can so passionately

10:08  13   argue that it is not indefinite but that I have a specific

10:08  14   meaning I have to give.

10:08  15   So you may be fortunate that you have two defendants who

10:08  16   are taking essentially the opposite position on this.

10:08  17   MR. LOGAN:  Yes, Your Honor.  And this time I want to say

10:08  18   I believe the Court may have been peeking ahead in my slides.

10:08  19   I skipped a few steps ahead here, because I do think that

10:08  20   intuitively it is important to point out.

10:08  21   And I do want step back for just a second on

10:08  22   indefiniteness to, you know, remind the Court that

10:08  23   indefiniteness is a high standard.  It's an invalidity

10:08  24   standard.  So it's something that has to be proven by clear and

10:09  25   convincing evidence.  And in this case of course Cameron had

10:09  1    its expert -- as I'll walk through in just a minute -- that

10:09  2    went through the claims, the patent, the prior art, and talked

10:09  3    about this term and came to the conclusion that it was

10:09  4    understood with reasonable certainty.

10:09  5        The only other expert in this case is Nitro's expert.

10:09  6    Butch's did not offer an expert to support its position.

10:09  7    Nitro's expert looked at these same claim terms, at these same

10:09  8    prior art references, and, as this slide shows, came to the

10:09  9    conclusion that a POSITA would understand this term, and in

10:09  10   fact would understand it to provide one and only one route for

10:09  11   fluid to flow from the manifold to the respective fracturing

10:09  12   tree.

10:09  13       So in this case, Your Honor -- or in these two cases, I

10:09  14   should say, we only have two experts.  And both of those

10:09  15   experts have looked at these materials, looked at the patent,

10:09  16   and both of them has reached the conclusion that they

10:09  17   understand this term with reasonable certainty.

10:09  18       So to that extent I do believe that, you know, at least

10:10  19   probative of that clear and convincing standard, that aside

10:10  20   from the, you know, attorney argument, Butch's doesn't have

10:10  21   anything to buoy its position here.

10:10  22       And, you know, stepping back to how Dr. Wooley reached

10:10  23   that conclusion, because I do think that's important.  It's not

10:10  24   just that Dr. Wooley gave his opinion in a conclusory fashion.

10:10  25   In Dr. Wooley's declaration, he walks through prior art, he

10:10  1   walks through the claims, he's walked through the

10:10  2   specification.

10:10  3        And here's what he's found and what he's explained from

10:10  4   doing that.  In the prior art and, you know, to their credit

10:10  5   Nitro of course takes umbrage with this and disagrees, but as

10:10  6   the Court noted, that's an issue for invalidity.

10:10  7        But I don't believe Nitro disagrees with the proposition

10:10  8   that in the prior art there were frac iron setups, which are

10:10  9   multiple fluid line setups that go from the fracturing manifold

10:10  10  to the fracturing tree.  From this a POSITA would understand

10:11  11  that those give multiple fluid pathways between the fracturing

10:11  12  manifold and the fracturing tree.

10:11  13       So this is important background knowledge that Dr. Wooley

10:11  14  explained a POSITA would have.  A POSITA would have this

10:11  15  preexisting knowledge about these multiple pathway setups using

10:11  16  prior art frac iron.

10:11  17       And, you know, importantly when we get to the

10:11  18  indefiniteness question, a lot of the argument that Mr. Henry

10:11  19  raises when he discussed this term were about, well, how do we

10:11  20  know what that means?  And Mr. Henry actually, I believe, said

10:11  21  it himself when he looked at one of his embodiments that he was

10:11  22  proposing, and he said, well, is this one fluid pathway?  It

10:11  23  has two separate pathways.

10:11  24       And I think that sort of answers the question.  If you

10:11  25  look at it and there's multiple pathways to the tree, then it's

10:11  1    not one fluid pathway to the tree.  That doesn't mean that this

10:11  2    is a part that Mr. Henry said was confusing about the term,

10:12  3    that the pathway can't be made up of multiple segments of fluid

10:12  4    conduit.

10:12  5         And again, this is background knowledge that a POSITA

10:12  6    would have from the prior art.  Those prior art frac iron

10:12  7    systems, their runs of pipe in each of those fluid pathways

10:12  8    were made up of various segments of pipe joints connected by

10:12  9    hammer unions.

10:12  10        So this is something that would be very familiar to a

10:12  11   POSITA, and that's how Dr. Wooley explains it.  It would not be

10:12  12   confusing to a POSITA to understand that each fluid pathway to

10:12  13   a tree, or in this case the one and only one fluid pathway to a

10:12  14   tree, might be made up of multiple pipe sections connected in

10:12  15   series.

10:12  16        So with that background, Your Honor, Dr. Wooley also

10:12  17   looked at the figures and the specification.  And the figures

10:12  18   are very consistent with this.  And the figures also describe

10:12  19   this fluid pathway, you know, very clearly in their images.

10:13  20   Here, for instance, you know, similar to what's claimed in

10:13  21   Claim 1, we have one and only one rigid fluid pathway between

10:13  22   that fracturing tree, 20, which is red, and the fracturing

10:13  23   manifold which begins at the outlet branch there with those two

10:13  24   valves in series.

10:13  25        So a POSITA looking at this would reaffirm, would

10:13  1   understand again, from his knowledge in the art, that what
10:13  2   these claims are talking about is that one and only one rigid
10:13  3   fluid pathway differentiating it from those prior art systems.
10:13  4   And in fact, that's exactly what Dr. Wooley opines on this
10:13  5   slide when he says, this is as opposed to the multiple lines of
10:13  6   prior art frac iron that provide multiple fluid pathways.
10:13  7         And this isn't limited to just the figures, and this isn't
10:13  8   limited to just snippets from the -- you know, the
10:13  9   specification that explain the one and only one rigid fluid
10:13  10  pathway concept.  It was also something that came up during
10:14  11  prosecution.  You know, originally claims were rejected for
10:14  12  double patenting over the '195 patent.  And there the examiner
10:14  13  said, well, you know, this essentially seems to be double
10:14  14  patenting because the '195 already handles the case where you
10:14  15  have fracturing trees coupled to the manifold by only one rigid
10:14  16  fluid conduit, providing that one and only one rigid fluid
10:14  17  pathway.
10:14  18        And, importantly, the way that the patentee came around
10:14  19  that was adding these specific arrangements of pipe joints,
10:14  20  connection blocks with the flange connections that ultimately
10:14  21  appear in the issued claim.
10:14  22        So again, there was no confusion at the Patent Office.
10:14  23  There's no confusion in the figures.  There's no confusion with
10:14  24  the experts who have opined in this case about what this term
10:14  25  means with reasonable certainty.

10:14  1        And, you know, as Your Honor intuited earlier and we
10:14  2   already discussed in looking at this slide then, there doesn't
10:14  3   really seem to be any dispute between the parties.  Because
10:14  4   Butch's says it can understand with reasonable certainty, it
10:15  5   says here's a better way potentially that the patentee could
10:15  6   have drafted this curve to get the same thing across.  And
10:15  7   again, Nitro's expert reached his own conclusion that a POSITA
10:15  8   would understand this term.
10:15  9        So, Your Honor, unless there's any specific questions on
10:15  10  indefiniteness, I can also address Nitro's arguments about
10:15  11  reading in the adjustability limitation.
10:15  12       THE COURT:  And I don't want to take -- I know you'd like
10:15  13  to speak.  Are they much different than the arguments that were
10:15  14  made to the prior claim term?  What I would say -- let me say
10:15  15  it this way.  If there's anything you'd like to add to what was
10:15  16  said earlier about why it would be inappropriate for fluid
10:15  17  conduit, you're certainly welcome to.
10:15  18       MR. LOGAN:  Yes, Your Honor.  And I will do my best here
10:15  19  not to be repetitive.  And Ms. Merritt has already handled much
10:15  20  better -- Ms. Westcott has already handled much better than I
10:15  21  could, you know, all of the basic background there.
10:15  22       What I would like to point out is that, you know, the
10:16  23  claim differentiation principle is even stronger, really, in
10:16  24  the '645.  Because here you have both of the terms that Nitro
10:16  25  wants to read into the claim.  And this is presented on our

10:16  1    Slide 22.  Both those terms appear in the dependent claim.  So

10:16  2    the adjustment joint's in Claim 6, the swivel's in Claim 9.

10:16  3    Nitro's position has been that's okay, because we're reading

10:16  4    them both in.

10:16  5         And, Your Honor, Nitro hasn't cited any cases for that

10:16  6    proposition, but it seems not very intuitive that claim

10:16  7    differentiation doesn't apply the more independent claims that

10:16  8    you read in.  So that's one difference that I would like to

10:16  9    note for the Court.

10:16  10        The other difference is in the specification.  Nitro has

10:16  11   consistently said that there are no embodiments disclosed that

10:16  12   don't have these adjustment joints and pivot joints in them.

10:16  13   But importantly in describing Figure 10, the patentee went to

10:17  14   lengths to distinguish that from other potential embodiments.

10:17  15   In fact, in this highlighted section the patentee said, as

10:17  16   presently illustrated, Figure 10 has those rotatable

10:17  17   components.

10:17  18        But you could have one with less degrees of freedom.  And

10:17  19   it goes on to say, in fact, in some instances you can have some

10:17  20   where you just basically can rotate these pipes and these

10:17  21   connection blocks into position before you bolt them together.

10:17  22        So, Your Honor, sort of the intuition there is, as an

10:17  23   example, to give the example studded connection, you can rotate

10:17  24   that -- you know, that connection block along those studded

10:17  25   connections before you bolt it in place, and that lets you kind

10:17  1    of turn the pipe joints to the position that you want them,

10:17  2    which gives you some ability for linear or for vertical or

10:17  3    horizontal adjustment.  So those embodiments are described and

10:17  4    discussed in the specification.

10:17  5         The last point that I would like to make is just to

10:17  6    distinguish a little bit Columbia.  In discussing Columbia,

10:18  7    they put it up on their initial slide, Nitro says that --

10:18  8    Columbia says, no.  To depart from the plain and ordinary

10:18  9    meaning, you don't need a definition.  You don't need a

10:18  10   disavowal of claim scope.

10:18  11        I don't believe that's quite right, Your Honor.  Columbia

10:18  12   dealt with a very specific question which was, do you need an

10:18  13   express definition?  Or do you need an express disavowal of a

10:18  14   claim scope?  In other words, do you need to put that in the

10:18  15   terms of I define X term to mean Y thing?

10:18  16        The Columbia case, you know, wasn't an en banc decision

10:18  17   that was overruling Thorner.  And I think that's important to

10:18  18   point out because, as this Court has noted before in its

10:18  19   opinions like True Chemical, Thorner stands for the proposition

10:18  20   that you've got to give weight to the plain and ordinary

10:18  21   meaning of a term.

10:18  22        And unless you're finding those clear definitions or clear

10:18  23   disavowals of claim scope, terms should be given their plain

10:18  24   and ordinary meaning.  That harkens all the way back to

10:18  25   Phillips.  And that's sort of one of those standard principles

10:19   1   of claim construction.

10:19   2        So, Your Honor, with that said, I cede my time and I

10:19   3   greatly appreciate the opportunity to argue today.

10:19   4        THE COURT:  Well, I had a wonderful trial lawyer in my

10:19   5   court this week who was from Alabama, and I always enjoy

10:19   6   hearing folks talk that don't have an accent.  So I appreciate

10:19   7   your time this morning.

10:19   8        MR. LOGAN:  Thank you, Your Honor.

10:19   9        THE COURT:  Mr. Henry or Mr. Cabello, if you'd like to

10:19   10  respond.

10:19   11       MR. HENRY:  Yes, Your Honor.  David Henry for Butch's.

10:19   12       It's been pointed out that there were two experts in the

10:19   13  case, and great emphasis has been given on that, as well as the

10:19   14  fact that Butch's did not employ an expert.  I'm certainly sure

10:19   15  we could have, but then we would only compound the issue here.

10:19   16       It's notable that, you know, if experts could so readily

10:19   17  divine the meaning of this term, they would have come up with

10:19   18  the same construction.  But in this case they didn't, which in

10:20   19  our opinion underscores the indefiniteness of this.

10:20   20       I would point out too that Nautilus and its progeny

10:20   21  certainly do not give primacy to expert testimony.  What do

10:20   22  they talk about over and over again?  They talk about the claim

10:20   23  language, the specification, the prosecution history.  That is

10:20   24  what we've relied on, Your Honor.

10:20   25       And in this case, given indefiniteness, the lack of

10:20   1   guidance as to what is enough and what is too much to satisfy

10:20   2   that element.  And in terms again of primacy, Mr. Logan

10:20   3   referenced Phillips.  Well, again, what does Phillips tell us?

10:20   4   That one of the last resorts would be extrinsic evidence.

10:20   5        So, Your Honor, we rely on the evidence that all the case

10:20   6   law says is the prime evidence here, the intrinsic record.  And

10:20   7   there's just not enough guidance there to tell us what does and

10:20   8   doesn't satisfy these elements.

10:20   9        That's the gist of my comments.

10:21   10        THE COURT:  Mr. Cabello?

10:21   11        MR. CABELLO:  Thank you, Your Honor.

10:21   12        First of all, I want to start out with the Venn diagram.

10:21   13   And I will tell the Court that at least we didn't overhear

10:21   14   anything that the Court might have said about the Venn.

10:21   15        (Laughter.)

10:21   16        MR. CABELLO:  But I do want to focus on that, because the

10:21   17   Venn diagram was not intended to be all inclusive of the claim.

10:21   18   And that's why there's a lot of white space.  I mean, if we go

10:21   19   and we look at the claim, there's a lot of other limitations

10:21   20   set out in the claim.  And those are in the white space.

10:21   21        What we wanted to focus on was these rotational and

10:21   22   adjustment -- or the lengthwise adjustment that are, we

10:21   23   believe, inherent in the claim and inherent in the

10:21   24   specification.

10:21   25        If I can go to Slide -- well, first of all, with respect

10:21   1   to the slides that Mr. Logan used with respect to Nitro's

10:21   2   expert, I will merely tell the Court that our expert was not

10:21   3   opining on the one and only one.  It had to do with something

10:22   4   else.  And so the issue was not directly in front of him.  And

10:22   5   I recognized by the Court's comments that the issue with

10:22   6   respect to the differences in the positions taken by Butch and

10:22   7   Nitro are understandable.

10:22   8         If we can go to Slide 23 used by Cameron.

10:22   9         I wanted to point out, because I think it's critical here,

10:22  10   Mr. Logan focused on the three rotational degrees of freedom,

10:22  11   and then it goes on and talks about how it can be rotated to a

10:22  12   desired position.

10:22  13         What is key here, Your Honor, is that nowhere does this

10:22  14   patent teach no degrees of freedom.  And that's what Cameron's

10:22  15   position is, is that there can be piping configurations that

10:22  16   have no degrees of freedom.  The patent clearly teaches that in

10:23  17   some cases there can be three degrees of freedom.  And

10:23  18   certainly this excerpt that's used by Mr. Logan teaches at

10:23  19   least one degree of freedom.

10:23  20         If I can go to Slide 31.

10:23  21         Mr. Logan did not focus on this, Your Honor, but I wanted

10:23  22   to call the Court's attention to this particular slide.  You'll

10:23  23   notice in green at the bottom of the slide, bottom left-hand

10:23  24   corner of the slide, there are some valves placed in this green

10:23  25   line.

10:23  1      And, you know, valves are basically on and off.  And so

10:23  2  you see these valves appear to be three-way valves.  And valves

10:23  3  don't just don't direct fluid, and certainly they're not taught

10:23  4  to direct fluid.  And at least this particular embodiment, or

10:23  5  at least the way it was doctored up by Cameron, which suggests

10:23  6  that you can direct fluid either down the paper or into the

10:24  7  wellhead.  And that's just not the case with valves, Your

10:24  8  Honor.

10:24  9      And so I know that Mr. Logan didn't focus on this

10:24  10  particular slide, but it is in their pack and so I wanted to

10:24  11  call that out with respect to this particular slide.

10:24  12      Mr. Logan talked about express disclaimers.  You know,

10:24  13  we've said enough.  I mean, there's certainly no express

10:24  14  limitations in the patent.  But again, we believe that the

10:24  15  Trustees of Columbia University case teaches us that there

10:24  16  doesn't have to be an express disclaimer and certainly that we

10:24  17  have to focus on the embodiments that are disclosed in the

10:24  18  specification in interpreting the claims.  So we can't strictly

10:24  19  look at the claims.

10:24  20      I think with that, Your Honor, I'm getting repetitive, and

10:24  21  so I'll stop.

10:25  22      THE COURT:  Mr. Logan, anything you'd like to add?

10:25  23      MR. LOGAN:  Yes, Your Honor.  Very briefly just a few

10:25  24  things I would lake to touch on.

10:25  25      To begin with, as Mr. Henry said, Nautilus is the case

10:25   1   that controls when it comes to indefiniteness.  And certainly

10:25   2   the claim terms and specification, those things are important.

10:25   3       But what Mr. Henry misses is that the Nautilus standard is

10:25   4   based on whether a POSITA would understand the term with

10:25   5   reasonable certainly.  And that's where the clear and

10:25   6   convincing evidence standard comes in, because as Nautilus

10:25   7   makes clear, it's not whether an attorney understands the terms

10:25   8   or whether a layperson understands the term with reasonable

10:25   9   certainty.  It's whether a POSITA does.  And in that sense I do

10:25   10  believe that the extrinsic evidence of how a POSITA understands

10:25   11  the term is probative and does go towards that clear and

10:25   12  convincing burden.

10:25   13      Setting that aside, Mr. Cabello says that the figure that

10:25   14  I showed, or the slide that I showed on 23 which had the

10:26   15  description of it of Figure 10 that talked about the different

10:26   16  embodiments you could have that could differ from Figure 10, he

10:26   17  said it certainly doesn't show any that don't have, you know,

10:26   18  less than one degree of freedom.

10:26   19      But there's nothing in that passage that supports what he

10:26   20  just said.  There's nothing in there that says it must have at

10:26   21  least one degree of freedom.  Those words don't exist in that

10:26   22  passage.  So certainly it can't be read into the passage simply

10:26   23  because it suits Nitro's arguments here.

10:26   24      Also as to the figure that Nitro showed on Slide 31,

10:26   25  frankly, Your Honor, I'm not sure what the relevance is about

10:26  1  the valves to this particular term in that figure.  But I will

10:26  2  note for the Court, because I dont want to go unresponded to,

10:26  3  that certainly multiport valves are known in the art.  There

10:26  4  are three-way valves known in the art.  And that is something

10:26  5  that I'm sure the Court can take notice of if it would like to.

10:26  6      But, Your Honor, with those statements made, that's all I

10:27  7  have for argument on this term.

10:27  8      THE COURT:  Okay.  I'll be back in just a second.

10:27  9      (Pause in proceedings.)

10:29  10     THE COURT:  We're back on the record.

10:29  11     Mr. Logan, you should be very happy.  Despite being up

10:29  12  against two very articulate and skilled lawyers, you win.  I'm

10:29  13  going to maintain construction for both "rigid fluid pathway"

10:29  14  and for "one and only one rigid fluid pathway" of plain and

10:30  15  ordinary meaning.

10:30  16     The next issue is outlet branches, which my understanding

10:30  17  is only with respect to one of the parties.  If they would like

10:30  18  to take up -- give me one second to get there on my -- here we

10:30  19  go.

10:30  20     I guess on this one it'd be well to start with the

10:30  21  plaintiff.  The Court's construction -- preliminary

10:30  22  construction currently is that the claim term "outlet branches"

10:30  23  is indefinite.

10:30  24     MR. KEVILLE:  Thank you, Your Honor.  John Keville for

10:30  25  Cameron.  I'll take this one.

10:30   1        THE COURT:  Okay.

10:30   2        MR. KEVILLE:  So, Your Honor, we've proposed, in view of

10:30   3    your preliminary construction, two alternative clarifying

10:30   4    constructions.  And I will note we e-mailed those to Mr. Henry

10:31   5    and Butch's this morning at around 8 o'clock.  I haven't heard

10:31   6    any response, so I assume they're not in agreement and maybe

10:31   7    they'll tell me differently.

10:31   8        But why do we offer these?  Well, when Your Honor came

10:31   9    back with indefiniteness, we looked back at our plain and

10:31  10    ordinary meaning which is, "extensions from the shared trunk

10:31  11    line," and saw that the bulk of the briefing by Butch's really

10:31  12    went to they could not tell what the boundaries of the outlet

10:31  13    branches were.  And by saying "extensions from the shared trunk

10:31  14    line," we didn't quite clarify the boundaries.

10:31  15        So what we've proposed as alternative constructions is

10:31  16    extensions originating from the shared trunk conduit and

10:31  17    extending to the rigid fluid conduits.  Or, alternatively,

10:31  18    outlets beginning at the shared trunk line and ending at the

10:31  19    rigid fluid conduits.  They're intended to say the same thing

10:31  20    but to address the complaint that was the vast majority of

10:32  21    Butch's, which said there was no clarity to where an outlet

10:32  22    branch begins and ends.  And the boundaries between a manifold

10:32  23    and conduit for purposes of identifying the outlet branch

10:32  24    remain unclear.  And that was in their opening brief at

10:32  25    Pages 16 and 17.

10:32  1      So with apologies for any confusion, we think these new

10:32  2  proposed constructions will provide certainty in the structure

10:32  3  and the boundaries of the term "outlet branches" in full accord

10:32  4  with the specification and the claims, as I'll show when we go

10:32  5  forward.

10:32  6      If we go to the next slide.

10:32  7      If you look at the abstract, Your Honor, it talks about

10:32  8  the fracturing system and then it says in one embodiment, "the

10:32  9  fracturing system includes a fracturing manifold for routing

10:32 10  fracturing fluid to multiple wells."  So you start at the

10:32 11  manifold.  And then it says, "The fracturing manifold can be

10:32 12  coupled via fluid conduit to fracturing trees."

10:33 13      So that provides you a path.  You go from the manifold to

10:33 14  the fluid conduits and to the fracturing trees.

10:33 15      And then in the highlighted language it explains what the

10:33 16  manifold is.  "The fracturing manifold can include a trunk line

10:33 17  that provides fracturing fluid to multiple outlet branches."

10:33 18  So now you have the manifold has a trunk line and that provides

10:33 19  to multiple outlet branches which can include valves.  And then

10:33 20  we know that we go from the outlet branches to the fluid

10:33 21  conduits, because that's what the earlier sentence said.  "The

10:33 22  fracturing manifold can be coupled via fluid conduits to the

10:33 23  fracturing trees."  So that explains the outlet branches.  They

10:33 24  begin at the trunk line and they end at the outlet branches.

10:33 25      And that's consistent with the claim language, if we look

10:33   1    at the next slide.

10:33   2        So if you look at Claim 2, Claim 2 says "outlet branches

10:34   3    for routing fracturing fluid from the shared trunk conduit to

10:34   4    the individual fracturing trees."  But if you have to read that

10:34   5    in conjunction with Claim 1 which we looked at in-depth, which

10:34   6    said, wherein each fracturing tree is coupled to the fracturing

10:34   7    manifold by at least one fluid conduit.

10:34   8        So now we see that the manifold in Claim 2 includes a

10:34   9    trunk line and the outlet branches.  So again, this is clear

10:34   10   you begin at the trunk line.  You go to the outlet branches,

10:34   11   and those -- and that the -- at least one rigid fluid conduit.

10:34   12       And Claim 18 might be one of the ones that makes it most

10:34   13   clear.  If you look at Claim 18 in whole, it says the method of

10:34   14   Claim 17 wherein the fracturing manifold -- assembling the

10:34   15   fracturing manifold includes assembling the fracturing manifold

10:34   16   so as to include outlet branches having valves for controlling

10:35   17   flow of fracturing fluid from the trunk line -- so it's telling

10:35   18   you again the outlet branches start at the trunk line -- to the

10:35   19   multiple outlets and routing fracturing fluid from the

10:35   20   fracturing manifold to the multiple wells through the rigid

10:35   21   conduits includes operating the valves of the outlet branches

10:35   22   through the rigid conduits.

10:35   23       So again, Claim 18 makes it very clear you have the

10:35   24   manifold.  It includes outlet branches.  You start at the trunk

10:35   25   line, you go through the outlet branches then through rigid

10:35  1    conduits to get to the trees.

10:35  2         And I will note that there was no argument on Claim 18

10:35  3    that they couldn't understand the structure and where it ends.

10:35  4    There were actually three different indefiniteness arguments.

10:35  5    And so for Claim 18 there was no argument that they couldn't

10:35  6    understand where the outlet begins and ends.  They just said it

10:35  7    was uncertain as to the number of valves.

10:35  8         And the outlet branches having valves is not uncertain.

10:36  9    There's no requirement that any claims say each outlet branch

10:36  10   having one valve or each outlet branch having two valves.

10:36  11   Those are possible embodiments.  But in their own briefing they

10:36  12   didn't argue that for Claim 18 that they couldn't tell with

10:36  13   reasonable certainty what's the structure and where does the

10:36  14   structure begin and end.

10:36  15        You can see in the specification it says, in some

10:36  16   instances a fracturing manifold includes a trunk line for

10:36  17   providing fracturing fluid to multiple outlet branches of the

10:36  18   manifold.  So again, the structure is clear.  It tells you

10:36  19   where it starts.

10:36  20        And then we can go through the embodiments, and we can see

10:36  21   how some of this plays out.  So this is drawn, Your Honor, this

10:36  22   is Figure 10 from the patent.  And Figure 10, as drawn, shows

10:36  23   the exemplary claim for embodiment.  And it requires a first

10:37  24   outlet branch having two valves connected in series and a

10:37  25   second outlet branch having two valves connected in series.

10:37  1   Very clearly shows you the green is the shared trunk conduit.

10:37  2   What's shown in purple are the outlet branches.  Those together

10:37  3   make up the fracturing manifold.  And then what's shown in blue

10:37  4   is the rigid fluid conduit that takes the fluid the rest of the

10:37  5   way to the fracturing trees.  And this is essentially the same

10:37  6   structure as Claim 10 which requires a first and second pair of

10:37  7   valves.

10:37  8          Then what we've drawn in the next slide, Your Honor, is

10:37  9   we've shown a modified version of Figure 10 to show the

10:37  10  exemplary Claim 3 embodiment.  Claim 3 is broader than Claim 4.

10:37  11  It can include the pair of valves in series, or it can include

10:37  12  this embodiment.

10:37  13         So in this embodiment we have the same structure.  The

10:37  14  shared trunk conduit is shown in green.  The outlet branches

10:38  15  are shown in purple.  But here there's only one valve.  So this

10:38  16  is an alternative embodiment where the outlet branches of the

10:38  17  fracturing manifold include valves.  So there's very clear

10:38  18  that's another embodiment.

10:38  19         And then if we get to the next slide, this is again

10:38  20  broader than 3 or 4.  This is broad enough to capture the Claim

10:38  21  3 and 4 embodiments which are all just possible embodiments of

10:38  22  the invention, but also this embodiment where the outlet

10:38  23  branches for routing fracturing fluid from the shared trunk

10:38  24  conduit to individual fracturing trees.  In this instance we're

10:38  25  showing an embodiment that doesn't have valves.

10:38  1      So this again would be another embodiment showing that you

10:38  2  have valves this time in the shared trunk conduit, and the

10:38  3  outlet branches are shown connecting to the rigid fluid

10:38  4  conduit.  Again, beginning at the shared trunk conduit and

10:38  5  ending at the rigid fluid conduit.

10:39  6      Another place that would show a POSITA would understand

10:39  7  where the outlet branches begin and end is this part of the

10:39  8  specification.  The specification says, "The fracturing

10:39  9  manifold, 22, is mounted on at least one skid, 24."  So I've

10:39  10  shown in yellow skid 24.

10:39  11      Now, the claims do not include the skid.  The skid is not

10:39  12  claimed.  But the specification makes clear that the fracturing

10:39  13  manifold, which is the trunk line and the outlet branches, is

10:39  14  what is shown on skid 24.  So again, it's the green shared

10:39  15  trunk conduit and the purple outlet branches.

10:39  16      While this is not to be read into the claims, a POSITA

10:39  17  would be reading the specification, would look to the

10:39  18  specification for guidance if indeed the POSITA didn't --

10:39  19  wanted more clarity on where the outlet branches ended, and

10:39  20  would see, okay.  I see from Figure 10 that they end at the

10:39  21  purple valves which are the outlet branches.

10:40  22      And I would note, Your Honor, just in this case, although

10:40  23  Mr. Cabello did not provide an expert opinion, there was no

10:40  24  claim by Nitro that this claim term could not be understood.

10:40  25  And so in this case where they have the high burden of clear

10:40  1   and convincing evidence on indefiniteness, we have a POSITA who

10:40  2   provided declaration evidence on behalf of Cameron that said, I

10:40  3   understand what outlet branches mean.  We have Nitro who has

10:40  4   made no argument.  They can't understand what outlet branches

10:40  5   mean.  And then we have Mr. Henry and attorney argument only on

10:40  6   behalf of Butch's that says, we can't understand what outlet

10:40  7   branches mean.

10:40  8       And we think with the alternative construction it's very

10:40  9   easy.  It resolves all the issues they raised.  It shows

10:40  10  exactly where the outlet branches begin and end.

10:40  11      The other thing that we look at to understand why outlet

10:40  12  branches is not indefiniteness is the Patent Office.  The

10:41  13  Patent Office understood what outlet branches are.  This is

10:41  14  from the office action where the examiner was talking about the

10:41  15  Kajaria reference.  And in there the examiner said, "Kajaria

10:41  16  discloses...the fracturing fluid distribution manifold

10:41  17  including a trunk line (Fig. 3A #60) and multiple outlet

10:41  18  branches (Fig. 3A No. 44A and No. 44C)."

10:41  19      So we also have evidence in this case, Your Honor, that

10:41  20  the Patent Office understood not only what outlet branches

10:41  21  meant in terms of this patent, but understood those to be terms

10:41  22  that it could easily find in the prior art.

10:41  23      Other prior art also uses the terms "outlet branches."

10:41  24  This is the Childress patent which is in the file history.  And

10:41  25  at the abstract it says there are a number of outlet branches

10:41  1   that have corresponding outlet branches to each tree.

10:41  2        So "outlet branches" is an easily understood term both to

10:41  3   a POSITA in our case, both to Nitro and to the patent examiner

10:42  4   and to other POSITAs who wrote and invented the prior art.

10:42  5   Again, Childress talks about a number of outlet branches in the

10:42  6   specification as well.

10:42  7        And then so I would end, Your Honor, with Butch's not

10:42  8   meeting its high burden here, because Dr. Wooley, a POSITA on

10:42  9   behalf of Cameron, said it's not indefinite.  A POSITA would

10:42  10  understand this with reasonable certainty.  Butch's provided no

10:42  11  evidence to meet its clear and convincing standard.  And this

10:42  12  is exactly what was rejected in the Whirlpool case from the

10:42  13  Eastern District of Texas 2016 where the Court said, instead of

10:42  14  submitting evidence such as an expert declaration to

10:42  15  demonstrate the understanding of a person of ordinary skill in

10:42  16  the art, Yunda relies entirely on attorney argument based on

10:43  17  the patent's intrinsic evidence.  The Court finds such argument

10:43  18  unpersuasive.

10:43  19       So I understand Your Honor preliminarily found it

10:43  20  persuasive.  I think they have not met their high -- you know,

10:43  21  their high burden of clear and convincing evidence.  I think

10:43  22  there's overwhelming evidence the other way.  But I think to

10:43  23  the extent there remained any ambiguity -- if you would go to

10:43  24  the next slide -- the clarifying constructions that we provided

10:43  25  easily resolve any ambiguity.

10:43  1      Whichever way you do it, if you substitute for outlet

10:43  2  branches, either extensions originating from the shared trunk

10:43  3  conduit and extending to the rigid fluid conduits, or you use

10:43  4  outlet branches beginning at the shared trunk conduit and

10:43  5  ending at the rigid fluid conduits, it's just a different kind

10:43  6  of way of saying the same thing.  But I think it completely

10:43  7  resolves any ambiguity that Butch's has.  Obviously Nitro has

10:43  8  no ambiguity.  And we would propose that one of these

10:43  9  clarifying constructions would resolve the issues that they

10:44  10  raised and address Your Honor's preliminary construction as

10:44  11  indefinite.

10:44  12      And with that, if Your Honor has any questions, I'm happy

10:44  13  to answer.

10:44  14      THE COURT:  That was a nice job.

10:44  15      I'll hear from defendant.

10:44  16      MR. HENRY:  Your Honor, with respect to the proposed

10:44  17  clarifying constructions, we simply haven't had time

10:44  18  sufficiently to assess that.  But with respect to responding

10:44  19  specifically to Cameron's arguments, Mr. David DeZern of our

10:44  20  firm will be taking that up.

10:44  21      MR. DEZERN:  Yes, Your Honor.  David DeZern for Butch's

10:44  22  Rathole.  And if you can hear me, may I proceed?

10:44  23      THE COURT:  Yes, sir.  Of course.

10:44  24      MR. DEZERN:  So thank you.

10:44  25      Let me start first with Cameron's two new proposed

10:44  1    constructions.  And my apologies to Mr. Cabello.  I believe I
10:44  2    responded to the e-mail shortly before we jumped on the Zoom
10:44  3    call, but we may not have seen it once we all got logged in.
10:45  4        But he did presciently realize that we would not agree to
10:45  5    those constructions, and I think for two reasons.
10:45  6        First, we don't believe that now is the appropriate time
10:45  7    to be rewriting these terms to clarify what they mean when
10:45  8    either the spec or file history identify what these structures
10:45  9    are.
10:45  10       Second, we believe that the proposed constructions
10:45  11   continue to be too ambiguous and fail to apprise one of
10:45  12   ordinary skill as to what structure actually satisfies these
10:45  13   outlet branch limitations and how to determine whether or not a
10:45  14   system includes it or does not include it.
10:45  15       THE COURT:  Well, Mr. DeZern, help me out there, because
10:45  16   the slides that were just shown to me actually went to the
10:45  17   figures and articulated exactly where the outlet branches were
10:45  18   disclosed in the figures in the patents.  It seems to me that
10:46  19   that makes it much more difficult for you to argue
10:46  20   indefiniteness, and also for you to -- I get that you -- let me
10:46  21   start over.
10:46  22       It is unfair to you on one level that you just got the
10:46  23   construction this morning -- proposed construction.  That is a
10:46  24   result, however, of what I'm trying to accomplish which is by
10:46  25   giving the preliminary constructions, motivating people to try

10:46  1   and prove on what they may have proposed before, knowing what

10:46  2   I'm thinking.

10:46  3        So I just want to put on the record that the blame for

10:46  4   what happened is probably the Court's fault.  If -- Mr. Henry

10:46  5   and Mr. DeZern, if you feel like you -- I am persuaded that,

10:47  6   based on the argument I've heard, that the claim term is not

10:47  7   indefinite, if you all -- I'm talking about Mr. Henry and

10:47  8   Mr. DeZern -- feel like you would be better served by having

10:47  9   time to think about the proposal that the plaintiff made and

10:47 10   attempting to work out either that or a better proposal, I'm

10:47 11   happy to let you all do that.

10:47 12        But I am persuaded that they articulated a sufficient --

10:47 13   they established to me that it's not indefinite.  So,

10:47 14   Mr. DeZern, I'll let you and Mr. Henry tell me what is the

10:47 15   course I could take that is most fair to your client to make

10:47 16   sure that your rights are protected, that the claim

10:47 17   construction that I give is an appropriate one.

10:47 18        MR. HENRY:  Your Honor, we would like to have a bit of

10:47 19   time to perhaps confer with both our codefendant and Cameron

10:48 20   before responding to this.  We just simply can't in this short

10:48 21   notice --

10:48 22        THE COURT:  Got it.  And maybe your client.

10:48 23        MR. HENRY:  Certainly.

10:48 24        (Laughter.)

10:48 25        THE COURT:  Well, why don't we do this.  Why don't we do

10:48  1   this.  You all -- I always hate it when I say that.  If the

10:48  2   counsel -- I'm not going to find this is indefinite.  I'm not

10:48  3   prepared on the spot to force, Mr. Henry, your client or

10:48  4   Mr. Dezern's client, to on the spot fight over this.  I don't

10:48  5   know that that's fair either.

10:48  6       You all can -- you all meaning truly in your case the

10:48  7   defendants, because the plaintiffs have articulated what they

10:48  8   think is correct.  If the defendants would like to submit a --

10:48  9   and by the way, to the extent you do this, your argument that

10:48  10  it's indefinite is preserved.  However, if you -- with that

10:49  11  understanding, if the defendants -- either defendants would

10:49  12  like to submit a counterproposal to what the plaintiffs have

10:49  13  submitted to me, you can do that.  Just, you know, send it to

10:49  14  Evan, my law clerk, and we'll review it.  And whenever we get

10:49  15  it -- as soon as we get it from you, we'll select the one we

10:49  16  think is the best.  And that's the one we will make final.

10:49  17      And I'll also go ahead, as is my custom, at the end of the

10:49  18  hearing is when I lift the stay on discovery.  I don't know

10:49  19  that we need to delay discovery commencing to get this one

10:49  20  claim term resolved.  Because as soon as I get from you all

10:49  21  counterproposals, you'll have within a day or two what their

10:49  22  final construction is.

10:49  23      If any of the counsel feel like they have been

10:49  24  disadvantaged by not getting to argue why an alternate claim

10:50  25  term is necessary or better, again, let Evan know and we'll

10:50   1   probably just have a quick phone conference.  And I'll hear

10:50   2   from Mr. DeZern and Mr. Cabello, if you would like to make

10:50   3   arguments, about why your alternative is better than what

10:50   4   plaintiffs have proposed.  And we can do that next week.

10:50   5         MR. KEVILLE:  Your Honor, John Keville, if I may.

10:50   6         I understand perfectly and I'm perfectly acceptable with

10:50   7   that.  Just as a point of clarification, though, it was only

10:50   8   Butch's that said this term was in dispute.  Nitro was fine,

10:50   9   apparently, with the plain and ordinary meaning, did not raise

10:50   10   this as a term in dispute.

10:50   11         So I'm not sure if Your Honor intends for Mr. Cabello to

10:50   12   have a new chance to now put this term in dispute when he was

10:50   13   fine with plain and ordinary meaning, or is this just between

10:50   14   Cameron and Butch's --

10:50   15         THE COURT:  No.  I think if I'm going to allow you to

10:50   16   articulate a new -- if I'm going to allow the plaintiff to say

10:51   17   that that's what the plain and ordinary meaning is, I think

10:51   18   Mr. Cabello should get to weigh in on that as well.

10:51   19         And by that I mean Mr. Cabello can either say he's okay

10:51   20   with that as the plain and ordinary meaning or he's not.  And

10:51   21   if he's not and he thinks -- I doubt Mr. -- well, I'll let

10:51   22   Mr. Cabello do what he wants.

10:51   23         If Mr. Cabello thinks now, having heard that, that plain

10:51   24   and ordinary meaning needs to have a more refined meaning, he

10:51   25   can suggest that to the Court as well.  And I'll look at the

10:51  1   counter arguments that are made in that regard.

10:51  2       MR. CABELLO:  Your Honor, we certainly intend to weigh in

10:51  3   on this issue.  You know, it's one thing to say we both -- we

10:51  4   being --

10:51  5       THE COURT:  Mr. Cabello, you've won.

10:51  6       MR. CABELLO:  Okay.

10:51  7       THE COURT:  So, no.  You get to weigh in.  So you have the

10:52  8   panoply of responses.  You're okay with it, you're not okay

10:52  9   with it, you're not okay with it and it should be something

10:52  10  different.  Whatever, Mr. Cabello, however you want to weigh

10:52  11  in, you discuss that with Mr. Henry and Mr. Keville.  I have

10:52  12  the plaintiff's proposal.  I'll await a proposal from

10:52  13  Mr. Cabello, you and Mr. Henry.  Once I have those, I'll look

10:52  14  at them and see which one I think is the most appropriate.

10:52  15      So let's move on to the next claim term which is the

10:52  16  "second connection block."  I'm sorry.  That's not right.  Give

10:52  17  me one second.

10:52  18      The next claim term to take up is "positioned at," and

10:52  19  this is also Nitro only.  So if I can hear from counsel for

10:53  20  Nitro on this one.

10:53  21      MR. CABELLO:  Thank you, Your Honor.

10:53  22      THE COURT:  Yes, sir.  And this is the one earlier -- just

10:53  23  to make clear on the record, this is the one earlier you said

10:53  24  you wanted to make sure you had an opportunity to speak on.

10:53  25  And so I just want the record to reflect that this is your

10:53  1    opportunity to do so.

10:53  2          MR. CABELLO:  Thank you, Your Honor.

10:53  3          THE COURT:  Yes, sir.

10:53  4          MR. CABELLO:  First of all, I wanted to start out with the

10:53  5    claim term and focus the Court on the first and second

10:53  6    connection block because the claim language says "a first

10:53  7    connection block positioned at the well fracturing tree."

10:53  8          And then it goes on.  It says, "a connection block; and."

10:53  9          So we know that there has to be more than just a

10:53  10   connection block.  And so if in fact Cameron had intended for

10:54  11   there just to be two connection blocks, they could have said

10:54  12   so.  But they went on and said a second -- a first connection

10:54  13   block positioned at the well fracturing tree.  And they didn't

10:54  14   tell us where it was positioned.  They just said it's

10:54  15   positioned.

10:54  16         And that's our fundamental dispute with this term is what

10:54  17   does "positioned at" mean?  And so we've got at least an

10:54  18   illustration, taking Figure 3 of the patent.  And you can see

10:54  19   where this proffered term "attached to" is really irrelevant to

10:54  20   the position or distance, because it can be directly attached.

10:54  21   It can be indirectly attached, as is illustrated by the two far

10:54  22   connection blocks, and then the one on the -- in the middle

10:54  23   which is indirectly attached with respect to the far left

10:54  24   illustration.

10:55  25         Moreover and moving on to the next slide, "adjacent to" is

10:55  1    subjective and also therefore indefinite.  We see this notion

10:55  2    of adjacent twice in the specification talk about adjacent

10:55  3    wellheads.  And then also about the adjustment joints and the

10:55  4    length of the conduit between adjacent connection blocks, 48.

10:55  5    And so you have this concept of adjacent being subjective and,

10:55  6    we believe, indefinite.

10:55  7         Moving on to the next slide.

10:55  8         Cameron's position that meaning of "positioned at" depends

10:55  9    on a particular configuration I think really drives home and

10:55  10   illustrates the indefiniteness.  I mean, how do you know?  Do

10:55  11   you have to go ask Dr. Wooley whether something is positioned

10:56  12   at?  And so you see this in Cameron's responsive brief.  They

10:56  13   focus on the depending on the arrangement of a given system.

10:56  14        And I'm not going to read these quotes to the Court.  I

10:56  15   know that you can read them faster than I can.  But you see

10:56  16   that Cameron really provides us no -- and certainly the

10:56  17   specification provides us with no guidance at all as to what

10:56  18   "positioned at" means.  Cameron has certainly briefed it in a

10:56  19   manner that only creates more ambiguity and really drives home

10:56  20   the fact that this term is indefinite.

10:56  21        Certainly the '132 patent provides no standard or method

10:56  22   for making the determination as to what is "positioned at."  We

10:56  23   think, you know, certainly one illustration that -- is that

10:56  24   merely putting it close to might be positioned at, but we don't

10:57  25   know.

10:57 1    And so when you look at the goal of the claims is to

10:57 2    provide guidance to the public as to what -- where the metes

10:57 3    and bounds of the claim is, we don't believe that it's

10:57 4    adequately provided in this claim term "positioned at."

10:57 5        And with that, I'll stop, Your Honor.

10:57 6        THE COURT:  Mr. Keville?

10:57 7        MR. KEVILLE:  Yes, Your Honor.  I'm going to let the

10:57 8    attorney who's smarter than me handle this one as well.

10:57 9        MR. LOGAN:  Thank you, Your Honor.  Mr. Cabello, many of

10:57 10   his remarks are directly pointed at Cameron's proposed

10:58 11   construction in this case that had "attached to" or "adjacent

10:58 12   to."

10:58 13       Cameron, however, is perfectly fine with the Court's

10:58 14   preliminary construction of plain and ordinary meaning, because

10:58 15   Cameron believes the plain and ordinary meaning in this case is

10:58 16   reasonably certain.  To be clear, the suggestion that

10:58 17   "positioned at" means attached to or adjacent to, Cameron

10:58 18   brought that forward in the Butch's litigation just simply

10:58 19   attempting to resolve the dispute between the parties there and

10:58 20   find some common ground, even though that ultimately wasn't

10:58 21   successful.

10:58 22       The question is, would a POSITA understand with reasonable

10:58 23   certainty what it means --

10:58 24       THE COURT:  If I could ask you -- Mr. Logan, you just made

10:58 25   a comment that I actually meant to ask Mr. Cabello.  It sounded

10:58  1    to me like a lot of what Mr. Cabello is arguing is indefinite

10:58  2    was actually what's contained in your proposed claim

10:58  3    construction; is that right?  I mean, as opposed to arguing

10:58  4    just that "positioned at" is indefinite, a lot of his argument

10:59  5    was that the words that you used were indefinite in terms of

10:59  6    the claim construction that you proposed.  Did I get that

10:59  7    right?

10:59  8         MR. LOGAN:  Your Honor, I don't know if you're directing

10:59  9    that to me or Mr. Cabello.  That was my understanding.  Yes,

10:59  10   Your Honor.

10:59  11        THE COURT:  Mr. Cabello, why don't you -- Mr. Logan, you

10:59  12   can leave your slides open.

10:59  13        But, Mr. Cabello, that was the impression I got from your

10:59  14   argument.

10:59  15        MR. CABELLO:  It was certainly in Cameron's briefing

10:59  16   directly responsive to the claim terms as we raised them.  This

10:59  17   is -- while it may have been in Nitro -- I'm sorry -- in

10:59  18   Butch's Rathole's briefing, it was also in Nitro's briefing.

10:59  19        So what I had taken what we're using is clearly what was

10:59  20   in the briefing papers exchanged by Cameron and Nitro in this

10:59  21   particular case.

10:59  22        THE COURT:  No.  Mr. Cabello, you may be missing my point.

11:00  23   And I'm sure that's my fault.  My sense is that -- give me one

11:00  24   second.

11:00  25        So we're arguing over whether or not "positioned at" is

11:00  1    indefinite.  But my sense was from your argument that you are

11:00  2    arguing that the words that plaintiff used for their

11:00  3    construction, proposed construction, was what was indefinite.

11:00  4    That was what I took away, and I just want to make sure -- that

11:00  5    was the way I took it.

11:00  6        MR. CABELLO:  Your Honor, if I may.  I'm going to ask

11:00  7    Mr. Zinda to take this issue up, because he's trying to get my

11:00  8    attention on some briefing.  And I'm just going to go ahead and

11:01  9    turn it over to him.

11:01  10        THE COURT:  I'm always happy for whoever knows best to

11:01  11    speak.  Or more than one person.  I'm just trying to get to the

11:01  12    right answer.

11:01  13        MR. ZINDA:  Yes, Your Honor.  Thank you for giving me an

11:01  14    opportunity to speak.

11:01  15        We did take the position that the phrase "positioned at"

11:01  16    was indefinite.  That was actually the first portion in our

11:01  17    opening brief.  But we did largely focus on what Cameron had

11:01  18    proposed as their construction, because we believe that just

11:01  19    illustrates how indefinite the term is.  Even under their

11:01  20    proposal, their interpretation of the claim, particularly for

11:01  21    the term "adjacent," which we contend is very subjective, we

11:01  22    believe there's no way for a POSITA to understand whether

11:01  23    being -- having a connection block with five feet from the tree

11:01  24    or 50 feet the tree falls within or outside the scope of the

11:01  25    claims.  And that was sort of the crux of our entire argument.

11:01  1    But we did take the position that the phrase "positioned at" is

11:01  2    indefinite.

11:01  3         THE COURT:  So let me ask you this.  Let's say I were to

11:01  4    disagree and find that it was not indefinite, which is my

11:02  5    preliminary construction, is it your -- is it Nitro's position

11:02  6    that you would not be able to find an expert who could use the

11:02  7    construction that was proposed by the plaintiff would not be

11:02  8    able to understand it and use it either for infringement or

11:02  9    invalidity?

11:02  10         MR. ZINDA:  Your Honor, I don't think there's any question

11:02  11   that you could find an expert that could give you his or her

11:02  12   opinion on what "adjacent to" means.  The problem is is that

11:02  13   you're going to get inconsistent opinions from experts, because

11:02  14   "adjacent to" just -- at least from my perspective as a

11:02  15   layperson -- is a moderately subjective term.

11:02  16         Is five feet adjacent?  Is ten feet adjacent?  There's not

11:02  17   a consensus on that.  There's no objective way to determine

11:02  18   what "adjacent to" means.  And in fact, there's nothing in the

11:02  19   specification that they pointed to, there's nothing in the

11:02  20   industry that they pointed to that a POSITA would go look to to

11:02  21   determine whether something is considered "adjacent to" or not.

11:03  22         And so that's our issue with that particular term

11:03  23   "adjacent to," is it's very subjective.  And Cameron is now

11:03  24   taking the position, well, it could be five feet or it could be

11:03  25   50 feet.  It just depends on the particular configuration of

11:03  1    your well site.

11:03  2         Well, we're all ears to hear what these different

11:03  3    configurations are that would help you figure out whether

11:03  4    you're within or outside the scope of the claims.  The problem

11:03  5    we have is, we don't think that exists.  We don't think there's

11:03  6    any objective way for you to determine whether you're within or

11:03  7    outside the scope of the phrase "adjacent to" or "positioned

11:03  8    at," Your Honor.  Sorry.

11:03  9         THE COURT:  Isn't that really true in just about every

11:03  10   case that I have?  I mean, for example here, you know, if the

11:03  11   plaintiff's expert takes a position that something is adjacent

11:04  12   to, and it's -- then your person says as a person of skill in

11:04  13   the art, no.  No one in the oil and gas industry would believe

11:04  14   that 50 feet away is adjacent to.  I think he's wrong.  We

11:04  15   don't infringe.  And then the jury sits there and decides

11:04  16   whether or not they think which of the two experts is correct

11:04  17   about whether it was adjacent to or not.  I think I've seen

11:04  18   that in about every patent case I've ever had.  You know, I

11:04  19   mean, that's why we have people, you know, skilled in the art.

11:04  20        But at any rate, I've gotten you off track a little bit.

11:04  21   Why don't we go back to Mr. Logan, and I'll let him finish.

11:04  22   And then of course I'll let anyone who wants to on behalf of

11:04  23   Nitro respond when he's done.

11:04  24        MR. LOGAN:  Thank you, Your Honor.  And I actually

11:04  25   appreciate that clarification.  That was very helpful from

11:04  1   Nitro about what its position is today at the hearing.

11:04  2       The issue here is, and Your Honor pointed it out properly,

11:05  3   that these are standard litigation issues that Nitro is

11:05  4   pointing to.  Nitro says it has no doubt it would be able to go

11:05  5   find an expert that could tell it, in a particular system, that

11:05  6   expert's opinion about whether it's positioned at the

11:05  7   fracturing tree or not.

11:05  8       Nitro's concern is there may be inconsistent opinions

11:05  9   between experts.  Your Honor, that's a hallmark of litigation.

11:05  10  It shows that the term's understandable, but there may be

11:05  11  factual disputes that need to be resolved.

11:05  12      Nitro also, in responding just now, said that Cameron

11:05  13  raised the issue of whether, you know, a connection block

11:05  14  50 feet away might be part of a system.  That's not quite true.

11:05  15  Nitro actually raised that in its briefing.  Cameron's response

11:05  16  was simply limited to figuring out where a block is in any

11:05  17  particular accused system or prior art system.  And whether

11:05  18  it's positioned at the tree is a factual determination, an

11:05  19  opinion issue that experts can make and maybe differ upon, that

11:06  20  have to be resolved, and that's perfectly acceptable within the

11:06  21  context of patent litigation as the Court alluded to.

11:06  22      So the important question here really is just would a

11:06  23  POSITA understand with reasonable certainty what it means for

11:06  24  something to be positioned at the fracturing tree?  The claims

11:06  25  give some examples of things that are positioned at the

11:06  1    fracturing tree.  It gives an example of attaching to a valve

11:06  2    at the well fracturing tree in Claim 10.

11:06  3         So, you know, from those disclosures from looking at the

11:06  4    figures, Dr. Wooley, for instance, was able to opine, you know,

11:06  5    the connection block could be part of the stack of valves

11:06  6    that's on the fracturing tree.  The connection block could just

11:06  7    be adjacent to and connected to one of those valves.

11:06  8         There's various different configurations you could have

11:06  9    like with many claims, where a claim term might be satisfied.

11:06  10   That doesn't mean the claim term's not reasonably certain.  It

11:06  11   simply means, rather unremarkably, that there may be multiple

11:06  12   embodiments, and that to get an opinion about how the, you

11:07  13   know, connection box positioned at a certain embodiment does

11:07  14   require looking at that embodiment.

11:07  15        As far as background understanding goes, Dr. Wooley didn't

11:07  16   base his opinion simply on speculation.  It wasn't conclusory.

11:07  17   He talked about the prior art.  He talked about how POSITAs

11:07  18   have an understanding from their education and experience.  An

11:07  19   example of this would be with frac heads which are positioned

11:07  20   at fracturing trees.

11:07  21        On some fracturing trees, like the one here on 42, the

11:07  22   frac head's positioned on top of the tree.  On other fracturing

11:07  23   trees, horizontal fracturing trees, the frac head's positioned

11:07  24   at different places on the tree.  But looking at any of those

11:07  25   systems, a POSITA can tell with reasonable certainty whether or

11:07   1   not that component is positioned at the fracturing tree.

11:07   2        So really the question here is, and what defendants are

11:07   3   arguing, or more specifically at this point what Nitro is

11:07   4   arguing, is that they want some absolute precision.  In their

11:07   5   briefing they say, we want to know, is it six inches away?

11:08   6   What about five?  What about 50?  They don't want to

11:08   7   necessarily tailor this to any particular system or any

11:08   8   particular arrangement or give any surrounding contextual

11:08   9   details.  They want to know with mathematical precision, at

11:08  10   what measurement -- they want to get a ruler out and exclude

11:08  11   systems based on that.

11:08  12        And, Your Honor, I daresay if that were the standard,

11:08  13   probably the MPEP would have to be rewritten, and this Court

11:08  14   would be knee-deep in having to try to invalidate patents

11:08  15   because that demands the type of precision that the Supreme

11:08  16   Court said was unattainable and not necessary to satisfy the

11:08  17   definite standard in Nautilus.

11:08  18        So, Your Honor, you know, with those issues in mind, I

11:08  19   think that the question of whether it's positioned at a

11:08  20   fracturing tree, it's reasonably certain, it's a simple term,

11:08  21   and it's certainly a simple term to someone like a POSITA who

11:08  22   has experience and education in the art.  And for that reason,

11:08  23   we believe that the Court's preliminary construction of plain

11:09  24   and ordinary meaning was correct.

11:09  25        THE COURT:  I'm happy to hear any response.

11:09  1      MR. ZINDA:  Yes, Your Honor.  So the only additional

11:09  2  comment I have, Your Honor, is there's simply no objective way

11:09  3  for a person of ordinary skill in the art to determine what

11:09  4  "adjacent to" means.  They've offered expert testimony that

11:09  5  they -- that a POSITA could figure out what it means.  We've

11:09  6  offered expert testimony that says there's no objective way to

11:09  7  determine whether something's adjacent to a wellhead or not.

11:09  8  And we believe that there's simply no evidence that there is an

11:09  9  objective way of making that determination, that that's

11:09  10  standard in the industry.  And there's certainly nothing in the

11:09  11  specification that would allow a POSITA to make that

11:09  12  determination.  And, again, that's why we believe the term is

11:09  13  indefinite.

11:10  14      THE COURT:  Anything else?

11:10  15      MR. ZINDA:  No, Your Honor.

11:10  16      THE COURT:  Okay.  I'll be right back.

11:11  17      (Pause in proceedings.)

11:11  18      THE COURT:  We're back on the record.

11:11  19      The Court is going to give as its final construction plain

11:11  20  and ordinary meaning, which is a first connection block

11:11  21  attached to or adjacent to the well fracturing tree.

11:11  22      The last claim term, my understanding is that you all

11:11  23  wanted to take up, is fracturing tree.  And this is in the

11:11  24  Nitro case.

11:11  25      MR. CABELLO:  Yes, Your Honor.  We're going to start out

11:11  1    at Slide 23.  And I want to ask Mr. Zinda to take this issue.

11:11  2         MR. ZINDA:  Just give me one moment, Your Honor.

11:11  3         So the crux of the issue for frac tree, Your Honor, is

11:11  4    essentially whether a frac tree is a tree that's simply used

11:11  5    for fracturing, or it's a specialized tree that's used only for

11:11  6    fracturing.  Cameron's taking the latter position.

11:12  7         I think it's important to first note that there's no

11:12  8    dispute that a ordinary production tree is and can be used for

11:12  9    fracturing operations.  Now, are there -- is there a

11:12  10   specialized tree that some uses for fracturing?  Yes.  And

11:12  11   those trees are used because production trees tend to wear out

11:12  12   quicker if you fracture through them.

11:12  13        But there's no dispute that an ordinary Christmas tree can

11:12  14   be fracked through, and that there's a higher pressure rating

11:12  15   tree that can also be fractured through that's more commonly

11:12  16   used for fracturing operations.

11:12  17        Now, this exact issue was disputed in front of the Patent

11:12  18   Office on a related patent which is a earlier patent in this

11:12  19   family.  The '645 patent is a continuation of that patent -- or

11:12  20   indirect continuation -- excuse me, Your Honor.  And the board

11:12  21   expressly rejected in their final written decision under the

11:12  22   same claim construction standard Cameron's position that you

11:12  23   had to have some specialized tree that was installed only for

11:13  24   fracturing operations.

11:13  25        And, in fact, Cameron's expert which also testified that

11:13  1  ordinary Christmas trees -- I'm sorry -- that fracturing trees

11:13  2  don't always have to have physical characteristics that are

11:13  3  greater than that of an ordinary Christmas tree, such as higher

11:13  4  pressure rating and larger internal diameter.

11:13  5      And so if you look at Cameron's definition of a frac tree,

11:13  6  you'll notice that it says typically and generally it will have

11:13  7  larger bores and higher pressure ratings.  What does that mean?

11:13  8  It means it doesn't always have to have a larger bore and

11:13  9  higher pressure rating.  It means it could be an ordinary

11:13 10  Christmas tree that you use for fracturing which was consistent

11:13 11  with the practice at the time of the invention as admitted by

11:13 12  Cameron's own expert.

11:14 13      Now, let's look at some other definitions relating to

11:14 14  trees, just for Christmas tree.  As you'll note here, Your

11:14 15  Honor, these definitions don't just limit trees to production

11:14 16  fluids.  They say other fluids.  And that's because it was

11:14 17  known at the time that a tree, an ordinary tree, Christmas

11:14 18  tree, could be used for both fracturing and production.  And

11:14 19  it's actually consistent with the specification.  The

11:14 20  specification specifically teaches that the frac tree in the

11:14 21  patent, that's Element 20, you can produce frac fluids or

11:14 22  production fluids through the tree.

11:14 23      And so, Your Honor, our biggest issue with their proposed

11:14 24  construction that we think is clearly incorrect is that a

11:14 25  fracturing tree has to be a specialized component.  Our

| 11:14 | 1 | position is that a frac tree is simply a tree used for |

11:14  1   position is that a frac tree is simply a tree used for

11:14  2   fracturing.  Could be an ordinary production tree used for

11:14  3   fracturing, could be a specialized tree used for fracturing.

11:14  4   It's not exclusive of one or the other.

11:15  5       And with that, Your Honor, I'll be more than happy to

11:15  6   answer any questions you might have.

11:15  7       THE COURT:  Yes.  Here's my question.  This is one -- you

11:15  8   know, occasionally I'll go through, and I'm not a big fan of

11:15  9   extrinsic evidence, but it occurred to me on several of these

11:15  10  claim terms that in the oil and gas field, for example, there

11:15  11  are claim terms that have a plain and ordinary meaning.  And

11:15  12  the reason I care about that is that when a person is drafting

11:15  13  a patent and they write down -- or in this case a frac -- you

11:15  14  know, a fracking tree or fracturing tree or -- and, you know, I

11:15  15  can go and look up and see that frac tree is part of

11:15  16  Schlumberger's oil field glossary.

11:15  17      In other words, it's -- I worry that, you know, when

11:16  18  someone's writing a patent and they use a claim term not just

11:16  19  for a POSITA but, you know, for people who are in that field

11:16  20  where they will automatically or should know that's something

11:16  21  that's used, absent narrowing it in some way where they say

11:16  22  this is a unique fracturing tree or this is -- or where you're

11:16  23  inventing a kind of fracturing tree where you are narrowing

11:16  24  what it means, I tend to think that plain and ordinary meaning

11:16  25  is appropriate for that or that it's well-known in that field.

11:16   1        What do you think about that?

11:16   2        MR. CABELLO:  Your Honor, if I may.  This is David

11:16   3  Cabello.

11:16   4        THE COURT:  Yes, sir.

11:16   5        MR. CABELLO:  The issue we have here -- and you're going

11:16   6  to see it.

11:16   7        THE COURT:  Mr. Cabello, I'm having a hard time hearing

11:16   8  you, and that may be just because I'm old, but if you could --

11:17   9        MR. CABELLO:  I'll get the speaker up closer, or the mic

11:17  10  up closer, Your Honor.

11:17  11        I think the issue we're going to see here comes when we

11:17  12  get to invalidity positions, because the prior art has used

11:17  13  production trees, Christmas trees and frac trees

11:17  14  interchangeably.  Sometimes fracking is done with a production

11:17  15  tree and sometimes it's done with this specialized tree.

11:17  16        Your proposed construction, and certainly Cameron's

11:17  17  proposal, would permit the argument that, well, gee whiz.

11:17  18  That's a production tree, it's not a frac tree and therefore it

11:17  19  doesn't invalidate this patent.

11:17  20        And I understand that the Court may not be too enamored

11:17  21  with extrinsic evidence, but I don't think we have to look at

11:17  22  extrinsic evidence because the '645 patent -- and this was the

11:17  23  last slide that was used by Mr. Zinda -- clearly shows that a

11:18  24  frac tree can either be used for fracturing fluids or

11:18  25  production fluids.

11:18  1      And so we don't see there is a need to limit what kind of

11:18  2  tree or to talk about a fracturing tree being a specialized

11:18  3  tree.  It can be any kind of tree that is used for -- I'm

11:18  4  sorry -- in a fracturing operation, whether it's production or

11:18  5  fracturing.

11:18  6      And the specification, the intrinsic evidence in this case

11:18  7  clearly permits that a frac tree can either be used in

11:18  8  production or fracturing, therefore no specialized tree.  A

11:18  9  frac tree is just a tree that is used in the fracturing

11:18 10  operations.

11:18 11      THE COURT:  So I'm actually -- this is -- you read me

11:18 12  backwards.  This is actually one where I'm -- and I'm not

11:18 13  usually a big fan of extrinsic evidence, but this is one where

11:19 14  I'm saying the extrinsic evidence seemed to me to be uniform,

11:19 15  that the word "fracturing tree" actually does have a meaning.

11:19 16      MR. CABELLO:  I'm sorry.  You say the fracturing tree

11:19 17  actually has a meaning?

11:19 18      THE COURT:  In other words, it is not interchangeable with

11:19 19  the others, that it actually is -- you know, that people know

11:19 20  that a frac tree is a specific kind of -- a specific product

11:19 21  that's designed for a specific use in fracking.

11:19 22      MR. CABELLO:  Well, Your Honor, I guess I respectfully

11:19 23  disagree.

11:19 24      First of all, there's no need to look at the extrinsic

11:19 25  evidence, because the intrinsic evidence tells us that a frac

11:19   1   tree can be used for either production fluids or fracturing

11:20   2   fluids, first and foremost.

11:20   3         Secondly, the extrinsic evidence supports the intrinsic

11:20   4   evidence because it describes these kinds of trees as generally

11:20   5   having these kinds of fluids.  But it doesn't exclude -- a

11:20   6   production tree doesn't exclude the use of a production tree

11:20   7   for use in fracturing operations.

11:20   8         And so we believe that the extrinsic evidence is certainly

11:20   9   consistent with the intrinsic evidence, and that is that no

11:20   10  specialized tree is required.

11:20   11        THE COURT:  Let me hear a response to that.

11:20   12        MR. LOGAN:  Thank you, Your Honor.  Yes.

11:20   13        The primary dispute here, and I'll share Cameron's slides.

11:20   14  Mr. Zinda laid out -- Mr. Zinda, at the beginning of his

11:20   15  statement, he said, the real dispute between the parties at

11:20   16  this point is does fracturing tree mean some kind of

11:20   17  specialized tree?  And then he said right after that that there

11:21   18  are fracturing trees that are specialized trees that, you know,

11:21   19  have the higher pressure ratings that don't need the tree

11:21   20  savers, that are able to be fractured directly through, that

11:21   21  are distinct from production trees.

11:21   22        And with those two things being true, Cameron's argument,

11:21   23  the gist of it is, the meaning, the use of those very specific

11:21   24  words "fracturing tree" in the claim.  Not oil field tree, not

11:21   25  production tree, that should have some meaning.  It should be

11:21   1   imparted with meaning.

11:21   2       Mr. Cabello argues, well, when we get to invalidity, we

11:21   3   want to be able to read production trees on to fracturing

11:21   4   trees, because you could fracture through a production tree as

11:21   5   well.

11:21   6       But that's exactly the point, Your Honor.  The patentee

11:21   7   here chose a more specific component, a fracturing tree.  Not a

11:21   8   standard Christmas tree, not a production tree.  If

11:21   9   Mr. Cabello's premise was correct that, you know, Cameron is

11:21   10  arguing you can only fracture through a fracturing tree, there

11:21   11  would be no need for a dispute.  But that's not what Cameron's

11:22   12  saying.  Cameron's never disputed that you can't fracture

11:22   13  through a production tree.

11:22   14      Cameron's dispute, Cameron's position is that fracturing

11:22   15  tree, as Your Honor mentioned, has a specific meaning in this

11:22   16  field.  And that when the patentee used that term, it should be

11:22   17  respected as being towards that special meaning, not towards

11:22   18  more general meaning like Christmas tree or production tree.

11:22   19      And Your Honor's right that here the extrinsic evidence is

11:22   20  helpful, because this is a term that's understood in the art.

11:22   21  For instance, in showing that clip from the Schlumberger oil

11:22   22  field glossary, Mr. Zinda focused on the end of it where it

11:22   23  talks about maybe some have bigger bores, maybe some don't.

11:22   24      Notably, it says some have bigger bores and higher

11:22   25  pressure ratings.  It may be correct that some just have a

11:22  1    normal size bore but still have higher pressure ratings.

11:22  2          But it's the first sentence that Mr. Zinda omits, which is

11:22  3    that it's a Christmas tree installed specifically for the

11:23  4    fracturing process.  And then once we accept that premise that

11:23  5    there are these specialized Christmas trees, all the rest of

11:23  6    the extrinsic evidence makes sense.

11:23  7          On Slide 47 we have here Dr. Wooley who gives his opinion

11:23  8    that a fracturing tree is a specific type of Christmas tree

11:23  9    installed specifically for the fracturing process.

11:23  10         Now, no doubt Nitro will tell you, that's our expert, and

11:23  11   they don't agree with him.  The problem is, Nitro had their own

11:23  12   expert during the IPR, John Ely.  On Slide 47 it's John Ely's

11:23  13   opinion about what a fracturing tree is.  John Ely was not

11:23  14   equivocal.  This term has a generally accepted meaning in the

11:23  15   field.  Specifically, a fracturing tree, also called a frac

11:23  16   tree or frac stack, is a specific type of Christmas tree.

11:23  17         And that wasn't just Mr Ely's opinion.  Nitro adopted it

11:23  18   as well, very specifically.  A fracturing tree or frac tree is

11:24  19   a specific type of Christmas tree.  All of this --

11:24  20         Yes, Your Honor?

11:24  21         THE COURT:  Keep that slide up there for a second.  And if

11:24  22   I could hear -- I think it was Mr. Zinda who was arguing.

11:24  23         So, Mr. Zinda, what if, as my construction, I just take

11:24  24   exactly what you said in your petition, a fracturing or frac

11:24  25   tree is a specific type of Christmas tree installed

11:24  1    specifically for the fracturing process.  I literally -- if I

11:24  2    quote what your client said it was during the IPR.

11:24  3        MR. ZINDA:  Yes, Your Honor.  I think the one thing that

11:24  4    we want to have clarified is that if you took an ordinary tree

11:24  5    and you installed it for a fracturing job, that tree is a frac

11:24  6    stack.  That's a frac tree.  That's our position, Your Honor.

11:24  7    It is not dependent on physical characteristics of the tree.

11:24  8        And of course if you put a tree in a well and you fracture

11:24  9    it, it was installed for fracking.  It wouldn't be there if you

11:24  10   hadn't specifically intended for it to be there for fracking.

11:25  11       Now, might it also be used for production?  Yes.  A

11:25  12   production tree is used primarily for production.  But there

11:25  13   are operators out there that go, well, I don't want to go buy a

11:25  14   really expensive tree that's got all these specialized

11:25  15   characteristics like higher pressure rating or higher -- a

11:25  16   greater flow passage.  I would rather just frac through my

11:25  17   production tree and just let the production tree wear out a

11:25  18   little bit faster.

11:25  19       So we don't think -- we think they're taking our expert's

11:25  20   quote here and saying that that means that the tree's got to

11:25  21   have special physical characteristics.  What our expert was

11:25  22   saying is the tree that you --

11:25  23       THE COURT:  Well, let me interrupt you there, because even

11:25  24   in what you just said, if it were a production tree, you said

11:25  25   it might still be a fracturing tree if it was installed

11:25  1   specifically for the fracturing process, which is all -- which
11:25  2   is what you say here.  And I would argue that the preliminary
11:26  3   construction we gave is a fracturing tree is not an ordinary
11:26  4   production tree and one that is used specifically for the
11:26  5   fracturing process.  I mean, it seems to me a fracturing tree
11:26  6   is one that is used specifically for the fracturing process.
11:26  7        MR. ZINDA:  Your Honor, I believe we agree with that.  I
11:26  8   guess -- maybe this will help clarify the issue that we have
11:26  9   with their construction and kind of the way we think that
11:26  10  they're trying to take our former expert's testimony, is that
11:26  11  if you are looking, for example, Your Honor, at a piece of
11:26  12  prior art that has a tree, and the reference tells you that
11:26  13  they're fracking through the tree, our view is that that is a
11:26  14  fracturing tree.  Whether it is also -- whether it's an
11:26  15  ordinary tree that's used for production or whether it's a
11:26  16  higher-rated tree that's primarily focused on fracturing,
11:26  17  that's where the rub is that we have is we think if there's a
11:26  18  tree and you're fracturing through it, that is a fracturing
11:27  19  tree.
11:27  20       THE COURT:  If you all will hold on for just a second.
11:27  21       (Pause in proceedings.)
11:27  22       THE COURT:  Okay, gentlemen.  I think the Court's
11:28  23  preliminary construction is correct.  The Court's final
11:28  24  construction is going to be -- for "fracturing tree" and
11:28  25  "fracturing trees" is going to be a fracturing tree is not an

11:28  1  ordinary production tree and is one used specifically for the

11:28  2  fracturing purpose.

11:28  3      And my understanding, but someone can correct me if I'm

11:28  4  wrong, that is all the claim terms you all wanted to take up

11:28  5  today; is that correct?  Anyone can jump in.

11:28  6      MR. KEVILLE:  That is all for Cameron, Your Honor.

11:28  7      THE COURT:  Okay.  And I'm assuming for everyone else.  If

11:28  8  I'm wrong, Mr. Cabello or --

11:28  9      MR. CABELLO:  That's all for Nitro.

11:28  10     THE COURT:  Okay.

11:28  11     MR. HENRY:  Your Honor, I -- oh, I'm sorry.

11:28  12     THE COURT:  No.  Go, please, Mr. Henry.

11:28  13     MR. HENRY:  I just had a quick question.  Ordinarily at

11:28  14  the end of your constructions on "one and only" and "single" I

11:28  15  might have asked for a clarification of exactly what plain and

11:28  16  ordinary meaning means.  But as I understood, I just wanted to

11:28  17  be sure I was correct, that what you're suggesting is when we

11:29  18  exchange our infringement and invalidity submissions in the

11:29  19  future, that may raise that issue, and we may have a chance to

11:29  20  come back and request that clarification if it appears

11:29  21  necessary.

11:29  22     THE COURT:  That was the first claim term we took up?

11:29  23     MR. HENRY:  Yes, Your Honor.  The one and only rigid

11:29  24  fluid --

11:29  25     THE COURT:  Yes.

11:29  1          MR. HENRY:  -- pathway and the single fluid conduit.

11:29  2          THE COURT:  You are correct.  I'm sorry, Mr. Henry.  Yes.

11:29  3     You are correct.  If when you exchange your expert reports on

11:29  4     that claim term and the experts have substantially differed in

11:29  5     their analysis of what the claim term means as its plain and

11:29  6     ordinary meaning, let me know.  We'll have a mini -- I'll look

11:29  7     at what each expert did.  I'll determine which is correct.  And

11:29  8     someone's expert report will not be coming in.

11:29  9          MR. HENRY:  Thank you, Your Honor.

11:29  10         THE COURT:  So have we set a trial date?

11:30  11         MR. HENRY:  I don't believe we have, Your Honor.

11:30  12         MR. KEVILLE:  No, Your Honor.

11:30  13         THE COURT:  Okay.  Give me just a second.  I'll check with

11:30  14    my law clerks and we'll come up with one.  Give me one second.

11:30  15         (Pause in proceedings.)

11:32  16         THE COURT:  Ladies and gentlemen, we're back on the

11:32  17    record.

11:32  18         I'm told that we are free for trial on August 23rd of next

11:32  19    year.  That's when we'll be setting the trial.

11:32  20         MR. KEVILLE:  Your Honor, this is John Keville for

11:32  21    Cameron.  We have two cases here.  Is Your Honor combining the

11:32  22    two cases for one trial, or is it going to be consecutive?

11:32  23         THE COURT:  Thank you for asking.  No.  We will not be

11:32  24    combining them for trial.  But we will -- they'll be both set

11:32  25    on that date and we'll figure out which one will go first,

11:32  1   assuming neither settles.  As we get closer, we'll figure
11:32  2   out -- and we'll do the pretrial hearings at the same time.
11:32  3       MR. KEVILLE:  Understood.  Thank you.
11:32  4       THE COURT:  And for those of you who have not been in
11:32  5   trial with me, you should plan on having a seven-person jury.
11:32  6   I give four strikes per side.  You'll be doing your voir dire
11:32  7   in front of the magistrate judge the Thursday or Friday before
11:33  8   the trial starts.  He typically asks questions for about an
11:33  9   hour in a very robust manner.  And then you'll each have 30 to
11:33 10   45 minutes to do voir dire as well.
11:33 11       I could see -- and I could also see in this case, if both
11:33 12   cases are still going to trial, we may pick both juries at the
11:33 13   same time.  I mean, we'll -- seriatim, but we may pick them on
11:33 14   the same day.  We'll get a bigger panel and we'll pick two
11:33 15   juries, and then we'll start with one trial, and when it ends,
11:33 16   we'll start with the next trial.
11:33 17       And so you should anticipate on a two-patent case
11:33 18   somewhere between 13 to 15 hours per side.
11:34 19       That's about all I can think of.  If you have any
11:34 20   questions off the top of your head, I'm happy to answer them.
11:34 21       MR. KEVILLE:  None for plaintiff, Your Honor.  Thank you
11:34 22   for that guidance.
11:34 23       THE COURT:  Mr. Cabello?
11:34 24       MR. CABELLO:  Your Honor, and the 13 to 15 hours per side
11:34 25   does not include the voir dire.  Does it include the opening

11:34   1   and closing statements?

11:34   2         THE COURT:  It does not include the voir dire, it does not

11:34   3   include the opening, it does not include the closing.

11:34   4         MR. CABELLO:  Thank you, Your Honor.

11:34   5         THE COURT:  Thank you for asking.  I should have said

11:34   6   that.

11:34   7         And so I typically give about 30 minutes for opening,

11:34   8   about 30 minutes for closing per side.  I'm not sitting there

11:34   9   with a stopwatch.  I just think that's about the best time and,

11:34   10  you know, if you're somewhere in that neighborhood, you're

11:34   11  going to be fine.

11:34   12        Anything else we can -- hopefully by the time we try the

11:34   13  case, we'll have no Plexiglas® in my courtroom.  And no masks.

11:34   14  But who knows?

11:34   15        MR. KEVILLE:  Let's hope.

11:34   16        THE COURT:  Anything else we can take up today?

11:35   17        MR. KEVILLE:  Not for plaintiff, Your Honor.

11:35   18        THE COURT:  Okay.  Get us your counterproposals on that

11:35   19  one claim term as quickly as possible, just so -- for y'all's

11:35   20  sake more than mine.  As soon as you get them to us, we'll get

11:35   21  a ruling out pretty quickly on that.  You should anticipate an

11:35   22  order on -- a complete order on the Markman sometime within

11:35   23  about a month.

11:35   24        And so having -- and also just so you know, because this

11:35   25  came up yesterday, the ten months to trial is a little shorter

11:35  1   than what is in the Court's standard time.  So you're going to

11:35  2   have to get together knowing when the trial date is and work

11:35  3   from there backwards to figure out your appropriate trial

11:35  4   dates, you know, discovery and exchange and everything.

11:35  5       If for some reason you can't work out what those dates

11:36  6   are, that's fine.  You have to protect your clients.  If you

11:36  7   can't work those dates out, call Evan and let me know and I'll

11:36  8   help you out with that as well on a quick hearing by phone.

11:36  9       Have a good Friday.  Thanks to everyone for being here.

11:36  10  Thanks to the -- I don't know if they were younger people or

11:36  11  just more junior people, I don't know.  Everyone's younger than

11:36  12  me on this call, so it doesn't matter.  But to those people who

11:36  13  argued, I thought you did a very fine job.  Have a good weekend

11:36  14  and be safe.

15       (Hearing adjourned at 11:36.)

16

17

18

19

20

21

22

23

24

25

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS      )

3

4         I, Kristie M. Davis, Official Court Reporter for the

5    United States District Court, Western District of Texas, do

6    certify that the foregoing is a correct transcript from the

7    record of proceedings in the above-entitled matter.

8         I certify that the transcript fees and format comply with

9    those prescribed by the Court and Judicial Conference of the

10   United States.

11        Certified to by me this 19th day of October 2020.

12
                              */s/ Kristie M. Davis*
13                            KRISTIE M. DAVIS
                              Official Court Reporter
14                            800 Franklin Avenue
                              Waco, Texas 76701
15                            (254) 340-6114
                              kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25